# EXHIBIT A

# LEASE

PORT OF LONGVIEW, Lessor

and

EGT DEVELOPMENT, LLC, Lessee

Dated: June 1, 2009

Premises at the Port of Longview, County of Cowlitz, State of Washington

3053672

## TABLE OF CONTENTS

**Page**

**ARTICLE 1**

**DEFINITIONS**

Section 1.1          Definitions ................................................................................................ 2

**ARTICLE 2**

**DEMISE**

Section 2.1          Demise of Premises and Appurtenances ..................................................... 7

Section 2.2          Other Rights within the Port ....................................................................... 10

Section 2.3          Relocation at Lessee's Request .................................................................. 10

Section 2.4          Relocation at Lessor's Request ................................................................... 11

Section 2.5          Dedication ................................................................................................... 11

**ARTICLE 3**

**TERM**

Section 3.1          Term ............................................................................................................ 11

Section 3.2          Options to Extend Term .............................................................................. 12

Section 3.3          Meaning of Term ......................................................................................... 12

Section 3.4          Confirmations at Completion Date .............................................................. 12

**ARTICLE 4**

**RENT AND CONTRIBUTIONS**

Section 4.1          Rent ............................................................................................................. 12

Section 4.2          Proration ...................................................................................................... 14

Section 4.3          Site Contribution ......................................................................................... 14

Section 4.4          Dock Contribution ....................................................................................... 15

Section 4.5          Place of Payment ......................................................................................... 15

Section 4.6          Inspection and Audit .................................................................................... 15

**ARTICLE 5**

**PAYMENT OF IMPOSITIONS**

Section 5.1          Payment of Impositions ............................................................................... 15

Section 5.2          Place of Payment ......................................................................................... 16

Section 5.3          Right to Contest Impositions ....................................................................... 16

i

Section 5.4          Lessor Payment of Accrued Impositions ................................................. 16

**ARTICLE 6**

**LESSOR WARRANTIES**

Section 6.1          Warranty of Title ......................................................................................... 17

Section 6.2          Warranty of Environmental Condition ....................................................... 17

Section 6.3          Warranty of Labor ....................................................................................... 18

Section 6.4          Warranty of Permits .................................................................................... 18

Section 6.5          Covenant of Security ................................................................................... 18

Section 6.6          Covenant of Quiet Enjoyment ..................................................................... 18

**ARTICLE 7**

**DEVELOPMENT, OPERATION AND MAINTENANCE BY LESSEE**

Section 7.1          Lessee Projects ............................................................................................ 19

Section 7.2          Improvements .............................................................................................. 19

Section 7.3          Control of Construction ............................................................................... 19

Section 7.4          Discharge of Mechanic's Liens .................................................................. 19

Section 7.5          Permitted Use .............................................................................................. 20

Section 7.6          Compliance with Laws and Permits ........................................................... 20

Section 7.7          Maintenance of Improvements .................................................................... 20

Section 7.8          Dangerous Conditions and Hazardous Materials ....................................... 20

Section 7.9          Security ........................................................................................................ 20

Section 7.10         Improvement Allowance ............................................................................. 21

**ARTICLE 8**

**DEVELOPMENT, OPERATION AND MAINTENANCE BY LESSOR**

Section 8.1          Port Projects ................................................................................................ 21

Section 8.2          Control of Construction ............................................................................... 21

Section 8.3          Discharge of Mechanic's Liens .................................................................. 21

Section 8.4          Buffer and Set Back Areas .......................................................................... 22

Section 8.5          Operations .................................................................................................... 22

Section 8.6          Compliance with Laws and Permits ........................................................... 23

Section 8.7          Maintenance of Port Projects and Other Port Amenities ........................... 23

Section 8.8          Dangerous Conditions and Hazardous Materials ....................................... 24

Section 8.9          Security ........................................................................................................ 24

**ARTICLE 9**

**UTILITIES; EASEMENTS**

Section 9.1          Payment of Public Utility Charges.................................................25

Section 9.2          Easements...................................................................................25

**ARTICLE 10**

**INSURANCE**

Section 10.1         Lessee Insurance.........................................................................26

Section 10.2         Lessor Insurance.........................................................................26

**ARTICLE 11**

**DAMAGE OR DESTRUCTION**

Section 11.1         Casualty Involving Improvements.................................................27

Section 11.2         Casualty Involving Docks and Port Amenities...............................27

**ARTICLE 12**

**CONDEMNATION**

Section 12.1         Temporary Taking by Eminent Domain.........................................28

Section 12.2         Total Taking of Whole or Affecting Whole by Eminent Domain.............28

Section 12.3         Substantial Taking Not Affecting Whole.......................................28

**ARTICLE 13**

**SUBLEASES AND ASSIGNMENTS**

Section 13.1         Assignments and Subleases.........................................................29

Section 13.2         Notification to Lessor...................................................................29

**ARTICLE 14**

**MORTGAGING THE LEASEHOLD AND THE IMPROVEMENTS**

Section 14.1         Mortgages...................................................................................29

Section 14.2         Right of Mortgagee to Cure Defaults............................................30

**ARTICLE 15**

**INDEMNIFICATION**

Section 15.1         Indemnification of Lessor.............................................................30

Section 15.2         Indemnification of Lessee.............................................................30

Section 15.3         Survival.......................................................................................31

3053672

**ARTICLE 16**

**DEFAULT BY LESSEE**

Section 16.1        Bankruptcy or Insolvency ................................................................31

Section 16.2        Default in Performance ..................................................................31

Section 16.3        Default in Payment of Rent ............................................................32

Section 16.4        Notices of Default..........................................................................32

Section 16.5        Mitigation .......................................................................................32

**ARTICLE 17**

**DEFAULT BY LESSOR**

Section 17.1        Default in Performance ..................................................................32

Section 17.2        Notices of Default..........................................................................33

**ARTICLE 18**

**HOLDING OVER**

Section 18.1        Rights upon Holding Over .............................................................33

**ARTICLE 19**

**SURRENDER**

Section 19.1        Surrender .........................................................................................33

Section 19.2        Vesting of Remaining Improvements upon Termination ...............33

**ARTICLE 20**

**ESTOPPEL CERTIFICATES**

Section 20.1        Estoppel Certificates .....................................................................33

**ARTICLE 21**

**NOTICES**

Section 21.1        Manner of Making Notices.............................................................34

Section 21.2        Notices to Mortgagees ...................................................................35

Section 21.3        When Notice Deemed Given..........................................................35

**ARTICLE 22**

**ADJACENT PROPERTY**

Section 22.1        Leases of Adjacent Property...........................................................35

Section 22.2        No Conflict......................................................................................35

Section 22.3        No Use of Railroad Tracks or Other Improvements .....................35

Section 22.4        Limited Use of Adjacent Property .................................................35

3053672

Section 22.5         Access to Adjacent Property ........................................................36
Section 22.6         Stormwater from Adjacent Property.........................................36
Section 22.7         Reports .........................................................................................37

**ARTICLE 23**

**RIGHT OF FIRST REFUSAL FOR ADJACENT PROPERTY**

Section 23.1         Right of First Refusal ................................................................37
Section 23.2         Notice of Proposed Sale or Lease .............................................37
Section 23.3         Exercise or Waiver of Right of First Refusal ........................37
Section 23.4         Effect of Rejection or Termination ..........................................37

**ARTICLE 24**

**RIGHT OF FIRST REFUSAL FOR DEMISED PREMISES**

Section 24.1         Right of First Refusal ................................................................38
Section 24.2         Notice of Proposed Sale or Lease .............................................38
Section 24.3         Exercise or Waiver of Right of First Refusal ........................38
Section 24.4         Effect of Rejection or Termination ..........................................39
Section 24.5         Survival ........................................................................................39

**ARTICLE 25**

**RIGHT OF ACCESS FOR REMOVAL OF IMPROVEMENTS**

Section 25.1         Surplus Improvements................................................................39
Section 25.2         Surplus Access Easement .........................................................40
Section 25.3         Exercise of Access and Removal Rights ..................................41
Section 25.4         Survival ........................................................................................41

**ARTICLE 26**

**MOST FAVORED NATIONS** ..................................................................................41

**ARTICLE 27**

**MISCELLANEOUS**

Section 27.1         Covenants to Run with the Land ..............................................41
Section 27.2         Memorandum of Lease ...............................................................41
Section 27.3         Invalidity of Provisions .............................................................42
Section 27.4         Remedies Cumulative; Remedies Not Waived .......................42
Section 27.5         Time of the Essence ...................................................................42
Section 27.6         Modification ................................................................................42

v

Section 27.7        Interpretation ...................................................................................42

Section 27.8        Singular and Plural .............................................................................42

Section 27.9        Captions and Recitals..........................................................................42

Section 27.10       Law .......................................................................................................43

Section 27.11       No Joint Venture..................................................................................43

**ARTICLE 28**

**CONDITIONS**

Section 28.1        Conditions to Effectiveness ................................................................43

Section 28.2        Termination...........................................................................................43

Section 28.3        Effectiveness........................................................................................44

**ARTICLE 29**

**EXHIBITS AND ADDENDUM TO LEASE**

Section 29.1        Exhibits and Addendum to Lease.......................................................44

| | |
|---|---|
| EXHIBIT A | LAND |
| EXHIBIT B | DEMISED PREMISES |
| EXHIBIT C | APPURTENANCES |
| EXHIBIT D | PERMITTED ENCUMBRANCES |
| EXHIBIT E | ADJACENT PROPERTY/BUFFER AND SET BACK AREAS |
| EXHIBIT F | PORT/PORT LAYOUT |
| EXHIBIT G | DISCLOSURES |
| EXHIBIT H | FACILITY |
| EXHIBIT I | LESSEE PROJECTS |
| EXHIBIT J | PORT PROJECTS |
| EXHIBIT K | DOCK CONSTRUCTION |
| ADDENDUM | FORM OF ACKNOWLEDGMENT OF COMMENCEMENT DATE, COMPLETION DATE AND INITIAL TERM |

3053672

# LEASE

THIS LEASE, made and entered into as of the 1st day of June, 2009, by and between PORT OF LONGVIEW, a municipal corporation and political subdivision of the State of Washington (hereinafter sometimes referred to as "Lessor"), and EGT DEVELOPMENT, LLC, a limited liability company formed under the laws of the State of Delaware (hereinafter sometimes referred to as "Lessee").

WITNESSETH:

WHEREAS, Lessor, as a public port district organized and existing under the laws of the State of Washington, is authorized to acquire, lease, construct, improve and develop harbor and other improvements, including transfer, receiving, handling, storage, processing, terminal and shipping facilities within the boundaries of the Port of Longview; and

WHEREAS, Lessor, as a public port district organized and existing under the laws of the State of Washington, finds it necessary to expand and enhance the infrastructure of the Port of Longview, including additional berth and dock improvements and multi-modal transportation improvements, in order to optimize development opportunities within the Port of Longview and on surrounding industrial and other commercial properties, and in order to improve the public services and amenities available at the Port of Longview; and

WHEREAS, Lessor, acting through the Port Commission of the Port of Longview and in accordance with applicable law, has determined that it is in the best interests of the Port of Longview and the general public that facilities within the boundaries of the Port of Longview be leased to Lessee and that infrastructure within the boundaries of the Port of Longview and on surrounding industrial and other commercial properties be used by Lessee, to construct, develop, use and operate such facilities as and for agricultural products transfer, receiving, handling, storage, processing, terminal and shipping purposes, as well as accessory and related purposes; and

WHEREAS, Lessor, acting through the Port Commission of the Port of Longview and in accordance with applicable law, has further determined that the rentals expressly specified herein are adequate to provide Lessor a fair return on its investment in such facilities and the infrastructure within the boundaries of the Port of Longview and on surrounding industrial and other commercial properties, and that such rentals constitute the maximum attainable by Lessor for the leasing of and provision of rights in such facilities and such infrastructure as set forth herein; and

WHEREAS, Lessor, acting through the Port Commission of the Port of Longview and in accordance with applicable law, has further determined that the leasing of and provision of rights in such facilities and such infrastructure, on and subject to the terms and conditions set forth herein, are consistent with the Comprehensive Scheme of Harbor Improvements and Industrial Developments for the Port of Longview Port District as amended (the "Comprehensive Plan"), and that these arrangements are in the best interests of the Port of Longview and the general public;

NOW, THEREFORE, for and in consideration of the rent hereinafter provided, and for and in consideration of the mutual agreements herein set forth and for other good and valuable consideration, Lessor hereby leases and Lessee hereby takes the premises herein described as the Premises, upon and subject to the terms and conditions herein set forth, for the term herein stated, as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1    Definitions.   The underscored terms set forth below shall have the respective meanings indicated for purposes of this Lease:

Adjacent Property.  The term "Adjacent Property" means the parcels of land depicted and legally described in Exhibit E-1 hereto.

Adjacent Property Leases.  The term "Adjacent Property Leases" means the leases, licenses, permits or use agreements of or with respect to all or any portions of the Adjacent Property, defined as such and set forth in Article 22 hereto.

Appurtenances.  The term "Appurtenances" means the easements, rights, hereditaments and other appurtenances now or hereafter appurtenant to the Demised Premises, defined as such and set forth in Article 2.

Barge Dock.  The term "Barge Dock" means the barge unloading slip and related Improvements constructed and installed on the Port Property, referenced as such in Section 8.1 and described in Exhibit K hereto.

Buffer Areas.  The term "Buffer Areas" means the buffer areas, referenced as such and set forth in Section 8.4, including "Buffer Area No. 1", "Buffer Area No. 2", and "Buffer Area No. 3", as defined and set forth in Section 8.4 and depicted and legally described in Exhibits E-2A, E-2B and E-2C hereto.

Cap.  The term "Cap" means an amount, which shall initially be the sum of $870,000.00, but which sum shall be subject to reduction in the event that, at any time and from time to time, all or any portion of the Adjacent Property shall be sold or conveyed by Lessor (including any transfer of title or interest in the Adjacent Property or any portion of the Adjacent Property, other than a leasehold estate in, license of, or permit or other right to use the Adjacent Property or any portion of the Adjacent Property pursuant to the Adjacent Property Leases or pursuant to any lease to Lessee); and effective as of the date of any such sale or conveyance, the sum then applicable as the Cap shall be reduced by the amount of $7,981.00 per acre (prorated for partial acres) so sold or conveyed.

Commencement Date.  The term "Commencement Date" means the date on which the term of the Lease commences, defined as such and set forth in Article 3.

2

Completion Date. The term "Completion Date" means the date of substantial completion of the Lessee Projects and commencement of operation of the Facility, as such date shall be established as set forth in Section 7.1.

CPI. The term "CPI" means the consumer price index -- All Items, All Urban Consumers, Portland – Salem Average, published by the U.S. Department of Labor Bureau of Labor Statistics (1982-84 : 100). If the CPI shall no longer be published or cannot be adjusted, then another index generally recognized as authoritative shall be substituted therefor by Lessor, and the term "CPI" shall refer to such substituted index.

Demised Premises. The term "Demised Premises" means the Land and the Improvements thereon, within the areas depicted on Exhibit B hereto, which shall be subject to the exclusive possession of Lessee.

Dock/Berth Access Area. The term "Dock/Berth Access Area" means the area defined as such and set forth in Section 2.1(b) and depicted within the areas designated as the "Dock Access Easement & Berth Access Easement" in Exhibit C-1 hereto.

Dock Completion. The term "Dock Completion" means the date when Lessor's work on the Ship Dock and the Barge Dock is sufficiently complete to allow Lessee to commence Lessee's completion thereof.

Dock Contribution. The term "Dock Contribution" means the contribution, defined as such and set forth in Section 4.4.

Early Termination Date. The term "Early Termination Date" means the date on the 30th anniversary of the Commencement Date, defined as such in Section 3.1.

Effective Date. The term "Effective Date" means the date on which all conditions to the effectiveness of this Lease shall have been satisfied (or waived in writing by Lessee), as set forth in Article 28.

Environmental Claims. The term "Environmental Claims" means any and all present and future administrative, regulatory, equitable or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violations, investigations or proceedings relating in any way to Hazardous Materials or any Environmental Laws and permits under any such Environmental Laws.

Environmental Laws. The term "Environmental Laws" means any and all present and future federal, state and local laws (whether under common law, statute, rule, regulation, policy, guideline or otherwise), judicial or administrative order, consent decree or judgment, requirements under permits, and other requirements and interpretations of governmental authorities relating to the environment, or to any Hazardous Substance or to any activity involving Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq., as amended ("CERCLA"), the Hazardous Materials Transportation Act, 49 U.S.C. 5101 et seq., the Resource Conservation and Recovery Act, as amended 42 U.S.C. 6901 et seq. ("RCRA"), the Federal Water Pollution Control Act, 33 U.S.C. 1251 et seq., the Clean Air Act, 42 U.S.C. 7401 et seq., the Toxic

3

Substance Control Act, as amended, 15 U.S.C. 2601 et seq., the Occupational Safety and Health Act, 29 U.S.C. 651 et seq., and the Safe Drinking Water Act, 42 U.S.C. 300f through 300j, as all of the foregoing may be amended or supplemented at any time or from time to time.

Facility. The term "Facility" means the export facility for Products to be handled by Lessee at the Demised Premises, including unloading and loading operations through a system of storage silos, shipping bins and conveyors onto vessels at the Ship Dock, as described in more detail in Exhibit H hereto.

Footprint. The term "Footprint" means that portion of the area of the Land, expressed in acres, physically occupied by those Improvements consisting of above ground portions of Lessee's installations of buildings, structures, poured foundations, silos, rail tracks, elevators, conveyors and pavement within the Land, determined as set forth in Exhibit I-1 hereto; provided, that in no event shall the Footprint include any unpaved (including areas covered by gravel, chat or sand) areas, even if the same may at any time or from time to time be used for vehicular or pedestrian access, parking or otherwise, any areas under wires or lines, or any areas under roof overhangs or similar structural overhangs.

Force Majeure. The term "Force Majeure" means causes or events beyond the reasonable control of a party from which an obligation is due or against which an obligation is to be enforced, including the following: acts of God, strikes, lockouts or other industrial disturbances; acts of public enemies; orders or restraints of any kind of the government of the United States or of the State of Washington or any of their departments, agencies, subdivisions or officials, or any civil or military authority; insurrections; riots; landslides; volcanoes; icebergs; typhoons; tornadoes; adverse weather conditions; tidal waves; earthquakes; fires; storms; droughts; floods; explosion; or accident to facilities; but not including the payment of money.

Hazardous Materials. The term "Hazardous Materials" means any chemical, compound, material, mixture, living organism or substance that is now or hereafter defined or listed in, or otherwise classified pursuant to, any Environmental Laws as a hazardous substance, hazardous material, hazardous waste, extremely hazardous waste, infectious waste, toxic substance, toxic pollutant or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, flammability, explosiveness, corrosivity, reactivity, carcinogenicity or toxicity, including any petroleum, polychlorinated biphenyls ("PCBs"), radon, natural gas, natural gas liquids, liquefied natural gas or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas), radioactive material, urea formaldehyde foam insulation, asbestos, PCBs, or any other substances the remediation or removal of which is required, or the manufacture, preparation, production, generation, use, maintenance, treatment, storage, transfer, handling or ownership of which is restricted, prohibited, regulated, penalized by or subject to any Environmental Laws.

Impositions. The term "Impositions" means the taxes, assessments and other rates, levies and governmental charges, defined as such and set forth in Section 5.1.

Improvement Allowance. The term "Improvement Allowance" means the expenditures for enhancements, maintenance, repairs or replacements to the Demised Premises, defined as such and set forth in Section 7.10.

4

3053672

Improvements.  The term "Improvements" means the buildings, structures and other improvements constructed or installed on the Land by Lessee as part of the Lessee Projects and the Ship Dock (excluding, however, the in-water structures comprising the Ship Dock), and the Barge Dock, and the improvements, fixtures and facilities constructed or installed within the Appurtenances by Lessee as part of the Lessee Projects (including the shiploaders and other above-water improvements comprising part of the Ship Dock but not the in-water improvements comprising part of the same, and including the Barge Dock), as well as any future additions, accessions, replacements, or alterations to any of the same, and any fixtures attached to the same or otherwise located in, on or about the same; provided, however, the term "Improvements" shall exclude the Port Projects, shall further exclude the water and stormwater improvements dedicated pursuant to Section 2.5 (such exclusion effective from and after such dedication), and the term "Improvements" shall further exclude any other improvements dedicated to public utilities at any time or from time to time pursuant to Section 2.5 (such exclusion also effective from and after such dedication).

Initial Term.  The term "Initial Term" means the period on and from the Completion Date until the 50th anniversary of the Commencement Date, defined as such in Section 3.1.

Land.  The term "Land" means the parcels of land described in Exhibit A hereto and the easements, rights, hereditaments and other appurtenances now or hereafter appurtenant to such parcels.

Lease Year.  The term "Lease Year" means the successive one-year periods during the term of this Lease beginning on January 1st and ending on December 31st, corresponding to calendar years, except (i) the first Lease Year, which, unless beginning on January 1st, shall be less than a one-year period during the term of this Lease and which shall commence on the Completion Date, and (ii) the last Lease Year, which, unless ending on December 31st, shall be less than a one-year period during the term of this Lease and which shall end on the date of expiration or earlier termination of this Lease.

Lessee.  The term "Lessee" means the Lessee named herein, and any person, firm, or other legal entity to whom or to which Lessee's interest in this Lease shall be assigned.

Lessee's Equipment.  The term "Lessee's Equipment" means the inventory, removable trade fixtures, machinery or equipment located on the Land or within the Improvements, which belong to Lessee or third parties, and which are not legally incorporated into the Premises as fixtures.

Lessee Projects.  The term "Lessee Projects" means the improvements constructed and installed on or about the Premises, defined as such and described in Section 7.1 and Exhibit I-1 hereto.

Lessor.  The term "Lessor" means the Lessor named herein and any person, firm, or other legal entity who or which shall succeed to Lessor's legal and equitable fee simple title to the Land (any such successor to be conclusively deemed to have assumed the obligations of "Lessor" herein by virtue of such succession).

Mortgage.  The term "Mortgage" means any indenture of mortgage, deed of trust to a trustee, mortgage, or other instrument in the nature thereof creating a lien on or other security interest in Lessee's title, estate and interest in the Improvements and in Lessee's leasehold estate and interest in the remainder of the Premises or any part thereof, and any and all related security agreements, conditional assignments and financing statements.

Permitted Encumbrances.  The term "Permitted Encumbrances" means the encumbrances defined as such and described in Exhibit D hereto.

Port.  The term "Port" means the Port of Longview, Washington, generally depicted with respect to its current (as of the date of this Lease) boundaries on Exhibit F hereto, operated as a full-service operating port on the Columbia River, offering marine terminal services, cargo vessel operations for bulks, breakbulks, forest products, steel, heavy lifts and project cargo, environmental permitting assistance, and rail and truck access, as the boundaries of the same may be modified from time to time consistent with duly authorized amendments of the Comprehensive Plan.

Port Projects.  The term "Port Projects" means those portions of the Barge Dock and the Ship Dock and those other improvements constructed and installed on the Port Property, defined as such and described in Section 8.1 and Exhibit J hereto.

Port Property.  The term "Port Property" means the parcels of land from time to time comprising the Port, and the easements, rights, hereditaments and other appurtenances now or hereafter appurtenant to such parcels.

Premises.  The term "Premises" means the Demised Premises and the Appurtenances.

Pre-Completion Term.  The term "Pre-Completion Term" means the period from the Commencement Date until the Completion Date, as defined and set forth in Section 3.1.

Products.  The term "Products" means grain (including feed grain, dried distillers grain and wheat) and grain byproducts, oilseed and oilseed byproducts, and meal (including soybean meal) and solubles, and similar products and byproducts.

Renewal Terms.  The term "Renewal Terms" means the renewal periods, defined as such and set forth in Section 3.2, including the "First Renewal Term" and the "Second Renewal Term", as defined and set forth in Section 3.2.

Rent.  The term "Rent" means the rental, defined as such and set forth in Section 4.1.

Set Back Areas.  The term "Set Back Areas" means the set-back areas, defined as such and set forth in Sections 7.2 and 8.4 and depicted and legally described in Exhibit E-2D hereto.

6

Site Contribution. The term "Site Contribution" means the contribution, defined as such and payable as set forth in Section 4.3.

Ship Dock. The term "Ship Dock" means the dock and related in-water improvements and above-water Improvements constructed and installed on the Port Property, referenced as such in Section 8.1 and described in Exhibit K hereto.

Subject Adjacent Property. The term "Subject Adjacent Property" means the property defined as such and determined as set forth in Section 23.2.

Subject Adjacent Property Notice. The term "Subject Adjacent Property Notice" means the notice defined as such and set forth in Section 23.2.

Subject Property. The term "Subject Property" means the property defined as such and determined as set forth in Section 24.2.

Subject Property Notice. The term "Subject Property Notice" means the notice defined as such and set forth in Section 24.2.

Surplus Access Easement. The term "Surplus Access Easement" means the easement, defined as such and set forth in Section 25.2.

Surplus Improvements. The term "Surplus Improvements" means the interests in the Improvements, including any reversionary interests in the Improvements, defined as such and set forth in Section 25.1.

Wharfage Agreement. The term "Wharfage Agreement" means the Wharfage Agreement by and between Lessor and Lessee, dated of even date with this Lease, as the same may be amended from time to time.

ARTICLE 2

DEMISE

Section 2.1   Demise of Premises and Appurtenances.   Lessor hereby leases to Lessee the Premises, possession of which shall be delivered by Lessor to Lessee on or no later than the Effective Date, including the following:

(a)   Exclusive possession of and rights to the Demised Premises comprising the same, depicted in Exhibit B hereto, and the Improvements thereon; and

(b)   Exclusive or non-exclusive (as the case may be) easements, rights, hereditaments and other appurtenances on or to the Land (the "Appurtenances"), described more fully in Exhibit C hereto and generally located as depicted on Exhibit C hereto and the Improvements thereon, for the construction, development, use and operation of the Facilities and Improvements, and including the following:

7

(i)      Dock access and use rights, including the preferential use of the Ship Dock and the trestle to the Ship Dock and other Improvements thereon, and exclusive use of the Barge Dock, the right to use the in-water improvements comprising part of the Ship Dock, the right to construct the above-water Improvements on and above the in-water improvements comprising part of the Ship Dock, the right to construct the Improvements comprising the Barge Dock, the right to access and use the Ship Dock and the Barge Dock and the Improvements thereon, and the right to construct, maintain and use pavement, utilities, foundations, trestles, elevators, conveyors and support bents and structures for trestles and elevators and conveyor facilities connecting to and on the Ship Dock and the Barge Dock in the areas shown on Exhibit C-1 hereto and depicted thereon as the "Dock/Berth Access Area"; as used in this Lease with respect to the Ship Dock, the trestle to the Ship Dock and Berth 9 of the Port, the term "preferential" shall mean exclusive and priority use by or at the direction of Lessee.

(ii)      Berth access and use rights, including the non-exclusive use of Berth 8 of the Port and the preferential use of Berth 9 in the areas shown on Exhibit C-1 hereto and depicted thereon as the "Dock/Berth Access Area", for purposes of berthing or mooring vessels, at the Ship Dock or the Barge Dock, including for purposes of maneuvering barges and tugboats in berthing or mooring vessels on the Ship Dock or the Barge Dock and for other purposes associated with the construction, maintenance or use of the Facility or the Improvements.

(iii)      River access and use rights, mooring rights and dredging rights, including the non-exclusive right to dredge at and around the Barge Dock and, if the Port shall fail in its obligations to dredge on and around the Ship Dock and alongside Berth 9, the non-exclusive right to dredge on and around the Ship Dock and alongside Berth 9.

(iv)      Road access and use rights, including the non-exclusive use of the access roadways for ingress to and egress from the Premises as delineated on Exhibits C-2A, C-2B and C-2C hereto.

(v)      Rail access and use rights, including the non-exclusive use of the rail access and, for rail staging and access, the rail spur delineated on Exhibit C-3 hereto, and the exclusive use of all rail lines within the Demised Premises, including the exclusive use of the rail lines on the portion of the Land located on the dike, including the right to construct, maintain and use tracks and other components and facilities of the rail lines.

(vi)      Dike and shoreline access and use rights, including non-exclusive access over and on the portions of the dike between the Land and the waterline of the Columbia River, including the right to construct, maintain and use pavement, utilities, foundations, trestles and conveyors and support bents and structures for trestles and conveyor facilities.

8

(vii)   Easements for electricity, steam and other power services and utilities, including the electrical easements and connections within the areas designated as the "Utility Easement" as delineated on Exhibit C-4A hereto.

(viii)   Easements for natural gas, including the natural gas easements and connections within the areas designated as the "Utility Easement" as delineated on Exhibit C-4A hereto.

(ix)   Easements for telephone, cable, fibre optic lines, and other data and communications systems and equipment, including the telephone easements and connections within the areas designated as the "Utility Easement" as delineated on Exhibit C-4A hereto.

(x)   Easements for water, including the loop water easements and connections delineated on Exhibits C-4A and C-4B hereto.

(xi)   Easements for sanitary sewer, including the sanitary sewer easements and connections within the areas designated as the "Utility Easement" as delineated on Exhibit C-4A hereto.

(xii)   Easements for stormwater and surface water collection, detention and discharge, including the stormwater easements and detention area rights and discharge rights and easements delineated on Exhibit C-5A, C-5B, C-5C, C-5D and C-5E hereto.

(xiii)   Easements for lateral support along and under the remainder of the Port Property abutting the Demised Premises, including the non-exclusive easements for the sublateral support areas delineated on Exhibit C-6 hereto.

(xiv)   Temporary access easements, including non-exclusive temporary access easements, for and during construction activities during the period and in the areas shown on Exhibit C-7A hereto, and non-exclusive temporary staging, sloping and construction licenses for and during such activities in the areas shown on Exhibit C-7B hereto.

(xv)   Non-exclusive rights and blanket easements for utilities, emergency access, temporary construction access (including for use of cranes and staging or otherwise) and maintenance on and over such portions of the Land and the remainder of the Port Property as may at any time or from time to time be owned by or under the control of Lessor or dedicated to public use and operated as part of the Port or appurtenant to the Port.

These Appurtenances are hereby granted by Lessor to Lessee, its successors and assigns, as easements, rights, hereditaments and appurtenances for and to the Demised Premises, including the Land, under and subject to this Lease, for the term of this Lease, and these Appurtenances and this grant of these Appurtenances shall include the right to install,

maintain (including maintenance, repair, replacement and removal) and use Improvements and Lessee's Equipment, including structures, foundations, poles, pipes, lines and other equipment and facilities, as may be reasonably necessary or accessory to the use and enjoyment of the same; provided that Lessor reserves the right, at such times as not required for preferential and exclusive use of the Ship Dock and/or Berth 9 by or at the direction of Lessee, for Lessor, under Lessor's control and direction and subject to Lessor's assumption of responsibility and risk, to use or permit the use of the Ship Dock, the trestle to the Ship Dock and/or Berth 9 for the berthing and mooring of vessels, staging and other non-exclusive uses associated with management of traffic on the river and at the Port, except that (x) before any such non-preferential use of the Ship Dock and/or Berth 9, Lessor shall coordinate with Lessee in order to assure the period of such non-preferential use shall not conflict with Lessee's operation of the Facility and Lessee's preferential and exclusive use of the Ship Dock and/or Berth 9, and (y) Lessor shall, in any event, cease such non-preferential use period and clear the Ship Dock, the trestle to the Ship Dock and the Dock/Berth Access Area of any vessels and activities associated with such non-preferential use at any time designated by Lessee for Lessee's preferential and exclusive use of the Ship Dock, the trestle to the Ship Dock and/or Berth 9; provided further that any activities associated with Lessee's rights involving berthing or mooring or maneuvering of barges and tugboats in connection with berthing or mooring on the north side of the Barge Dock within the areas shown on Exhibit C-1 within the "Dock/Berth Access Area" shall not require any vessel berthed or moored at Berth 8 of the Port to yield to such activities; and provided further that Lessee's nonexclusive use of the Port facilities on Berth 8 shall be subject to the from time to time rules and tariffs, if any, to be determined and applied on a non-discriminatory basis consistent with the rules and tariffs applied by Lessor to other users of Berth 8 and the Port.

TO HAVE AND TO HOLD the Premises unto Lessee and its successors and assigns, from the Commencement Date and continuing thereafter for the term of this Lease.

Section 2.2   Other Rights within the Port.   Lessor hereby further grants to Lessee for the term of this Lease, a non-exclusive right to use all roads and other common facilities from time to time owned by or under the control of Lessor or dedicated to public use and operated as part of the Port or appurtenant to the Port, for ingress and egress to and from the Premises, including all entrances, exits, driveways, parking areas, loading areas, walks, bridges, tunnels, streets and service drives necessary or convenient for the development, use and operation of the Facility and the Premises, unless and except only to the extent committed to the exclusive use of any of other owners or occupants of property within the Port.

Section 2.3   Relocation at Lessee's Request. Lessor agrees to relocate or reconfigure the Appurtenances at any time and from time to time upon the request of Lessee, and at the cost of Lessee, to accommodate the overall operation of the Facility and otherwise in a manner that does not materially interfere with the operation and use of the Port Property.  In such event, Lessee shall furnish to Lessor a written request for any such relocation or reconfiguration, accompanied by a form of amendment prepared by Lessee and reasonably satisfactory to Lessor and Lessee, whereupon Lessor and Lessee shall promptly amend this Lease to reflect such relocation or reconfiguration.

10

Section 2.4    Relocation at Lessor's Request. Lessee agrees to the relocation or reconfiguration of the access roadway delineated on Exhibit C-2B hereto at any time and from time to time upon the request of Lessor, and at the cost of Lessor, in a manner that does not materially interfere with the operation and use of the Facility. In such event, Lessor may furnish to Lessee a written request for any such relocation or reconfiguration, accompanied by a form of amendment prepared by Lessor and reasonably satisfactory to Lessor and Lessee, whereupon Lessor and Lessee shall promptly amend this Lease to reflect such relocation or reconfiguration.

Section 2.5    Dedication. Upon Lessee's completion of the construction of the Improvements constituting portions of the loop water system and located within the water easement delineated on Exhibit C-4B hereto, such loop water system improvements shall be dedicated to Lessor and, thereafter, shall be dedicated by Lessor to the City of Longview and will thereafter be maintained by the City of Longview as a public utility. Upon Lessee's completion of the construction of the Improvements constituting portions of the stormwater system and located within the within the stormwater easements delineated on Exhibit C-5A, C-5B, C-5C, C-5D and C-5E hereto in compliance with all federal, state and local laws and codes and all railroad regulations and safety standards (including depth, distance, clearance and use requirements), such stormwater improvements shall be dedicated to Lessor and, thereafter, such stormwater improvements shall no longer constitute Improvements but instead shall be owned and be maintained by Lessor as a Port amenity in accordance with Section 8.7. Upon Lessee's completion of the construction of the pipes and culverts for stormwater located underneath Lessee's rail tracks as provided in Section 22.6 in compliance with all federal, state and local laws and codes and all railroad regulations and safety standards (including depth, distance, clearance and use requirements), such pipes and culverts shall be dedicated to Lessor and, thereafter, such pipes and culverts shall no longer constitute Improvements but instead shall become part of Lessor's stormwater system and shall be owned and maintained by Lessor in accordance with Section 22.6. At Lessee's option, at any time other utility improvements shall be dedicated to the applicable public utility, and at the request of Lessee, Lessor agrees to join in such dedication and, thereafter, such other utility improvements shall no longer constitute Improvements but instead shall be owned and maintained by the applicable public utility accepting the dedication.

ARTICLE 3

TERM

Section 3.1    Term. The "Commencement Date" of the term of this Lease shall be the date on which Lessor delivers possession of the Premises to Lessee, which date shall be on the Effective Date, and which date shall be memorialized in a written acknowledgment by Lessee and Lessor and shall be incorporated into the memorandum of Lease referenced in Section 27.2. The term of this Lease shall run on and from the Commencement Date until the Completion Date (such period, the "Pre-Completion Term"), and then the term shall continue on and from the Completion Date until that date which is 50 years after the Commencement Date (such period, the "Initial Term"), subject to extension as provided in Section 3.2, but provided that the term of this Lease shall terminate prior to the end of the Initial Term on that date which is 30 years after the Commencement Date (such date, the "Early Termination Date") unless Lessee shall, at its option, elect to cancel the termination of the term of this Lease otherwise

11

scheduled to occur on the Early Termination Date and instead continue the term of this Lease through and beyond the Early Termination Date until the end of the Initial Term (i.e. until the 50th anniversary of the Commencement Date). In order to exercise the option to elect to cancel the termination of the term of this Lease otherwise scheduled to occur on the Early Termination Date and instead continue the term of this Lease until the end of the Initial Term, Lessee must so notify Lessor in writing not later than the first day of the Lease Year in which the Early Termination Date is scheduled to occur, which notice from Lessee to Lessor shall be binding and conclusive.

Section 3.2   Options to Extend Term.   Lessee shall have two successive options to extend the term of this Lease (the "Renewal Terms"), the first for a period of 5 years beyond the Initial Term (the first such 5-year extension period, the "First Renewal Term"), and the second for a period of 25 years beyond the First Renewal Term (the second such 25-year extension period, the "Second Renewal Term"). In order to exercise the option to extend for the First Renewal Term, Lessee must so notify Lessor in writing not later than the first day of the last Lease Year of the Initial Term, which notice from Lessee to Lessor shall be binding and conclusive; failure of Lessee to exercise such option to extend the term for the First Renewal Term shall automatically extinguish the option to extend for the Second Renewal Term. In order to exercise the option to extend for the Second Renewal Term, Lessee must so notify Lessor in writing not later than the first day of the last Lease Year of the First Renewal Term, which notice from Lessee to Lessor shall be binding and conclusive. Any rejection or termination of this Lease under (and in accordance with) the provisions of Sections 16.1, 16.2 or 16.3 shall end the "term" of this Lease and shall result in the extinguishment of any then remaining option(s) to extend under this Section 3.2.

Section 3.3   Meaning of Term.   The word "term" as used in this Lease shall mean, unless the context otherwise requires, the Pre-Completion Term, the Initial Term (subject, as may be applicable, to termination prior to the end of the Initial Term on the Early Termination Date, unless Lessee shall otherwise notify Lessor of Lessee's election to cancel the termination of the term of this Lease otherwise scheduled to occur on the Early Termination Date and instead to continue the term of this Lease until the end of the Initial Term as set forth in Section 3.1) and the Renewal Terms (including as may be applicable, the First Renewal Term and the Second Renewal Term).

Section 3.4   Confirmations at Completion Date.   Promptly upon the Completion Date, at the written request of either Lessor or Lessee, Lessee shall complete, and both parties shall execute, the Acknowledgment in the form set forth in the Addendum to this Lease, acknowledging, inter alia, the Completion Date.

ARTICLE 4

RENT AND CONTRIBUTIONS

Section 4.1   Rent.   Lessee covenants to pay to Lessor, as a rental for the Premises, payable monthly in advance, on the Commencement Date of this Lease and on the first business day of each month thereafter until the end of the term of this Lease, the following (the "Rent"):

12

(a)      During the Pre-Completion Term, the sum of $135,576 per annum ($11,298 per month).

(b)      On and from the Completion Date, the sum of $384,132 per annum ($32,011 per month), provided that the Rent shall be subject to adjustment every 10th anniversary of the first day of the Lease Year first following the Completion Date during the Initial Term and, if applicable, the Renewal Terms, in each case determined as follows:  if there shall have been any increase or decrease in the CPI since the date of the previous adjustment date under this subsection (b) of Section 4.1 (or, in the case of the initial adjustment date on the 10th anniversary of the first day of the Lease Year first following the Completion Date, since the Completion Date), the Rent shall be adjusted and Lessee shall pay to Lessor an adjusted Rent on such adjustment date and until the next such adjustment date (or, until the expiration or earlier termination of the Lease, if sooner), such adjusted Rent to be determined by adding to or subtracting from the Rent then payable the product of such Rent and the percentage increase or decrease, if any, in the CPI over the 10 year adjustment period then ending (subject to a maximum increase or decrease of 25% for any 10 year adjustment period), and the adjusted Rent, so determined, shall thereafter be payable by Lessee in equal monthly installments as otherwise provided for with respect to the payment of Rent, but subject in any event to adjustment and reduction of Rent in any Lease Year as may be necessary to reflect a maximum aggregate obligation for Rent in any Lease Year in the amount of the Cap, during the Initial Term or any Renewal Terms.

(c)      On and after the Completion Date, the Rent as then determined and applicable under subsection (b) of this Section 4.1 may be subject to further adjustment on the last day of any Lease Year based upon, and in the event there shall have occurred, installation or removal of Improvements within the boundaries of the Land resulting in a change, by way of increase or decrease, in the Footprint of the Improvements within the Land by one acre or more in the aggregate, in each case determined as follows: if in any Lease Year there shall have occurred installation or removal of Improvements within the Land, the net and aggregate effect of which is an increase or a decrease by one acre or more in the Footprint of the Improvements within the Land after such installation or removal since the date of the previous adjustment date under this subsection (c) of Section 4.1 (or, in the case of the initial adjustment date hereunder, an increase or decrease by one acre or more as compared with the 37.66 acres assumed to constitute the initial Footprint of the Improvements within the Land), and if by such last day of such Lease Year such increase or decrease by one acre or more in the Footprint shall have been certified by an independent civil engineering firm selected as set forth in Exhibit I-3 hereto, such certification shall have been prepared in accordance with the methodology set forth in Exhibit I-3 hereto, and such certification shall have been delivered to both parties pursuant to the procedures for identifying and certifying to any such change in the Footprint and for requesting any such adjustment in Rent as set forth in Exhibit I-3 hereto, the Rent shall be adjusted on such last day of such Lease Year to be effective on the first day of the immediately following Lease Year, and Lessee shall pay to Lessor an adjusted Rent on such adjustment date and until any such next adjustment date (or until the expiration or earlier termination of the Lease, if sooner), such adjusted Rent to be determined in the case of an aggregate increase in such Footprint of one acre or more by

13

adding to the Rent then payable on a per annum basis an amount equal to the product of $10,200 and the acreage of the net and aggregate increase in such Footprint (and on a monthly basis an amount equal to the product of $850 and the acreage of the net and aggregate increase in such Footprint), and such adjusted Rent to be determined in the case of an aggregate decrease in such Footprint of one acre or more by subtracting from the Rent then payable on a per annum basis an amount equal to the product of $10,200 and the acreage of the net and aggregate decrease in such Footprint (and on a monthly basis an amount equal to the product of $850 and the acreage of the net and aggregate decrease in such Footprint), and the adjusted Rent, so determined, shall thereafter be payable by Lessee in equal monthly installments as otherwise provided with respect to the payment of Rent, but subject in any event to adjustment and reduction of Rent in any Lease Year as may be necessary to reflect a maximum aggregate obligation for Rent in any Lease Year in the amount of the Cap, during the Initial Term or any Renewal Terms.

(d)     After the Completion Date, at any time and from time to time, Lessee may apply the accrued but not yet applied Improvement Allowance or any portion thereof as a credit against Rent as then determined and applicable under subsections (b) and (c) of this Section 4.1, but only to the extent of accrued but not yet applied Wharfage Surplus (as such term is defined in and established under the Wharfage Agreement), which credits and the basis for which credits shall be accounted for as set forth in Section 7.10; and such credit shall be shown on a written statement delivered by Lessee to Lessor at the time of such application, and such credit shall be reflected in an adjustment and reduction of the monthly installment(s) of Rent otherwise payable under subsections (b) and (c) of this Section 4.1.

(e)     The Rent payable under this Section 4.1 for and in respect of any Lease Year during the term of this Lease shall not exceed the amount of the Cap applicable as of the relevant Lease Year, notwithstanding any of the adjustments set forth in subsections (b) and (c) of this Section 4.1 and notwithstanding anything otherwise to the contrary in this Lease, and to the extent necessary to effect this agreement the adjusted Rent under subsections (b) and (c) of this Section 4.1 shall be subject to further adjustment and reduction of Rent in any Lease Year to reflect a maximum aggregate obligation for Rent for such Lease Year in the amount of the Cap, during the Initial Term and any Renewal Terms.

Lessor acknowledges that the Rent constitutes a fair rate of return on the market value of the Land and the Appurtenances, and Lessee acknowledges that the Rent constitutes a fair market rental for the Land and the Appurtenances.

Section 4.2     Proration.   In the event Lessee is obligated to pay Rent for a month which is less than a full calendar month, the installment of Rent shall be prorated on the basis the number of days in such month bears to the total number of days in the calendar month in respect of which such payment shall be due.

Section 4.3     Site Contribution.   Lessee agrees to pay to Lessor, as a contribution and reimbursement for Lessor's costs associated with the site assemblage necessary for this Lease (the "Site Contribution"), payable on the Effective Date only upon the satisfaction

14

of the conditions set forth in Section 28.1, the sum of $1,798,180. Lessor agrees, however, to refund to Lessee the amount of the proceeds or the reasonably-estimated value/cost savings, net of royalties paid under the Agreement for Deposit, Sale and Use of State-Owned Dredged Material by and between the State of Washington Department of Natural Resources and Lessor, recorded March 4, 2005, in Auditor's File No. 3251040, from on-site sand sold or moved off Port Property (except if moved to other Port Property or other qualifying public property) from time to time by Lessor, up to maximum aggregate refund of $500,000 (comprising part of the Site Contribution), such refund to be made by means of payment by Lessor to Lessee within 30 days of receipt of such proceeds or savings, but in no event more than 30 days after completion of the sand removal pursuant to paragraph 1 of Exhibit J hereto.

Section 4.4   Dock Contribution.   Lessee agrees to pay to Lessor, as a contribution and reimbursement for a portion of Lessor's costs associated with the construction of the in-water improvements comprising part of the Ship Dock under this Lease (the "Dock Contribution"), payable at the times, and on and subject to the terms and conditions set forth in, Exhibit K hereto, the sum of $1,240,800.

Section 4.5   Place of Payment.   All rentals and contributions payable hereunder shall be paid to Lessor at the address set forth at Section 21.1, unless Lessee is otherwise instructed in writing by Lessor.

Section 4.6   Inspection and Audit.   Lessor shall keep and maintain within the Port Property accurate books and records pertaining to this Lease, including information on the collections of Lessor and the services to be performed by Lessor hereunder.  If any leasehold excise or similar taxes shall be applicable under this Lease, Lessor shall provide Lessee a separate written statement listing such taxes in conformity with, and within time limitations required under, applicable laws and codes.  During the term and for a period of three years thereafter, Lessor shall permit Lessee or Lessee's authorized representatives, at Lessee's expense and upon reasonable written advance notice, access during regular business hours to examine and audit those books and records.  Any such inspections and audits shall be scheduled during normal business hours, and shall be conducted in a manner to minimize the disruption of Lessor's normal business operations.  The provisions of this Section 4.6 shall, as applicable, survive the expiration or earlier termination of this Lease.

ARTICLE 5

PAYMENT OF IMPOSITIONS

Section 5.1   Payment of Impositions.   Lessor warrants that Lessor, with respect to the Land and the remainder of the Port Property, is exempt from property taxes; Lessor and Lessee acknowledge, however, that Lessee and the Demised Premises may be subject to taxes, levies, assessments, water rates, and other governmental charges to the extent not part of real property taxes on the Land and the remainder of the Port Property.  Lessee agrees to pay, before any fine, penalty, interest or cost may be added thereto for the non-payment thereof (except as specifically provided otherwise in Section 5.3), any such taxes, levies, assessments, water rates, and other governmental charges (which taxes, levies, assessments, water rates, and other governmental charges, including leasehold excise taxes, if any, specifically incidental and

applicable to the payment of Rent and the payment of the Dock Contribution and the Site Contribution, are hereinafter sometimes referred to as "Impositions"), which accrue on or after the Commencement Date, which are assessed, levied, confirmed, imposed or become a legal obligation of Lessee or a lien upon Lessee's interest in the Land or upon Lessee's interest in the Improvements or both, and which become payable during the term of this Lease. The tax bills or copies thereof in respect of such Impositions received by Lessor as owner of record of the Land shall be furnished to Lessee on a timely basis in advance of the due date of any Imposition. Any Imposition relating to a fiscal period of the taxing authority, a part of which is included within the term of this Lease and a part of which is included in a period of time after the expiration of the term of this Lease, shall (whether or not such Imposition shall be assessed, levied, confirmed, imposed or become a lien upon the Land or upon the Improvements or both, or shall become payable, during the term of this Lease) be adjusted as between Lessor and Lessee as of the expiration of the term of this Lease, so that Lessor shall pay an amount which bears the same ratio to such Imposition which that part of such fiscal period included in the period of time after the expiration of the term of this Lease bears to such fiscal period and Lessee shall pay the remainder thereof. With respect to any Imposition which by law is payable, or at the option of the taxpayer may be paid, in installments, Lessor shall pay the installments thereof which become due and payable subsequent to the expiration of the term of this Lease, and Lessee shall pay only those installments which become due and payable during the term of this Lease.

Section 5.2   Place of Payment.  All Impositions payable hereunder shall be paid directly to the relevant payees of such Imposition or, in the case of any leasehold excise tax which shall be required by law to be paid to Lessor, for remittance by Lessor to the applicable state and local governmental entities, in which case Lessor agrees to make such remittance and Lessor agrees to itemize the same on a statement and to prepare and file any forms pertaining to the same along with the remittance of such payment.

Section 5.3   Right to Contest Impositions.  Lessee shall have the right to contest the amount or validity of any Imposition by appropriate legal proceedings, but this shall not be construed in any way as modifying Lessee's covenant to pay such Imposition at the time and in the manner as so provided unless the legal proceedings shall operate to prevent the collection of the Imposition so contested and, with respect to any such contested Imposition, the sale of the Premises or any part thereof to satisfy the same. Any such contest may be made in the name of Lessor or Lessee, or both, as Lessee shall determine, and Lessor agrees to cooperate reasonably with Lessee in any such contest. Lessee shall be entitled to any refund of any Imposition and penalties or interest thereon which have been paid by Lessee or which have been paid by Lessor and for which Lessor has been fully reimbursed.

Section 5.4   Lessor Payment of Accrued Impositions.  Lessor shall pay and be responsible for all Impositions, if any, accruing prior to the Commencement Date of the term of this Lease. In the event Lessee shall make payment of any Impositions for the calendar year in which such Commencement Date occurs, Lessor shall pay to Lessee, on demand, its pro-rated obligation for such Impositions on the basis of the number of days in such calendar year elapsed from January 1st to such Commencement Date.

16

ARTICLE 6

LESSOR WARRANTIES

Section 6.1   Warranty of Title.  Lessor warrants that (i) it holds good fee simple title to the Premises, free and clear of any and all easements, rights of way, restrictions, conditions, covenants, or encumbrances other than the Permitted Encumbrances (none of which, Lessor warrants, could substantially interfere with or impair or result in any substantial interference with or impairment of Lessee's development of the Lessee Projects in the locations depicted on Exhibit I-2 hereto or Lessee's use and operation of the Premises in accordance with the terms of this Lease), and free and clear of all liens, and (ii) no subdivision, replatting or other action is required under applicable subdivision, building and zoning laws, ordinances, rules, regulations and requirements of all federal, state and municipal governments and the appropriate departments, commissions, boards and officers thereof, in order for Lessor to demise and grant to Lessee the estate, interest and rights herein demised and granted with respect to the Demised Premises, including the Land, and with respect to the Appurtenances, and (iii) no consents or approvals are required under the Permitted Encumbrances, with respect to the Appurtenances, or otherwise.

Section 6.2   Warranty of Environmental Condition.  Lessor warrants that (a) except only as expressly set forth on Exhibit G-1 hereto, no Hazardous Materials are present on, in or under, or are emanating from, the Premises or the Adjacent Property, and no threatened or actual release, spill or discharge of any Hazardous Materials has occurred on, in or under the Premises or the Adjacent Property, and no Hazardous Materials have been at any time generated, used, treated or stored on, in or under, or transported to or from, the Premises or the Adjacent Property, or on adjacent property that might migrate onto the Premises or the Adjacent Property, (b) no part of the Premises or the Adjacent Property contains any underground storage tanks or vessels of any kind which are not in compliance with Environmental Laws, (c) there is no friable asbestos or asbestos containing material on, in or under the Premises, or the Adjacent Property, (d) neither the Premises nor the Adjacent Property is listed in the National Priorities List or the Comprehensive Environmental Response Compensation and Liability Information System promulgated pursuant to CERCLA or similar state lists or laws, (e) neither the Premises nor the Adjacent Property has been used to treat or store or dispose of materials regulated under RCRA, nor has the Premises or the Adjacent Property been subject to RCRA interim status or required to obtain an RCRA permit or permit application, (f) there are no pending or threatened Environmental Claims against Lessor or, to the knowledge of Lessor, any predecessor in title relating to the Premises or the Adjacent Property, and (g) all documents, records and information of any kind within the possession or control of Lessor and relating to the warranties in this Section 6.2 have been, and shall continue to be for the term of this Lease and for a period of three years thereafter, made available to Lessee.  Without limiting the generality of the foregoing, Lessor warrants with respect to the Premises that Lessor has undertaken all appropriate inquiry pursuant to 40 C.F.R. Part 312 (and any similar requirements under state law) in an attempt to qualify Lessor and Lessee for liability defenses under CERCLA and/or the Model Toxics Control Act, including the innocent purchaser defense and bona fide prospective purchaser defense (or similar defenses under state law), and Lessor covenants to undertake any further or ongoing obligations necessary to qualify Lessee for any such liability defenses.  The

17

provisions of this Section 6.2 shall, as applicable, survive the expiration or earlier termination of this Lease.

Section 6.3    Warranty of Labor.  Lessor warrants that there are no agreements or restrictions affecting the Port, whether Lessor is a party to the same or otherwise, requiring union labor or prevailing wage compliance (a) in connection with the construction of the Lessee Projects or other Improvements on or about the Premises, or (b) except only as expressly set forth on Exhibit G-2 hereto, in connection with the operation of the Ship Dock and the Barge Dock, the handling of cargo at the Facility and the operation of the Facility.

Section 6.4    Warranty of Permits.  Lessor warrants that Lessor has obtained all permits and governmental licenses necessary in order to lease the Demised Premises to Lessee under the Lease and grant Lessee the rights in the Appurtenances under the Lease, in order to permit the installation, development, construction and use of the Port Projects, and in order to permit Lessee (upon Lessee securing applicable building and occupancy permits and air discharge permits) to install, develop, construct and use as set forth in this Lease those portions of the Lessee Projects (including the above-water structures for the Ship Dock, the Barge Dock, the pavement, utilities, foundations, trestles, elevators, conveyors and support bents and structures for trestles and elevator and conveyor facilities between the dike and the Ship Dock and Barge Dock and on the dike, the tracks and other components and facilities of the rail lines on the dike, and other Lessee Projects) located within the dike right-of-way, within the 200-foot shoreline jurisdiction of the Columbia River or within portions of the Appurtenances outside of such 200-foot shoreline jurisdiction, including any SEPA (State Environmental Policy Act) checklist compliance and filing of a SEPA amendment, HPA (Hydraulic Project Approvals), and any shoreline, USCOE (United States Army Corps of Engineers), PATN (Private Aids to Navigation), stormwater (but only with respect to acceptance, detention and discharge of stormwater within the Port's stormwater system including the detention ponds, the log pond and other elements), and other permits required by United States Coast Guard, Washington Department of Fish and Wildlife, Cowlitz County, Washington, Consolidated Diking District No. 1 of Cowlitz County, or other agencies or authorities.

Section 6.5    Covenant of Security.  Lessor covenants that Lessor shall at all times provide security for the Ship Dock and the Barge Dock and for Berth 9 in conformity with all national security requirements imposed by the U.S. Department of Homeland Security, the Marine Transportation Security Act and its implementing regulations, and similar or other relevant federal laws and regulations, as well as any applicable state and local security rules and regulations; as used in this Lease, "security" shall include measures designed to safeguard premises and property, to prohibit unauthorized access to property and easements, to protect against espionage, sabotage, damage and theft, and to endeavor to prevent persons or organizations from engaging in activities or using Port properties in a manner that would harm or aid in harming vital interests of the Port of Longview, the State of Washington, or the United States of America.

Section 6.6    Covenant of Quiet Enjoyment.  Lessor covenants that Lessee, on performing its covenants and agreements herein and observing the provisions hereof, shall peaceably and quietly have possession of and enjoy the Premises in accordance with the terms of

18

this Lease, without hindrance or molestation by Lessor or any persons claiming by, through or under Lessor.

## ARTICLE 7

### DEVELOPMENT, OPERATION AND MAINTENANCE BY LESSEE

Section 7.1     Lessee Projects.     Commencing on the Effective Date, Lessee shall commence and thereafter diligently proceed with construction of the Facility as described on Exhibit H and other Improvements described on Exhibit I hereto and comprising the "Lessee Projects", in accordance with the schedule, scope, terms and conditions set forth on Exhibit I-1 hereto, and Lessee shall substantially complete the Lessee Projects and commence operations of the same no later than the date of March 1, 2012, subject to extensions for Force Majeure, subject to extensions for delays caused by Lessor's failure to complete the Port Projects on or before the respective dates as set forth in this Lease, and subject to extensions for delays in issuance of any final occupancy and other required governmental certificates, permits or approvals to Lessee notwithstanding substantial completion of the Lessee Projects in accordance with such schedule (such date, if and as so extended, the "Completion Date").

Section 7.2     Improvements.     Lessee shall have the right, at any time during the term of this Lease, (a) to erect or install upon the Land and use in connection with or as part of the Premises, in addition to the Lessee Projects, other permanent or temporary Improvements on and within any part of the Premises, (b) to erect or install additions to, alterations of, or substitutions or other replacements for the Improvements, and (c) to maintain, rearrange, remodel, otherwise modify the Improvements or to demolish and remove the Improvements; provided that Lessee shall not construct any above-ground structures or utility lines, equipment or other improvements upon or over the area identified in Exhibit E-2D to the Lease (the "Set Back Areas"), such areas to be used only for the installation of equipment and improvements incidental to rail operations, except that Lessee may install, use and operate reasonable above-ground structures or improvements in Set Back Areas for any underground electric lines as well as an RF card reader in Set Back Areas, and otherwise except pursuant to the written consent of Lessor, not to be unreasonably withheld.

Section 7.3     Control of Construction.     The construction, modification or demolition of Improvements shall be done in compliance with applicable building and zoning laws and other laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments and the appropriate departments, commissions, boards and officers thereof, but otherwise shall be under the control of Lessee as to schedule, scope, design, installation and construction.

Section 7.4     Discharge of Mechanic's Liens.     Lessee shall not suffer or permit any mechanic's liens to be filed against the Lessor's title to the Land or against Lessee's interest in the Premises, including the Improvements, by reason of work, labor, services or materials supplied to Lessee or as a result of an agreement with, or the assent of, Lessee.  If any such mechanic's liens shall at any time be filed against the Premises or any part thereof, Lessee shall promptly cause the same to be discharged of record or bonded over as may be necessary to prevent a foreclosure on the Premises or any part thereof to satisfy the same.

3053672

Section 7.5    Permitted Use.  Lessee may use the Premises for agricultural products and byproducts transfer, receiving, handling, storage, processing, terminal and shipping purposes, as well as accessory and related purposes, and for other lawful manufacturing, warehousing, processing, distribution, transportation, industrial and similar purposes.

Section 7.6    Compliance with Laws and Permits.  Lessee shall, throughout the term of this Lease, comply with all laws and ordinances and the orders, rules, regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof (whether or not the same require structural repairs or alterations) which directly or indirectly affect or relate to the development, use and operation of the Port and which may be applicable to the Premises or the construction, development, maintenance, repair or use of the Premises, and maintain, continue, extend and replace (to the extent and as may be required prior to expiration) all permits and governmental licenses required of Lessee or issued to Lessee and necessary for Lessee's construction and development of the Improvements and use and operation of the Improvements within the Premises.

Section 7.7    Maintenance of Improvements.  Lessee shall, throughout the term of this Lease, (a) maintain the Improvements in or on the Land which directly or indirectly affect or relate to the development, use and operation of the Port in safe and sanitary condition, and in good condition and repair (subject to reasonable wear and tear), subject to Section 11.1, and (b) maintain the unimproved portions of the Land in such manner as to provide reasonable weed control and reasonable erosion prevention.

Section 7.8    Dangerous Conditions and Hazardous Materials.  Lessee shall, throughout the term of this Lease, do all things necessary to remove any dangerous condition at any time or from time to time existing on the Premises and caused by Lessee or any of its agents, sublessees, contractors, servants, employees or licensees which directly or indirectly affect or relate to the development, use and operation of the Port, including promptly taking appropriate measures to prevent or repair any erosion, collapse or other unstable condition in the Premises, and Lessee shall exercise due care and reasonable control in the handling, storage, transportation, removal and disposal of any Hazardous Materials on or from the Premises.

Section 7.9    Security.  Lessee shall provide security at the Facility as required by applicable laws and codes, including the Demised Premises, the areas lying between the Land and the Ship Dock and Barge Dock, the Barge Dock and, during Lessee's periods of preferential use of the Ship Dock, the Ship Dock (subject, however, to Lessor's obligations under Section 8.9 to provide security for and around the Ship Dock and the Barge Dock prior to the Dock Completion, Lessor's obligations under Section 8.9 to provide security for and around the Ship Dock during any period of Lessor's non-preferential use of the same, and Lessor's general obligations to provide security for the Ship Dock, the Barge Dock and Berth 9).  Lessee shall be entitled to its from time to time published tariffs and fees assessed on and collected from vessels berthing or mooring at the Ship Dock or the Barge Dock or otherwise using the Facility with respect to such security.  Lessor agrees to cooperate with Lessee so that the development, construction, use and operation of the Facility and the Premises may conform to all national security requirements imposed by the U.S. Department of Homeland Security, the Marine Transportation Security Act and its implementing regulations, and similar or other relevant

20

federal laws and regulations, as well as any applicable state and local security rules and regulations.

Section 7.10   Improvement Allowance.   There shall accrue to Lessee's benefit an allowance (the "Improvement Allowance") which may be applied by Lessee as a credit against payment of Rent as set forth in Section 4.1(d) of this Lease.  The Improvement Allowance shall accrue only by means of expenditures (whether capital items or expenses) for enhancements, maintenance, repairs or replacements that restore, upgrade, improve or extend the useful life or serviceability of the Improvements or Lessee's Equipment located on the Demised Premises and used in connection with the Facility, or that otherwise increase the value of, or add to, the Improvements or fixtures or equipment located on the Demised Premises or on or within the Appurtenances and used in connection with the Facility (by way of example, and without limitation, excluding routine or ordinary operating expenses that do not maintain or contribute, directly or indirectly, to preservation or enhancement of the tax base).  Lessee shall, promptly after the end of each Lease Year, provide Lessor a separate written statement itemizing such expenditures for enhancements, maintenance, repairs or replacements for which Lessee is claiming a credit against Rent pursuant to Section 4.1(d), together with Lessee's computation of the then balance of the Improvement Allowance after adding such expenditures for such Lease Year to the balance of the Improvement Allowance as of the beginning of such Lease Year; and at the time of application of any balance of the Improvement Allowance or any portion thereof as a credit against Rent as set forth in Section 4.1(d) during any Lease Year, Lessee shall furnish Lessor with reasonable documentation detailing such application and the basis therefor.

ARTICLE 8

DEVELOPMENT, OPERATION AND MAINTENANCE BY LESSOR

Section 8.1   Port Projects.   Commencing on the Effective Date, Lessor shall commence and thereafter diligently proceed with construction of those portions of the Ship Dock, the Barge Dock and other improvements described on Exhibit J hereto as the "Port Projects", in accordance with the schedule, scope, terms and conditions set forth on Exhibit J hereto, and Lessor shall complete the Port Projects and make the same available to Lessee for Lessee's commencement of operations on the Premises and at the Ship Dock and the Barge Dock no later than July 31, 2010 (or sooner to the extent specifically so required on Exhibit J hereto).

Section 8.2   Control of Construction.   The construction, modification or demolition of the Port Projects shall be done in compliance with applicable building and zoning laws and other laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments and the appropriate departments, commissions, boards and officers thereof, but otherwise shall be under the control of Lessor as to installation and construction, provided that the prior written approval of Lessee shall be required as to schedule, scope and design.

Section 8.3   Discharge of Mechanic's Liens.   Lessor shall not suffer or permit any mechanic's liens to be filed against the Lessor's title to the Port Property or against Lessee's interest in the Premises, by reason of work, labor, services or materials supplied to Lessor or as a result of an agreement with, or the assent of, Lessor.  If any such mechanic's liens shall at any

21

time be filed against the Port Property or any part thereof, Lessor shall promptly cause the same to be discharged of record or bonded over as may be necessary to prevent a foreclosure on the Port Property or any part thereof to satisfy the same.

Section 8.4    Buffer and Set Back Areas.  Lessor agrees that:

(a)    Lessor shall not construct, maintain or permit any structures, improvements or utility lines, utility equipment or utility improvements under, upon or over the area identified in Exhibit E-2A to the Lease ("Buffer Area No. 1");

(b)    Lessor shall not construct, maintain or permit any structures, improvements or utility lines, utility equipment or utility improvements upon or over the area identified in Exhibit E-2B and to the Lease ("Buffer Area No. 2") or the area identified in Exhibit E-2C and to the Lease ("Buffer Area No. 3"), such areas shall only be used for the construction, use, operation, maintenance and repair of surface roadways and paths, and underground utility lines, utility equipment and utility improvements; and

(c)    Lessor shall not construct, maintain or permit any structures, improvements or utility lines, utility equipment and utility improvements upon or over the Set Back Areas, such areas shall only be used for the installation of equipment and improvements incidental to rail operations, except pursuant to the written consent of Lessee, not to be unreasonably withheld.

Section 8.5    Operations.  Lessor shall operate the Port Projects and the balance of the Port, or shall cause the same to be operated, as and for a Port facility generally, and specifically in a manner providing Lessee with the beneficial use and enjoyment of the Demised Premises and the Appurtenances under the Lease; and without limiting the generality of the foregoing Lessor shall:

(a)    Operate Berth 9, repair and replace any latent or patent defects in the construction of the "in-water" components of the Ship Dock or the Barge Dock which the Port is obligated to construct and install under Section 8.1 or Exhibit J hereto, and maintain portions of the Ship Dock constructed by the Port and the pilings, footings, fender systems, berth docks and other components of the Ship Dock in good condition and repair, and otherwise in accordance with the requirements of this Lease;

(b)    Maintain the water depth alongside Berth 9 at a minimum of -40 feet mean low water (tidal datum) until such time as the Columbia River navigation channel shall be deepened to 43 feet, from and after which time such water depth alongside Berth 9 shall be maintained at a minimum of -43 mean low water (tidal datum); and in the event that the Columbia River navigation channel shall at any time be further deepened, Lessor shall similarly increase and thereafter maintain the water depth alongside Berth 9 to such increased depth;

(c)    Maintain the layout of those portions of the Port between the Demised Premises and the Barge Dock and the Ship Dock, and not withdraw, transfer or encumber any real property from such portions of the Port, or alter any improvements on

22

such portions of the Port in a manner that might have an adverse impact on the operation of the Facility or use of the Premises by Lessee; and

(d)     Operate the Ship Dock during any period of Lessor's non-preferential use of the same under Section 2.1(b)(i) in safe and sound manner, using reasonable and due care, with responsibility for utility charges and maintenance costs applicable to such non-preferential use and for risk of loss from damage from vessels or operations in connection with such non-preferential use (including Lessor's responsibility for any insurance carried by Lessor to be considered primary over any insurance of Lessee with respect to such non-preferential use), and in conformity with the provisions of any tariff which, by mutual agreement of Lessor and Lessee, may apply from time to time to operations in connection with vessels berthing or mooring at the Ship Dock (including provisions on collection and cost recovery procedures for damage by vessels).

In the event of any default by Lessor in the operation or maintenance of the Port Projects and the other Port amenities and facilities as provided in this Section 8.5, notwithstanding anything to the contrary in Section 17.1 hereof if such default shall continue uncured upon notice thereof to Lessor, Lessee may immediately exercise such rights and remedies as may be otherwise permitted in Section 17.1 hereof upon such default by Lessor including proceeding to cure of such default.

Section 8.6     Compliance with Laws and Permits.   Lessor shall, throughout the term of this Lease, comply with all laws and ordinances and the orders, rules, regulations and requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof (whether or not the same require structural repairs or alterations) which directly or indirectly affect or relate to the development, use and operation of the Facility or the Premises and which may be applicable to the Port Property and improvements thereon or the construction, development, maintenance, repair or use of the Port Property and improvements thereon, and maintain, continue, extend and replace (to the extent and as may be required prior to expiration) all permits and governmental licenses required of Lessor or issued to Lessor and necessary in order to lease the Demised Premises to Lessee under the Lease and grant Lessee the rights in the Appurtenances under the Lease, in order to permit the installation, development, construction and use of the Port Projects, and in order to permit Lessee (upon Lessee securing and maintaining, continuing, extending and replacing, as the case may be, applicable building and occupancy permits and air discharge permits) to install, develop, construct and use as set forth in this Lease those portions of the Lessee Projects located within the dike right-of-way, within the 200-foot shoreline jurisdiction of the Columbia River or within portions of the Appurtenances outside of such 200-foot shoreline jurisdiction.

Section 8.7     Maintenance of Port Projects and Other Port Amenities.   Lessor shall, throughout the term of this Lease, maintain the Port Projects and the other Port amenities and facilities in or on the Port Property which directly or indirectly affect or relate to the development, use and operation of the Facility or the Premises in safe and sanitary condition, and in good condition and repair, subject to Section 11.2; and without limiting the generality of the foregoing, Lessor shall:

23

(a)     Maintain the improvements comprising or reasonably necessary for the road access set forth in Section 2.1(b)(iv) and delineated on <u>Exhibits C-2A, C-2B and C-2C</u> hereto in good and passable condition, providing for free and unobstructed ingress and egress over such roads to and from the Demised Premises and Berth 9 and the Ship Dock and Barge Dock (including the avoidance of any stopping or parking of trains across the road connecting with International Way), with a minimum roadway width of 28 feet (two 12-foot lanes with 2-foot recovery zones) to accommodate commercial and industrial traffic and roads and to be constructed in compliance with all local, state and federal laws and regulations and to be used only for the movement of vehicular traffic (by way of example, and without limitation, such roadways shall not be used for any other use, including temporary parking or storage);

(b)     Maintain in good condition and repair, and upon the dedication set forth in Section 2.5, make available to Lessee for the use and enjoyment of Lessee under this Lease, stormwater improvements and system delineated on <u>Exhibit C-5A</u>, <u>C-5B</u>, <u>C-5C</u>, <u>C-5D</u> and <u>C-5E</u> hereto, which stormwater system shall be permitted, maintained and operated in accordance with local, state and federal laws and regulations, and shall be sufficient to accommodate the reasonably anticipated discharge for all rainfall and stormwater events for the Demised Premises and the Adjacent Property, including an assumption of 100% coverage of the Adjacent Property by impervious surfaces; and

(c)     Maintain in good condition and repair, and make available to Lessee for the use and enjoyment of Lessee under this Lease, Lessor's improvements within or part of the Appurtenances, including the in-water improvements comprising the Ship Dock, the pavement and facilities comprising Berth 9, and the rail line and rail spur delineated on <u>Exhibit C-3</u> hereto.

In the event of any default by Lessor in the operation or maintenance of the Port Projects and the other Port amenities and facilities as provided in this Section 8.7, notwithstanding anything to the contrary in Section 17.1 hereof if such default shall continue uncured upon notice thereof to Lessor, Lessee may immediately exercise such rights and remedies as may be otherwise permitted in Section 17.1 hereof upon such default by Lessor including proceeding to cure of such default.

Section 8.8     <u>Dangerous Conditions and Hazardous Materials</u>.  Lessor shall, throughout the term of this Lease, do all things necessary to remove any dangerous condition at any time or from time to time existing on the Port Property (except to the extent caused by Lessee or any of its agents, sublessees, contractors, servants, employees or licensees) which directly or indirectly affect or relate to the development, use and operation of the Facility or the Premises, including promptly taking appropriate measures to prevent or repair any erosion, collapse or other unstable condition in the Port Property, and Lessor shall exercise due care and reasonable control in the handling, storage, transportation, removal and disposal of any Hazardous Materials on or from the Port Property.

Section 8.9     <u>Security</u>.  Lessor shall provide security at the Port as required by applicable laws and codes, including reasonable security lighting at the Ship Dock and the Barge Dock (at Lessor's expense), subject to but in coordination with Lessee's provision of security at

24

the Facility pursuant to Section 7.9; and as part of such security obligations Lessor shall provide security (a) for and around the Ship Dock and the Barge Dock during construction of the in-water structures for the Ship Dock and the Barge Dock until the Dock Completion, (b) for and around the Ship Dock during any period of Lessor's non-preferential use of the same under Section 2.1(b), and (c) for and around the Ship Dock, the Barge Dock and Berth 9.  Lessor shall be entitled to its from time to time published tariffs, assessed on and collected from vessels berthing or mooring at the Ship Dock (but not on vessels or for activities at the Barge Dock) with respect to such security, provided such tariffs shall be determined and applied on a non-discriminatory basis consistent with security tariffs charged by Lessor at other berths of the Port of Longview.  Lessee agrees to cooperate with Lessor so that the development, construction, use and operation of the Ship Dock, the Barge Dock and Berth 9 may conform to all national security requirements imposed by the U.S. Department of Homeland Security, the Marine Transportation Security Act and its implementing regulations, and similar or other relevant federal laws and regulations, as well as any applicable state and local security rules and regulations.

ARTICLE 9

UTILITIES; EASEMENTS

Section 9.1    Payment of Public Utility Charges.  Lessee shall pay or cause to be paid all charges for gas, water, sewer, electricity, light, heat or power, telephone or other communication service used, rendered or supplied upon in connection with the Improvements and also any charges or expenses in connection with any alterations, additions, installations or changes required or desired in connection with the supplying or using of such utilities or services or substitutes therefor throughout the term of this Lease, except only that the Lessor shall provide and pay all charges for equipment and utility costs for lighting of the Ship Dock at all times required by Lessee.  Lessee shall also procure any and all necessary permits, licenses or other authorization required for the lawful and proper installation and maintenance upon the Land and in or on the Improvements of wires, pipes, conduits, tubes and other equipment and appliances for use in supplying any such service to the Premises.  Lessor shall be responsible likewise with respect to the provision of, and payment of the costs of, lighting of the Ship Dock and the Barge Dock.

Section 9.2    Easements.  Lessor agrees, upon request of Lessee at any time and from time to time, to dedicate or join in the grant of new easements and rights of way or alteration of existing easements and rights of way upon, under or over the Premises and the remainder of the Port Property for public utilities, public purposes, access to public facilities, roads and ways, parking and reciprocal easements, provided such dedications or grants are necessary or reasonably beneficial to the development, use or operation of the Facility or the Premises for the uses permitted under Section 7.5, and provided Lessor approves, in advance, of the location, configuration and terms of such grant or alteration of easements, which approval shall not be unreasonably withheld.

25

## ARTICLE 10

### INSURANCE

Section 10.1   Lessee Insurance.   Lessee agrees as follows with respect to insurance:

(a)   Lessee shall, throughout the term of this Lease at Lessee's expense, keep the Improvements insured against loss or damage by fire or other casualty for the benefit of Lessee (and, as additional insureds, such others as Lessee may designate), in such amounts and on such terms and conditions as Lessee may from time to time deem appropriate.

(b)   Lessee shall, throughout the term of this Lease at Lessee's expense, maintain (a) commercial general liability insurance covering claims for personal injury or property damage at the Demised Premises, such insurance to afford combined single limit protection of at least $5,000,000 per occurrence, with general aggregate or umbrella coverage protection of at least $10,000,000, and (b) workers' compensation insurance with coverages and limits required by applicable law.

(c)   Lessee is authorized to adjust and compromise with any insurance company any and all claims and losses under the insurance maintained by Lessee.  No adjustment or compromise shall require the approval of Lessor.  The proceeds of any insurance policy required to be maintained by Lessee under this Lease shall belong to Lessee and shall be payable to Lessee (unless Lessee, in its discretion, otherwise directs in writing).

Section 10.2   Lessor Insurance.   Lessor agrees as follows with respect to insurance:

(a)   Lessor shall, throughout the term of this Lease at Lessor's expense, keep the improvements comprising the Ship Dock insured against loss or damage by fire or other casualty for the benefit of Lessor (and, as additional insureds, such others as Lessor may designate), in such amounts and on such terms and conditions as Lessor may from time to time deem appropriate.

(b)   Lessor shall, throughout the term of this Lease at Lessor's expense, maintain (a) commercial general liability insurance covering claims for personal injury or property damage at the Ship Dock and other Port Property, such insurance to afford combined single limit protection of at least $5,000,000 per occurrence, with general aggregate or umbrella coverage protection of at least $10,000,000, and (b) workers' compensation insurance with coverages and limits required by applicable law.

(c)   Lessor is authorized to adjust and compromise with any insurance company any and all claims and losses under the insurance maintained by Lessor.  No adjustment or compromise shall require the approval of Lessor.  The proceeds of any insurance policy required to be maintained by Lessor under this Lease shall belong to

26

Lessor and shall be payable to Lessor (unless Lessor, in its discretion, otherwise directs in writing).

## ARTICLE 11

## DAMAGE OR DESTRUCTION

Section 11.1    Casualty Involving Improvements.    In the event of loss or damage by fire or other casualty to any Improvements, this Lease shall not terminate and there shall be no abatement in rent by reason thereof, but instead this Lease shall continue in full force and effect.  In such event, Lessee may, at Lessee's option and at Lessee's expense, repair, restore, replace, or demolish the Improvements, and any insurance proceeds of Lessee's policies, if any, shall be paid to and shall belong solely to Lessee and any deficiency between insurance proceeds and the actual cost of repair, restoration, replacement or demolition shall be the risk and liability of Lessee.

Section 11.2    Casualty Involving Docks and Port Amenities.    In the event of loss or damage by fire or other casualty to the Ship Dock, the dike or facilities and improvements lying between the Land and the Ship Dock and Barge Dock, or any other facilities or improvements comprising any of the Appurtenances or lying within the Appurtenances and necessary to the development, construction, use and operation of the Facility or the Premises, or in the event of damage to any of the Improvements on or about the Ship Dock if and to the extent such damage shall be caused to such Improvements by vessels or from operations during any period of Lessor's non-preferential use of the Ship Dock under Section 2.1(b) hereof, this Lease shall not terminate but there shall be abatement in rent hereunder in proportion to the extent of and during the period of any interference with Lessee's use, and otherwise this Lease shall continue in full force and effect.  In such event, Lessor shall, at Lessor's expense, promptly repair, restore and replace or cause to be repaired, restored and replaced, as the case may be, the in-water structures for the Ship Dock, the dike and the other facilities and improvements referenced above in this Section 11.2, and the Improvements on or about the Ship Dock as (and to the extent) referenced above in this Section 11.2 to the condition existing immediately prior to such casualty, and any insurance proceeds of Lessor's policies, if any, shall be paid to and shall belong solely to Lessor and any deficiency between insurance proceeds and the actual cost of repair, restoration and replacement shall be the risk and liability of Lessor.  In the event of any default by Lessor in the repair, restoration and replacement or in causing to be repaired, restored and replaced, as the case may be, the Ship Dock, the dike and the other facilities and improvements as provided in this Section 11.2 or the Improvements on or about the Ship Dock as (and to the extent) provided in this Section 11.2, notwithstanding anything to the contrary in Section 17.1 hereof if such default shall continue uncured upon notice thereof to Lessor, Lessee may immediately exercise such rights and remedies as may be otherwise permitted in Section 17.1 hereof upon such default by Lessor including proceeding to cure such default.

27

ARTICLE 12

CONDEMNATION

Section 12.1   Temporary Taking by Eminent Domain.  If, during the term of this Lease, the temporary use of the whole or any portion of the Premises shall be taken as a result of the exercise of the power of eminent domain, Lessee shall be entitled to the entire compensation and award for any and all damage, loss or injury suffered as a result of such temporary taking, and this Lease shall continue in full force and effect without any abatement of the rental or other payments required to be made by Lessee hereunder; provided, however, that if such temporary use extends beyond the term of this Lease, the compensation and award shall be apportioned between Lessor and Lessee in an equitable manner upon which Lessor and Lessee shall agree, and if Lessor and Lessee shall not be able to agree on such apportionment, such award shall be apportioned between them in an equitable manner by the court or administrative body having jurisdiction over such proceedings as of the date of termination of this Lease.

Section 12.2   Total Taking of Whole or Affecting Whole by Eminent Domain. If, during the term of this Lease, all of the Premises shall be permanently taken as a result of the exercise of the power of eminent domain, or a portion of the Premises shall be taken as a result of the exercise of eminent domain with resulting damages to any Improvements and the award made in such proceedings shall be based on a determination that the portion of such Premises not taken is worthless and cannot practicably be rehabilitated, then this Lease shall on the date of vesting of title in such proceedings terminate.  The total award shall be apportioned between Lessor and Lessee in an equitable manner upon which Lessor and Lessee shall agree, and if Lessor and Lessee shall not be able to agree on such apportionment, such award shall be apportioned between them in an equitable manner by the court or administrative body having jurisdiction over such proceedings.  For purposes of this Section 12.2, if Lessee has already exercised its option to extend the term of this Lease as provided in Section 3.2 or exercises such option within 30 days after the taking by power of eminent domain, then the term of this Lease shall be deemed to be the term, as extended.

Section 12.3   Substantial Taking Not Affecting Whole.  If, during the term of this Lease, a portion of the Premises shall be taken as a result of the exercise of eminent domain with resulting damage to any Improvements and the amount of the award made is based on a determination that the portion of the Premises not so taken is of value and can practicably be rehabilitated, then unless Lessee shall elect, without cost to Lessee and at its option, to cancel this lease and surrender the Premises to Lessor,

(a)   this Lease shall upon vesting of title in such proceedings terminate as to the Premises so taken,

(b)   the total award shall be apportioned between Lessor and Lessee in an equitable manner upon which Lessor and Lessee shall agree, and if Lessor and Lessee shall not be able to agree on such apportionment, such award shall be apportioned between them in an equitable manner by the court or administrative body having jurisdiction over such proceedings,

28

(c)     rentals shall abate from and after vesting of title in such proceedings in the proportion that the area of Premises taken bears to the area of the entire Premises.

For purposes of this Section 12.3, (i) if Lessee has already canceled the termination of the term on the Early Termination Date as provided in Section 3.1 or exercises such election within 30 days after the taking by power of eminent domain, then the term of this Lease shall be deemed the term, as continued, and (ii) if Lessee has already exercised its option to extend the term of this Lease as provided in Section 3.2 or exercises such option within 30 days after the taking by power of eminent domain, then the term of this Lease shall be deemed to be the term, as extended.

## ARTICLE 13

## SUBLEASES AND ASSIGNMENTS

Section 13.1   Assignments and Subleases.   Lessee may assign its interest under this Lease or sublease or license all or any part of the Premises, at any time or from time to time; provided, however, that any subleases or licenses granted by Lessee demising all or any part of the Premises (a) shall be limited to the uses permitted in Section 7.5 and otherwise shall be subject to all the terms and conditions of this Lease and the rights of Lessor hereunder, and (b) shall, at the option of Lessor, terminate upon the termination of this Lease, whether by the passage of time or otherwise (unless and except to the extent Lessor shall, at its option, agree otherwise pursuant to the provisions of a non-disturbance and attornment agreement with the relevant sublessee or licensee).

Section 13.2   Notification to Lessor.   Lessee shall, promptly after making any assignment of this Lease, or after subletting the Premises as a whole or substantially as a whole, deliver to Lessor notification of such assignment or sublease, together with the business address of the assignee or sublessee thereunder.

## ARTICLE 14

## MORTGAGING THE LEASEHOLD AND THE IMPROVEMENTS

Section 14.1   Mortgages.   Lessee is hereby given the right, at any time and from time to time, to mortgage its interest in the Premises, including both its leasehold estate and interest in the Land and its title, estate and interest to the Improvements, by one or more Mortgages; provided, however, (a) that no holder of any such Mortgage or anyone claiming by, through or under such holder shall by virtue thereof acquire any greater rights in the Premises or any portion thereof than Lessee then shall have had under this Lease, and (b) that any such Mortgage shall be subject and subordinate to all conditions and covenants of this Lease and to the rights of Lessor hereunder, and shall not encumber Lessor's fee simple title to the Land.  In the event of a foreclosure or disposition in lieu of foreclosure of any such Mortgage, the holder thereof (or its assignee or purchaser at foreclosure) shall promptly cure any existing or accrued defaults of the Lessee hereunder.

Section 14.2   <u>Right of Mortgagee to Cure Defaults</u>.   If the interest and title of Lessee in the Premises shall from time to time be encumbered by the lien of a Mortgage by Lessee and if Lessor shall be notified in writing of such Mortgage, then, so long as such Mortgage shall continue in force and until a foreclosure sale thereof, notice of default in the performance of the covenants of this Lease (as is required to be given to Lessee under Article 16 hereof) shall simultaneously be given to the record holder of said Mortgage, and such holder shall have the right, within the period of 60 days thereafter, to take such action or to make such payment as may be necessary to cure any such default to the same extent and with the same effect as though done by Lessee, before Lessor shall have the right to declare default hereunder and exercise any of the remedies set forth in Article 16; provided, however, that in the event such default is of a nature that it cannot be cured within said 60 days (by way of example, and without limitation, not including any default in the payment of Rent, the Dock Contribution, the Site Contribution, or Impositions), then such holder shall have such longer period of time to effect the cure so long as such holder continuously and diligently endeavors to do so.

ARTICLE 15

INDEMNIFICATION

Section 15.1   <u>Indemnification of Lessor</u>.   Lessee agrees to indemnify and save Lessor harmless against and from any and all claims (known or unknown, foreseen or unforeseen, liquidated or unliquidated, including compensatory damages and consequential damages) arising during the term of this Lease from any condition of the Demised Premises to the extent created or caused by Lessee, or to the extent arising from any breach or default on the part of Lessee in the performance of any covenant or agreement on the part of Lessee to be performed pursuant to the terms of this Lease, or to the extent arising from any act of negligence of Lessee or any of its agents, sublessees, contractors, servants, employees or licensees regardless of whether or not such claim, loss, damage or expense is caused in part by a party indemnified thereunder, or arising from any accident, injury or damage whatsoever caused to any person, firm or corporation occurring during the term of this Lease on the Demised Premises, and from and against all costs, counsel fees, expenses and liabilities incurred in or about any such claim or action or proceeding brought thereon; and in case any action or proceeding be brought against Lessor by reason of any such claim, Lessee upon notice from Lessor shall resist or defend such action or proceeding on behalf of Lessor.

Section 15.2   <u>Indemnification of Lessee</u>.   Lessor agrees to indemnify and save Lessee harmless against and from any and all claims (known or unknown, foreseen or unforeseen, liquidated or unliquidated, including compensatory damages and consequential damages) arising from the breach of any warranty or covenant under this Lease, including the provisions of Articles 4, 5, 6 and 8 and the Exhibits to this Lease, and any and all claims arising during the term of this Lease from any condition of the Ship Dock, the Barge Dock, the Premises or the remainder of the Port Property, or the Appurtenances, to the extent created or caused by Lessor, or to the extent arising from any breach or default on the part of Lessor in the performance of any covenant or agreement on the part of Lessor to be performed pursuant to the terms of this Lease, or to the extent arising from any act of negligence of Lessor or any of its agents, sublessees, contractors, servants, employees or licensees regardless of whether or not such claim, loss, damage or expense is caused in part by a party indemnified thereunder, or

30

arising from any accident, injury or damage whatsoever caused to any person, firm or corporation occurring during the term of this Lease on the Ship Dock, the Barge Dock, the Premises or the remainder of the Port, and from and against all costs, counsel fees, expenses and liabilities incurred in or about any such claim or action or proceeding brought thereon; and in case any action or proceeding be brought against Lessee by reason of any such claim, Lessor upon notice from Lessee shall resist or defend such action or proceeding on behalf of Lessee.

Lessor waives as a real covenant, however, any immunity that may be granted Lessor under the Washington State Industrial Insurance Act, Title 51 RCW (as now existing or as hereafter amended), except that such waiver of immunity shall not extend to and shall not include claims by Lessor's employees directly against Lessor as employer, but shall only extend to claims against Lessee and the tenants, invitees, permittees or licensees of Lessee, and their respective employees, representatives, agents and contractors.

LESSOR ACKNOWLEDGES THAT THE FOREGOING PROVISIONS OF THIS SECTION 15.2 MAY REQUIRE LESSOR TO INDEMNIFY LESSEE AND THE OTHER INDEMNITEES AGAINST CLAIMS MADE AGAINST LESSEE OR THE OTHER INDEMNITEES BY EMPLOYEES OF LESSOR OR BY EMPLOYEES OF LESSOR'S TENANTS, INVITEES, PERMITTEES OR LICENSEES; TO THAT END AND TO THAT EXTENT, LESSOR EXPRESSLY WAIVES ANY AND ALL IMMUNITY AS WOULD OTHERWISE BE ENJOYED UNDER THE WASHINGTON STATE INDUSTRIAL INSURANCE ACT, A/K/A WORKER'S COMPENSATION LAW, TITLE 51 RCW (AS NOW EXISTING OR AS HEREAFTER AMENDED); AND LESSOR ACKNOWLEDGES THAT SUCH WAIVER OF IMMUNITY HAS BEEN SEPARATELY NEGOTIATED AND MUTUALLY AGREED UPON BY LESSEE AND LESSOR, AND IS BINDING UPON LESSOR, ITS SUCCESSORS AND ASSIGNS.

Section 15.3   Survival.   The provisions of this Article 15 will survive the expiration or earlier termination of this Lease.

ARTICLE 16

DEFAULT BY LESSEE

Section 16.1   Bankruptcy or Insolvency. Notwithstanding any other provision contained in this Lease, in the event Lessee or its successors or assigns shall become insolvent or the subject of a bankruptcy proceeding, or make an assignment for the benefit of creditors, or if Lessee or its interests hereunder shall be levied upon under legal process, then unless, in the event of bankruptcy, Lessee shall reject this Lease, Lessor may, at the option of Lessor, declare this Lease in default (by notice to Lessee) and thereafter exercise such rights and remedies as may be available at law or in equity.

Section 16.2   Default in Performance.   If, during the term of this Lease, Lessee shall be in default in fulfilling any of the covenants of this Lease (except the payment of rent, Impositions or other charges required to be paid by Lessee hereunder), and such default shall continue uncured for 30 days after notice thereof by Lessor, then Lessor may declare this Lease in default (by notice to Lessee) and thereafter Lessor may exercise such rights and remedies as

31

may be available at law or in equity to recover damages for such default or to specifically enforce Lessee's obligation or enjoin Lessee's breach (but such rights and remedies shall not include any right to terminate this Lease or Lessee's right of possession unless and until Lessor's claim shall have been adjudicated in favor of Lessor by the judgment of a court of competent jurisdiction and Lessee shall have failed to comply with such judgment within 60 days after such judgment shall have become final and all rights of appeal with respect to the same shall have been exhausted or shall have lapsed).

Section 16.3    Default in Payment of Rent.  If, during the term of this Lease, Lessee shall make default in the payment of the Rent reserved hereunder or any part of the same and such default shall continue for 10 days after notice thereof by Lessor, or if Lessee shall make default in the payment of any other Imposition or charge required to be paid by Lessee hereunder or any part of the same and such default shall continue for 10 days after notice thereof by Lessor, then Lessor may declare this Lease in default (by notice to Lessee) and thereafter Lessor may exercise such rights and remedies as may be available at law or in equity to recover damages for such default or to specifically enforce Lessee's obligation or enjoin Lessee's breach (but such rights and remedies shall not include any right to terminate this Lease or Lessee's right of possession unless and until Lessor's claim shall have been adjudicated in favor of Lessor by the judgment of a court of competent jurisdiction and Lessee shall have failed to comply with such judgment within 60 days after such judgment shall have become final and all rights of appeal with respect to the same shall have been exhausted or shall have lapsed).

Section 16.4    Notices of Default.   All notices of default given by Lessor to Lessee under this Article will be given in accordance with Section 21.1, with copies to holders of any Mortgages as required under Section 21.2.

Section 16.5    Mitigation.   Lessor shall have the duty to mitigate damages in the event of default by Lessee.

## ARTICLE 17

## DEFAULT BY LESSOR

Section 17.1    Default in Performance.  If, during the term of this Lease, Lessor shall be in default in fulfilling any of the covenants of this Lease, and such default shall continue uncured for 30 days after notice thereof by Lessee, then Lessee may declare this Lease in default (by notice to Lessor) and thereafter Lessee may exercise such rights and remedies as may be available at law or in equity to recover damages for such default or to specifically enforce Lessor's obligation or enjoin Lessor's breach, or without waiving or limiting its other rights and remedies available at law or in equity (all of which are cumulative) Lessee may, at its option (but without obligation) proceed to cure such default; and in any event, if Lessor is in default under any of its obligations under this Lease and such default materially interferes with Lessee's use, Lessee will be entitled to an abatement of Rent hereunder in proportion to the extent of and during the period of any such interference.  If Lessee expends any sums in curing Lessor's default as permitted above, all reasonable sums incurred by Lessee (together with Lessee's reasonable cost of funds) shall be reimbursed by Lessor to Lessee within 30 days following Lessor's receipt of written demand therefor accompanied by supporting invoices, and if Lessor

32

fails to repay the same when due, Lessee may deduct an amount from each monthly installment of Rent that becomes due hereunder or from any other payments due hereunder from Lessee to Lessor until Lessee is fully reimbursed.

Section 17.2   Notices of Default.   All notices of default given by Lessor to Lessee under this Article will be given in accordance with Section 21.1, with copies to holders of any Mortgages as required under Section 21.2.

ARTICLE 18

HOLDING OVER

Section 18.1   Rights upon Holding Over.   At the termination of this Lease by lapse of time or otherwise, Lessee shall yield up immediate possession of the Land to Lessor, and, failing so to do, hereby agrees to pay to Lessor on a month-to-month basis an amount equal to 110% of the amount of monthly Rent then being paid by Lessee, plus any other damages prescribed by law, subject to Lessee's rights under Article 25 with respect to removal of Improvements and access for purposes of such removal.

ARTICLE 19

SURRENDER

Section 19.1   Surrender.   Upon the termination of this Lease, whether by the passage of time or otherwise, Lessee shall surrender the Premises to Lessor in its then "AS IS" condition, and Lessee shall remove Lessee's Equipment on or prior to such termination and, at Lessee's option, Lessee may decommission and remove any Improvements on or within the Demised Premises or the Appurtenances on or prior to such termination.

Section 19.2   Vesting of Remaining Improvements upon Termination.   Upon the termination of this Lease, whether by passage of time or otherwise, the Improvements then remaining on the Land (after any removal of Improvements as permitted under Section 19.1) shall, as and when set forth in Article 25 or, if sooner, if and when quitclaimed and released by Lessee to Lessor by recordable instrument, become the property of Lessor in their "AS IS" condition, and Lessor thereupon shall be entitled to, and shall assume all responsibility of, possession of the same.

ARTICLE 20

ESTOPPEL CERTIFICATES

Section 20.1   Estoppel Certificates.   Lessor and Lessee each agree to furnish, at any time and from time to time, so long as this Lease shall remain in effect, and provided no default then exists, upon not less than 20 days prior written request by the other party, a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications that the same is in full force and effect as modified, stating the modifications), and the dates to which the rent and other charges have been paid in advance, if any, it being intended that any such statement delivered pursuant to this Article may be relied

33

upon by, inter alia, any prospective purchasers of Lessee's interests or any prospective mortgagee, holder of any Mortgage, or assignee of any Mortgage upon Lessee's interest in the Premises.

ARTICLE 21

NOTICES

Section 21.1   Manner of Making Notices.   In every case where under any of the provisions of this Lease or in the opinion of either Lessor or Lessee, or otherwise, it shall or may become necessary or desirable to make or give any declaration, approval or notice of any kind, it shall be sufficient if a copy of any such declaration, approval or notice is hand delivered, sent by United States registered or certified mail, return receipt requested, postage prepaid, properly addressed, or sent by nationally-recognized overnight courier service, charges prepaid, properly addressed and scheduled for next business day delivery, to Lessor or Lessee (as the case may be) at the following address (or such other address as may hereafter be given in writing as the address for notice hereunder by one party to the other):

| | |
|---|---|
| If to Lessor: | Port of Longview<br>10 Port Way<br>P. O. Box 1258<br>Longview, WA 98632<br>Attn: Executive Director |
| With a copy to: | General Counsel, Port of Longview<br>10 Port Way<br>P. O. Box 1258<br>Longview, WA 98632 |
| If to Lessee: | EGT Development, LLC<br>One S.W. Columbia<br>Portland, OR 97258<br>Attn: President and Chief Executive Officer |
| With copies to: | Bunge North America, Inc.<br>11720 Borman Drive<br>St. Louis, MO 63146<br>Attn: General Counsel |
| | and |
| | Itochu International Inc.<br>335 Madison Avenue<br>New York, NY 10017<br>Attn: General Counsel |
| | and |

34

STX Pan Ocean (America), Inc.
201 Route 17 North 6th Floor
Rutherford, NJ 07070
Attn:  General Counsel

Section 21.2   Notices to Mortgagees.   All notices, demands or requests which may be required to be given by Lessor to any mortgagee of the Premises as set forth in Section 14.2 shall be sent by Lessor in writing by hand delivery or United States registered or certified mail, return receipt requested, postage prepaid, properly addressed, or sent by nationally-recognized overnight courier service, charges prepaid, properly addressed and scheduled for next business day delivery, to such mortgagee at such place as such mortgagee may from time to time designate in a written notice to Lessor

Section 21.3   When Notice Deemed Given.   Whenever a notice which is required by this Lease to be given by either party hereto to the other party or by either party hereto to a mortgagee, the notice shall be considered as having been given on the day on which the notice was hand delivered, placed in the United States mail (registered or certified, return receipt requested, postage prepaid, properly addressed), or delivered by nationally-recognized overnight courier service (charges prepaid) as provided by this Article.

ARTICLE 22

ADJACENT PROPERTY

Section 22.1   Leases of Adjacent Property.   Lessor may lease or license, or permit the use of, all or any portion of the Adjacent Property identified in Exhibit E-1 to the Lease to or by any third-party tenant(s), licensee(s) or permittee(s) (the "Adjacent Property Leases"), subject to Lessee's Right of First Refusal as provided in Article 23.  Any Adjacent Property Lease shall be on terms and conditions approved in writing by Lessee (which approval will not be unreasonably withheld or delayed), subject to the remaining terms and conditions of this Article 22, and any modification or termination of any Adjacent Property Lease shall be subject to the advance written approval of Lessee (which approval will not be unreasonably withheld or delayed).

Section 22.2   No Conflict.   The Adjacent Property Leases shall be, and shall be made expressly, subject and subordinate to the rights of Lessee pursuant to this Lease.

Section 22.3   No Use of Railroad Tracks or Other Improvements.   No tenant(s), licensee(s) or permittee(s) of the Adjacent Property shall have any right to use any of the Improvements, including the railroad tracks within and comprising part of the Demised Premises.

Section 22.4   Limited Use of Adjacent Property.   Lessor shall not use or permit any use of the Adjacent Property in a manner that would impair the structural integrity and use of the Improvements on the Demised Premises or within the Appurtenances by Lessee, that would interfere with the operation of the Facility, or that would otherwise be in any way incompatible

35

with Lessee's intended use of the Facility as permitted in the Lease, including any use of any of the Adjacent Property which would cause health or security concerns, or would cause the cost of insurance on the Facility to rise, that would cause vibrations, air, noise, vapor, odor or other emissions which may be characterized as offensive or noxious (by way of example, and without limitation, a co-generation power facility), or that, based on Lessee's modeling or other information developed by or made available to Lessee, would cause emissions to exceed federal, state or local ambient air quality standards or to violate any permits applicable to Lessee's operations or facilities or that would require the installation by Lessee of pollution control equipment or other capital investment or process changes to further control emissions.

Section 22.5   Access to Adjacent Property.  Lessor shall maintain the roadway area depicted on Exhibit C-2C hereto for purposes of ingress to and egress from the portion of the Adjacent Property described on pages 2 through 8 of Exhibit E-1 hereto. The construction and maintenance of a road within such roadway area shall, in the event Lessor shall elect to construct such a road, be Lessor's responsibility and at Lessor's cost, constructed and maintained in compliance with all federal, state and local laws and codes and all railroad regulations and safety standards. In any event, whether or not such a road shall be constructed and maintained by Lessor within such roadway area, Lessor agrees to cooperate with Lessee and take reasonable actions and enforce reasonable rules to limit access to such portion of the Adjacent Property and use of the roadway areas depicted on Exhibit C-2C hereto to Lessor, successors-in-interest to Lessor with respect to title to any part of such portion of the Adjacent Property, tenant(s), licensee(s) or permittee(s) of such portion of the Adjacent Property under the Adjacent Property Leases, and their respective agents, contractors, employees or invitees.

Section 22.6   Stormwater from Adjacent Property.  Lessor shall collect and discharge stormwater from the portion of the Adjacent Property described on pages 2 through 8 of Exhibit E-1 hereto into Lessor's stormwater detention ponds through pipes and culverts in areas adjacent to Lessee's culverts that will be located underneath Lessee's rail tracks. The construction of such pipes and culverts shall be Lessee's responsibility and at Lessee's cost, and upon such construction such pipes and culverts shall be dedicated to Lessor as set forth in Section 2.5, and thereafter such pipes and culverts shall be a part of Lessor's stormwater system and the construction and modification of such pipes and culverts on the Adjacent Property (including extensions of such pipes, relocations of inlets and other design changes necessary to collect stormwater in the Adjacent Property and discharge such collected stormwater into such pipes and culverts and in order to avoid commingling such collected stormwater with stormwater from the Demised Premises) and the operation and maintenance of such pipes and culverts shall be Lessor's responsibility and at Lessor's cost, operated and maintained in a structurally sound and operationally safe manner and in compliance with all federal, state, and local laws and codes and all railroad regulations and safety standards (including depth, distance, clearance and use requirements), so as not to adversely impact the stability or structural integrity of the rail tracks, and so as not otherwise to interfere with the from time to time locations of the rail tracks or track beds or any other Improvements within and comprising part of the Demised Premises; provided further that such pipes and culverts shall be operated in a manner such that the stormwater from the Adjacent Property shall not commingle with stormwater from the Demised Premises until such stormwater from the Adjacent Property reaches Lessor's stormwater system.

36

Section 22.7   Reports.   Lessor shall provide reports to Lessee no later than 10 days after the end of each calendar quarter, listing the Adjacent Property Leases and summarizing the principal terms thereof, and indicating the rent, license or use fees due from the tenant(s), licensee(s) or permittee(s) under the Adjacent Property Leases for the applicable calendar quarter.

ARTICLE 23

RIGHT OF FIRST REFUSAL FOR ADJACENT PROPERTY

Section 23.1   Right of First Refusal.   Lessor hereby grants to Lessee an irrevocable, continuing right of first refusal, for the term of this Lease, with respect to any proposed sale or lease by Lessor of any interest of Lessor in the Adjacent Property on the terms and conditions set forth below.

Section 23.2   Notice of Proposed Sale or Lease.   If, during the term of this Lease, Lessor desires to sell or lease all or any part of the Adjacent Property or any interest therein (the "Subject Adjacent Property"), and Lessor shall receive a bona fide offer for such sale or lease Lessor shall notify Lessee in writing ("Subject Adjacent Property Notice") of the price or rental and the other terms and conditions on which such offer shall have been extended and on which Lessor would be willing to sell or lease such property or such interest therein, and Lessor's Subject Adjacent Property Notice shall constitute an offer by Lessor to sell or lease such property or interest therein at such price or rental and on such other terms and conditions.

Section 23.3   Exercise or Waiver of Right of First Refusal.   After receipt of the Subject Adjacent Property Notice, Lessee shall have an option for a period of three months in which to purchase or lease, or enter into a binding contract with Lessor to purchase or lease, as the case may be, the Subject Adjacent Property at the price or rental and the other terms and conditions set forth in the Subject Adjacent Property Notice.  If Lessee does not exercise this option to purchase, lease or contract to purchase or lease the Subject Adjacent Property within such three month period, thereafter Lessor shall have a period of six months in which to sell or lease, as the case may be, no more and no less than the Subject Adjacent Property to the third party making the offer for such sale or lease described in the Subject Adjacent Property Notice, on any terms and conditions Lessor finds acceptable, but at a price or rental which is no lower than that offered to Lessee and under terms and conditions which are no less onerous or restrictive and which are no more favorable or, as a whole, more advantageous to such third party than those offered by Lessor to Lessee as set forth in the Subject Adjacent Property Notice.  If Lessor does not sell or lease the Subject Adjacent Property during the six month period to such third party on such basis, then any future proposed sale or lease of all or any portion of the Subject Adjacent Property shall be subject to Lessee's right of first refusal as described in this Article 23.

Section 23.4   Effect of Rejection or Termination.   Any rejection or termination of this Lease under (and in accordance with) the provisions of Sections 16.1, 16.2 or 16.3 shall result in the extinguishment of the rights of first refusal under this Article 23.

37

ARTICLE 24

RIGHT OF FIRST REFUSAL FOR DEMISED PREMISES

Section 24.1   Right of First Refusal.   In consideration of the substantial investment of Lessee in the Port Property, including the Lessee Projects and Improvements to be constructed by Lessee on the Port Property during the term of the Lease, which projects and improvements will constitute a majority of the terminal facilities to be operated by Lessee on the Demised Premises, and the resulting expansion of opportunities for domestic trade and commercial and industrial development, efficient rail service to marine terminals through development of inland freight connections, the beneficial impact on the regional and local economy, including enhancement of tax base and generation of jobs, and the increase in value of the Port Property, Lessor hereby grants to Lessee an irrevocable, continuing right of first refusal, for the term of this Lease and thereafter for the period established under Section 24.2 hereof, with respect to any proposed sale or lease by Lessor of any interest of Lessor in the Demised Premises on the terms and conditions set forth below.  Lessor acknowledges and agrees, however, that any such lease of the Demised Premises shall not, in any event, demise, grant or otherwise establish any estate, right, title or interest in and to the Demised Premises and the Appurtenances until after the end of the term of this Lease.

Section 24.2   Notice of Proposed Sale or Lease.   If, at any time during the term of this Lease or any time thereafter for a period of ten years, Lessor desires to lease for a term commencing anytime after the term of the Lease or sell all or any part of the Demised Premises or any interest therein (the "Subject Property") for any purpose, including development, redevelopment, operation and/or use for terminal facilities or any other uses, and Lessor shall receive a bona fide offer for such sale or lease, Lessor shall notify Lessee in writing (the "Subject Property Notice") of the price or rental and the other terms and conditions, including the terms of the proposed use, on which such offer shall have been extended and on which Lessor would be willing to sell or lease the Subject Property, and Lessor's Subject Property Notice shall constitute an offer by Lessor to sell or lease the Subject Property at the price or rental and on the other terms and conditions set forth in the Subject Property Notice.

Section 24.3   Exercise or Waiver of Right of First Refusal.   After receipt of Lessor's Notice, Lessee shall have an option for a period of six months in which to consider the offer extended by Lessor in the Subject Property Notice and accept Lessor's offer for Lessee to purchase or lease, as the case may be, the Subject Property at the price or rental and on the other terms and conditions set forth in the Subject Property Notice.  If Lessee does not exercise this option to accept Lessor's offer to purchase or lease the Subject Property at the price or rental and on the other terms and conditions set forth in the Subject Property Notice within such six month consideration period, thereafter Lessor shall have a period of one year to sell or lease, subject to the Lease if applicable (i.e. if during the term of the Lease), no more and no less than the Subject Property, at the price or rental and on the other terms and conditions set forth in the Subject Property Notice.  If, within one year after the expiration of Lessee's six month consideration period, (i) Lessor and the third party making the offer for such sale or lease of the Subject Property described in the Subject Property Notice enter into a binding agreement for the sale or lease of no more and no less than the Subject Property, upon a price or rental no less than and under terms and conditions, including the terms of the proposed use, no less onerous or

38

restrictive and no more favorable or, as a whole, more advantageous to such third party than the terms and conditions set forth in the Subject Property Notice, (ii) Lessor and such third party close such transaction in strict accordance with such binding agreement, and (iii) such third party commences the development, redevelopment, operation and/or use of the Subject Property in material furtherance of the proposed use set forth in the Subject Property Notice, any and all conditions to such development, redevelopment, operation and/or use having been satisfied or waived, then, and only then, the right of first refusal granted herein to Lessee shall be deemed irrevocably waived as to the Subject Property, and only the Subject Property. Without limiting the generality of the provisions of the preceding sentence, if, however, either (a) Lessor desires to sell or lease all or any part of the Subject Property to such third party upon a price or rental less than and under terms and conditions, including the terms of the proposed use, any less onerous or restrictive or any more favorable or, as a whole, more advantageous than the terms and conditions set forth in the Subject Property Notice, or (b) within one year after the expiration of Lessee's six month consideration period, Lessor and such third party fail to satisfy any one or more of the conditions set forth in the preceding sentence, then any proposed sale or lease of all or any portion of the Subject Property shall be subject to Lessee's right of first refusal as described above in this Article 24.

Section 24.4    Effect of Rejection or Termination.   Any rejection or termination of this Lease under (and in accordance with) the provisions of Sections 16.1, 16.2 or 16.3 shall result in the extinguishment of the rights of first refusal under this Article 24.

Section 24.5    Survival.   The provisions of this Article 24 will survive the expiration or early termination of this Lease, except as otherwise expressly provided in Section 24.4.

## ARTICLE 25

## RIGHT OF ACCESS FOR REMOVAL OF IMPROVEMENTS

Section 25.1    Surplus Improvements.   In recognition of Lessee's ownership of the Improvements and Lessee's rights under this Lease to alter, reconstruct or remove the Improvements, including Lessee's rights under Article 19 to decommission and remove any Improvements remaining on or within the Demised Premises or the Appurtenances, and to provide an incentive for Lessee to refrain from dismantling and removing all Improvements prior to the termination of this Lease (although Lessee reserves, and Lessee shall have, the rights to do so under Article 19), Lessor acknowledges that all Improvements remaining on the Land upon the termination of this Lease ("Surplus Improvements"), if any, are and shall be surplus to Lessor's needs, and as of the date hereof Lessor hereby declares the Surplus Improvements to be surplus and hereby quit claims to Lessee, its successors and assigns, Lessor's residual, reversionary interest, if any, in the Surplus Improvements, subject to a further right of removal in favor of Lessor with respect to any Surplus Improvements remaining on Port Property on the date of expiration of the Surplus Access Easement as set forth in Section 25.2 (whereupon Lessee's interest in the remaining Surplus Improvements, if any, shall be abandoned by Lessee to Lessor on such date).

39

Section 25.2   Surplus Access Easement.   Lessor hereby grants Lessee, its successors and assigns, a temporary access easement ("Surplus Access Easement") over and upon Port Property or any portion thereof, including the Demised Premises, as may be reasonably necessary, for the purpose of removal of Surplus Improvements.  Lessee shall provide reasonable notice to Lessor prior to accessing Port Property pursuant to this Surplus Access Easement.  This Surplus Access Easement shall expire on the date which is 10 years after the expiration or earlier termination of the term of this Lease, provided that (i) in the event the term of this Lease shall terminate at any time prior to the 80th anniversary of the Effective Date, this Surplus Access Easement shall terminate on the date which is 10 years after such earlier termination date, (ii) in the event the term of this Lease shall terminate upon any rejection of this Lease in bankruptcy proceedings under Section 16.1 or upon any termination of this Lease following default and failure to comply with any final judgment with respect to such default as set forth (and to the extent provided) in Sections 16.2 and 16.3, this Surplus Access Easement shall terminate on the date which is one year after the date of such rejection or such termination, (iii) in the event after the term of this Lease, Lessor shall notify Lessee in writing of Lessor's intent to remove any of the Surplus Improvements prior to the date on which the Surplus Access Easement shall otherwise expire, then unless Lessee shall have removed such Surplus Improvements within one year of receipt of such notice, Lessee's rights under the Surplus Access Easement shall be suspended for the following one year period with respect to such Surplus Improvements and during such one year period Lessor may remove such Surplus Improvements (whereupon, but only in such event, Lessee's interest in such Surplus Improvements so removed shall be abandoned by Lessee to Lessor), but if such Surplus Improvements shall not be so removed by Lessor within such one year period there shall be no further suspension of Lessee's rights under the Surplus Access Easement with respect to such Surplus Improvements, and (iv) in the event after the term of this Lease, Lessor shall notify Lessee in writing of an offer to sell or lease the Subject Property pursuant to a Subject Property Notice under Section 24.2 but Lessee shall not exercise Lessee's option to accept such offer pursuant to Section 24.3, then unless Lessee shall have removed the Surplus Improvements from the Subject Property within six months of receipt of the Subject Property Notice, Lessee's rights under the Surplus Access Easement with respect to the Subject Property shall be suspended for the following one year period with respect to those Surplus Improvements on the Subject Property (but only with respect to those Surplus Improvements) and during such one year period Lessor may enter into a binding agreement for the Subject Property with the third party, Lessor and the third party may close on the transaction under such binding agreement, and the third party may commence development, redevelopment, operation and/or use of the Subject Property in strict accordance with the conditions of Section 24.3 (whereupon, but only in such event, Lessee's interest in those Surplus Improvements on the Subject Property shall be abandoned by Lessee to Lessor), but if the right of first refusal granted in Section 24.3 as to the Subject Property in such event shall not be waived, including in the event any of the conditions set forth in the last sentence of Section 24.3 shall not be satisfied, then there shall be no further suspension of Lessee's rights under the Surplus Access Easement with respect to the Surplus Improvements on the Subject Property; and in any such event under clauses (i), (ii) or (iii) of this sentence Lessee's interest in the Surplus Improvements remaining on the Premises shall expire upon any termination (after any period of suspension, as may be applicable under clause (iii) of this sentence) of the Surplus Access Easement, and in any such event under clause (iv) of this sentence, Lessee's interest in those Surplus Improvements remaining on the Subject Property

3053672

shall expire upon any termination (after any period of suspension as may be applicable under clause (iv) of this sentence) of the Surplus Access Easement with respect to the Subject Property.

Section 25.3   Exercise of Access and Removal Rights.   This Surplus Access Easement shall not imply any right to possess, use or occupy the Demised Premises (or the Surplus Improvements) after termination of the Lease, but shall only provide a limited right of access onto Port Property to the extent reasonably necessary to decommission and remove the Surplus Improvements.   Lessee shall exercise its rights to remove the Surplus Improvements pursuant to the Surplus Access Easement in a safe and secure manner, and shall restore and repair any damage to Lessor's Improvements on the Port Property occasioned by such removal.

Section 25.4   Survival.   The provisions of this Article 25 will survive the expiration or early termination of this Lease, except as otherwise expressly provided in Section 25.2.

## ARTICLE 26

## MOST FAVORED NATIONS

Lessee shall be entitled to "most favored nations" status with respect to all rights, privileges, duties and obligations under or in connection with this Lease, such that in the event Lessor shall grant or allow any other owner, lessee, occupant or user of any of the Port Property or any land or appurtenances comprising part of or associated with the Port of Longview more favorable treatment with respect to rights, privileges, duties and obligations at or associated with leasing, occupancy, use or operations at the Port of Longview, such favorable treatment shall be extended immediately and at all times thereafter to Lessee as well, and this Lease shall, at the request of Lessee, be amended in writing (such amendment to be prepared by Lessee and to be reasonably satisfactory in form to Lessor and Lessee) to confirm such favorable treatment.

## ARTICLE 27

## MISCELLANEOUS

Section 27.1   Covenants to Run with the Land.   All the covenants, agreements, conditions and undertakings in this Lease shall extend and inure to and be binding upon the successors and assigns of each of the parties hereto, the same as if they were in every case named and expressed, and the same shall be construed as covenants running with the land.   Wherever in this Lease reference is made to any of the parties hereto, it shall be held to include and apply to, wherever applicable, also the successors and assigns of each such party, the same as if in each and every case so expressed.

Section 27.2   Memorandum of Lease.   Lessor and Lessee shall, concurrently with the Effective Date of this Lease, execute a memorandum of this Lease and a memorandum of the rights set forth in Article 25, in forms acceptable to Lessee for recording in the chain of title of the Premises.   The memorandum of this Lease shall set forth the parties hereto, the date hereof, the term hereof, the options to extend hereunder, and the rights of first refusal hereunder, and, subject to the acknowledgment set forth in Section 3.1, the Commencement Date, and said memorandum shall be immediately recorded by Lessor and Lessee.   The memorandum of the

41

rights described in Article 25 shall set forth the parties hereto, the date hereof, and the conveyance of surplus property and the rights of access set forth in Article 25, and said memorandum shall be immediately recorded by Lessor and Lessee.

   Section 27.3 <u>Invalidity of Provisions</u>. If any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

   Section 27.4 <u>Remedies Cumulative; Remedies Not Waived</u>. No remedy herein or otherwise conferred upon or reserved to Lessor or Lessee shall be considered exclusive of any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute; and every power and remedy given by this Lease to Lessor or Lessee may be exercised from time to time and as often as occasion may arise or as may be deemed expedient by Lessor or Lessee, as the case may be.  No delay or omission of Lessor or Lessee to exercise any right or power arising from any default shall impair any such right or power, nor shall it be construed to be a waiver of any such default or an acquiescence therein; and no waiver of any breach of any of the covenants or conditions of this Lease shall be construed to be a waiver of any other breach or to be a waiver of, acquiescence in, or consent to any further or succeeding breach of the same or similar covenant or condition.

   Section 27.5 <u>Time of the Essence</u>. Time is of the essence with respect to each and every provision of this Lease; without limiting the generality of the foregoing, Lessor and Lessee expressly agree that no dates set forth in this Lease for the performance of any covenant or condition on the part of Lessor or Lessee shall be subject to extension for Force Majeure unless expressly so provided with respect to such covenant or condition.

   Section 27.6 <u>Modification</u>. None of the covenants, terms or conditions of this Lease to be kept and performed by Lessor or Lessee shall in any manner be waived, modified, changed or abandoned except by a written instrument, duly signed and acknowledged by Lessor and Lessee.

   Section 27.7 <u>Interpretation</u>. Whenever the terms "include" or "including" are used in this Lease, such terms shall be interpreted and shall read as "include without limitation" or "including without limitation" unless the context expressly requires an interpretation and reading limited to a specific reference or example.

   Section 27.8 <u>Singular and Plural</u>. Any word contained in the text of this Lease, including but not by way of limitation "Lessee", and "Lessor", shall be read as the singular or the plural and as the masculine, feminine or neuter gender as may be applicable in the particular context.

   Section 27.9 <u>Captions and Recitals</u>. The captions of this Lease are for convenience and reference only and in no way define, limit or describe the scope or intent of this

42

Lease.  The recitals to this Lease, however, are incorporated into and constitute an integral part of this Lease.

Section 27.10 <u>Law</u>.  This Lease shall be construed and enforced in accordance with the laws of the State of Washington.

Section 27.11 <u>No Joint Venture</u>.   Nothing in this Lease creates any relationship of trust or fiduciary relationship between Lessee and Lessor; and this Lease does not establish any obligations of or attendant upon, a joint venture or other similar legal relationship.

## ARTICLE 28

## CONDITIONS

Section 28.1 <u>Conditions to Effectiveness</u>.   This Lease and Lessee's obligations under this Lease are conditioned upon satisfaction (or waiver) of the following:

(a)     Lessor exercising, on the date hereof concurrently with the execution of this Lease, the "Option" under Article 1 of the Settlement and Option to Purchase Real Estate dated February 12, 2009, by and between Lessor, as optionee, and RSG Forest Products, Inc., as optionor, as amended June 1, 2009 (the "Purchase Option"), by delivering written notice of such exercise to RSG Forest Products, Inc. in strict accordance with the terms of the Purchase Option on the date hereof, Lessor paying RSG Forest Products, Inc. the "Purchase Price" under and in strict accordance with the terms of Sections 2.1 and 2.2 of the Purchase Option, on or prior to the outside date for conditions stated in Section 28.3, closing on the acquisition of the "Property" and the "Easements" under and in strict accordance with the terms of Sections 2.3 and 2.5 of the Purchase Option, including Lessor placing of record with the Cowlitz County, Washington recorder's office the "Decree" and the "Easements" (in the forms furnished by Lessor to Lessee on the date hereof) on or prior to the outside date for conditions stated in Section 28.3.

(b)     Lessee determining, on or prior to the outside date for conditions stated in Section 28.3, that Lessor's title and estate in and to the land comprising the Demised Premises and the Appurtenances and Lessee's derivative leasehold estate and appurtenant rights in the same are acceptable to Lessee, and Lessee determining that no title exceptions or other matters will interfere with construction of the Lessee Projects and operation of the Facility as permitted herein or with Lessee's enjoyment of the other rights and privileges herein set forth, such determination to be confirmed by Lessee's receipt, at Lessor's cost, of a leasehold policy of title insurance with respect to the Premises; issued pursuant to and in accordance with the form prescribed in the commitment for such leasehold policy of title insurance endorsed in favor of Lessee as of the date of this Lease.

Section 28.2 <u>Termination</u>.   In the event that a condition set forth in Section 28.1 is not satisfied on or prior to the date established for the satisfaction thereof, then Lessee shall severally have the right to terminate this Lease by notice of termination given to Lessor within 10 days after the date established for the satisfaction of such condition; and upon such

43

termination, this Lease shall thereupon cease and terminate and each of the parties hereto shall be released and discharged from any and all liability and responsibility hereunder.

      Section 28.3   <u>Effectiveness</u>.   In the event the conditions set forth in Section 28.1 are satisfied on or prior to June 4, 2009 as the outside date for conditions to this Lease, then the date on which the last of such conditions is so satisfied shall be the "Effective Date" of this Lease.

ARTICLE 29

<u>EXHIBITS AND ADDENDUM TO LEASE</u>

      Section 29.1   <u>Exhibits and Addendum to Lease</u>.   Attached to this Lease, and incorporated into and made a part of this Lease by this reference, are the following:

| | |
|---|---|
| (a) | EXHIBIT A – Land |
| (b) | EXHIBIT B – Demised Premises |
| (c) | EXHIBIT C – Appurtenances |
| (d) | EXHIBIT D – Permitted Encumbrances |
| (e) | EXHIBIT E – Adjacent Property/Buffer and Set Back Areas |
| (f) | EXHIBIT F – Port/Port Layout |
| (g) | EXHIBIT G – Disclosures |
| (h) | EXHIBIT H – Facility |
| (i) | EXHIBIT I – Lessee Projects |
| (j) | EXHIBIT J – Port Projects |
| (k) | EXHIBIT K – Dock Construction |
| (l) | ADDENDUM – Form of Acknowledgment of Completion Date, Commencement of Initial Term, and "As Built" Demised Premises |

**[Remainder of page left blank intentionally; signature pages follow.]**

44

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Lease, the day and year first above written.

LESSOR

PORT OF LONGVIEW

By: _____
    Name: Darold D. Dietz
    Title: Secretary and Commissioner


By: _____
    Name: Robert Bagaason
    Title: Vice President and Commissioner



LESSEE

EGT DEVELOPMENT, LLC

By: _____
    Name: Bailey Ragan
    Title: Authorized Signatory

45

STATE OF WASHINGTON )
                        ) SS.
COUNTY OF COWLITZ    )

On this _1_ day of _June_, 2009, before me, the undersigned, a Notary Public in and for the state of Washington, duly commissioned and sworn, personally appeared Darold D. Dietz, to me known to be the Secretary and Commissioner, and Robert Bagaason, to me known to be the Vice President and Commissioner, of the PORT OF LONGVIEW, the municipal corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said municipal corporation, for the uses and purposes therein mentioned, and on oath each stated that he was authorized to execute the said instrument and that the seal affixed, if any, is the corporate seal of said municipal

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year first above written.

_Robin Johnson_
Notary Public

My Commission Expires:

_9-14-11_

STATE OF MISSOURI     )
                   ) SS.
COUNTY OF SAINT LOUIS)

On this _1st_ day of _June_, 2009, before me, the undersigned, a Notary Public in and for the state of Missouri, duly commissioned and sworn, personally appeared Bailey Ragan, to me known to be the authorized signatory of EGT DEVELOPMENT, LLC, a limited liability company, the limited liability company that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said limited liability company, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute the said instrument.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal on the day and year first above written.

_Terri A Siegel_
Notary Public

My Commission Expires:

TERRI A. SIEGEL
Notary Public - Notary Seal
State of Missouri
St. Louis County
My Commission Expires June 30, 2009
Commission # 05529673

3053672

# EXHIBIT A

## LAND

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 20.00 feet to the TRUE POINT OF BEGINNING;

THENCE North 27° 34' 22" East, parallel with and 40.00 feet Easterly from the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 1159.00 feet;

THENCE North 62° 25' 38" West, 1.00 feet;

THENCE North 27° 34' 22" East, 39.00 feet;

THENCE South 62° 25' 38" East, 1.00 feet;

THENCE continuing along said parallel line (40.00 feet Easterly etc.) 567.78 feet;

THENCE, leaving said parallel line, North 40° 00' 00" East, 101.61 feet;

THENCE along the arc of a 649.00 foot radius curve to the right (the radial bearing of which is South 50° 00' 00" East and the chord of which bears North 78° 46' 00" East, 812.74 feet) through a central angle of 77° 32' 00", for an arc distance of 878.24 feet to the Southwesterly line of Parcel "C", as described in Cowlitz County Auditor's File No. 3096009 at a point that bears South 62° 28' 00" East, 327.17 feet from an angle point on said Southwesterly line;

THENCE South 62° 28' 00" East, along said Southwesterly line of Parcel "C", as shown in Volume 21 of Surveys, page 162, Cowlitz County Auditor's Records, for a distance of 232.88 feet;

THENCE, leaving said Southwesterly line, along the arc of a 688.80 foot radius curve to the right, through a central angle of 61° 39' 52", for an arc distance of 741.32 feet to the West line of Parcel "D", also described in Cowlitz County Auditor's File No. 3096009, at a point that bears South 27° 34' 00" West, 499.40 feet from the Northwest corner thereof;

THENCE South 27° 34' 00" West, along the West line of Parcel "D" and the East line of Tract "F", as described in Cowlitz County Auditor's File No. 3096010, for a

distance of 2494.68 feet;

THENCE, leaving said East line, along the arc of a 758.80 foot radius curve to the right (the radial bearing of which is North 48° 55' 20" West and the chord of which bears South 78° 30' 18" West, 922.32 feet) through a central angle of 74° 51' 15", for an arc distance of 991.34 feet;

THENCE North 64° 04' 05" West, parallel with and 48.79 feet Northeasterly of the centerline of the Consolidated Diking Improvement District #1 right-of-way, as described by decree entered November 16, 1923 in Cowlitz County Superior Court Case #5362 and shown in Volume 21 of Surveys, page 16, Cowlitz County Auditor's Records, for a distance of 482.55 feet to a point that is 1173.32 feet South and 376.49 feet West of the most Northeasterly corner of the "Pacific Fibre Products tract" above described;

THENCE along the arc of a 765.00 foot radius curve to the right, through a central angle of 75° 03' 30", for an arc distance of 1002.16 feet;

THENCE North 18° 26' 53" East, 122.57 feet;

THENCE along the arc of a 592.00 foot radius curve to the left, (the radial bearing of which is North 82° 36' 12" West and the chord of which bears North 05° 59' 26" West, 274.14 feet) through a central angle of 26° 46' 31", for an arc distance of 276.65 feet;

THENCE North 19° 22' 42" West, 250.97 feet;

THENCE along the arc of a 740.00 foot radius curve to the right, through a central angle of 46° 30' 08", for an arc distance of 600.60 feet;

THENCE North 27° 07' 26" East, 401.95 feet;

THENCE along the arc of a 738.00 foot radius curve to the left, through a central angle of 21° 55' 08", for an arc distance of 282.33 feet;

THENCE North 05° 12' 18" East, 492.77 feet;

THENCE along the arc of a 615.80 foot radius curve to the right, through a central angle of 79° 25' 23", for an arc distance of 853.62 feet;

THENCE North 84° 37' 41" East, 368.36 feet;

THENCE South 05° 22' 19" East, 12.00 feet to a point that bears East, 144.37 feet and South, 853.07 feet from a brass cap in concrete at the intersection of Columbia Boulevard and Fibre Way, as shown in Survey 21-162;

THENCE South 05° 22' 19" East, 37.00 feet;

THENCE South 84° 37' 41" West, 28.12 feet;

THENCE South 78° 16' 20" West, 93.82 feet;

THENCE along the arc of a 567.00 foot radius curve to the left, through a central angle of 04° 03' 07", for an arc distance of 40.10 feet;

THENCE South 74° 13' 13" West, 200.70 feet;

THENCE along the arc of a 589.00 foot radius curve to the left, through a central angle of 74° 13' 13", for an arc distance of 762.98 feet;

THENCE South 00° 00' 00" West, 24.75 feet;

THENCE along the arc of a 641.00 foot radius curve to the right, through a central angle of 06° 16' 56", for an arc distance of 70.29 feet;

THENCE South 06° 16' 56" West, 184.14 feet;

THENCE South 00° 00' 00" West, 93.14 feet;

THENCE along the arc of a 749.00 foot radius curve to the right, through a central angle of 27° 07' 26", for an arc distance of 354.58 feet;

THENCE South 27° 07' 26" West, 420.93 feet;

THENCE along the arc of a 567.00 foot radius curve to the left, through a central angle of 46° 30' 08", for an arc distance of 460.19 feet;

THENCE South 19° 22' 42" East, 250.97 feet;

THENCE along the arc of a 765.00 foot radius curve to the right, through a central angle of 26° 46' 31", for an arc distance of 357.50 feet;

THENCE South 07° 23' 48" West, 168.25 feet;

THENCE along the arc of a 567.00 foot radius curve to the left, through a central angle of 71° 27' 53", for an arc distance of 707.22 feet;

THENCE South 64° 04' 05" East, 29.91 feet;

THENCE North 27° 00' 00" East, 275.00 feet;

THENCE North 11° 00' 00" East, 138.00 feet;

THENCE North 90° 00' 00" East, 198.00 feet;

THENCE along the arc of a 55.00 foot radius curve to the left, through a central angle of 90° 00' 00", for an arc distance of 86.39 feet;

THENCE North 00° 00' 00" East, 365.00 feet;

THENCE along the arc of a 115.00 foot radius curve to the left, through a central angle of 60° 00' 00", for an arc distance of 120.43 feet;

THENCE North 60° 00' 00" West, 104.37 feet;

THENCE North 27° 34' 22" East, 52.81 feet to the TRUE POINT OF BEGINNING.

EXCEPT the following described tract:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010; thence North 00° 00'00" East, 977.19 feet; thence North 90° 00'00" East, 706.34 feet to the TRUE POINT OF BEGINNING;

THENCE North 27° 42' 00" East, 191.00 feet;

THENCE North 19° 20' 00" East, 147.00 feet;

THENCE North 28° 30' 00" East, 268.19 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 80° 42' 00", for an arc distance of 798.33 feet;

THENCE South 62° 28' 00" East, 22.87 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 90° 02' 00", for an arc distance of 890.66 feet;

THENCE South 27° 34' 00" West, 1847.00 feet to a point that is 1093.39 feet East and 729.28 feet South of the Northeast corner of the "Pacific Fibre Products tract" above described;

THENCE North 80° 02' 30" West, 65.44 feet;

THENCE along the arc of a 663.35 foot radius curve to the left (the radial bearing of which is North 87° 12' 55" West and the chord of which bears North 27° 17' 42" West, 664.94 feet) through a central angle of 60° 09' 32", for an arc distance of 696.50 feet;

THENCE North 57° 22' 27" West, 65.05 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 40° 13' 00", for an arc distance of 397.84 feet;

THENCE North 56° 30' 00" East, 331.16 feet;

THENCE South 33° 30' 00" East, 26.00 feet;

THENCE North 56° 30' 00" East, 85.00 feet;

THENCE North 33° 30' 00" West, 23.00 feet;

THENCE North 56° 30' 00" East, 418.00 feet;

THENCE North 88° 30' 00" East, 50.00 feet;

THENCE North 27° 30' 00" East, 64.00 feet;

THENCE North 62° 30' 00" West, 105.00 feet;

THENCE South 27° 30' 00" West, 17.00 feet;

THENCE North 62° 30' 00" West, 454.00 feet to the TRUE POINT OF BEGINNING;

ALSO EXCEPT the following described tract:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010; thence North 00° 00' 00" East, 977.19 feet; thence North 90° 00' 00" East, 706.34 feet;

THENCE South 24° 27' 42" West, 70.29 feet to the TRUE POINT OF BEGINNING;

THENCE South 62° 30' 00" East, 440.00 feet;

THENCE South 56° 30' 00" West, 469.24 feet;

THENCE South 33° 30' 00" East, 23.00 feet;

THENCE South 56° 30' 00" West, 318.88 feet;

THENCE along the arc of a 566.80 foot radius curve to the right (the radial bearing of which is North 76° 47' 31" East and the chord of which bears North 05° 58' 49" West, 142.62 feet) through a central angle of 14° 27' 19", for an arc distance of 143.00 feet;

THENCE North 25° 20' 00" East, 440.00 feet;

THENCE South 64° 40' 00" East, 51.00 feet;

THENCE North 25° 20' 00" East, 65.00 feet;

THENCE North 64° 40' 00" West, 37.00 feet;

THENCE North 31° 48' 30" East, 76.54 feet to the TRUE POINT OF BEGINNING;

ALSO EXCEPT the following described tract:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Southwesterly corner of the "Schwans tract", as described in Cowlitz County Auditor's File No. 870213060;

THENCE South 62° 27' 12" East, 200.00 feet to the Southeast corner of the "Schwans tract"; thence, continuing South 62° 27' 12" East, 140.74 feet; thence South 27° 32' 48" West, 99.88 feet to the TRUE POINT OF BEGINNING of the tract to be described;

THENCE along the arc of a 130.17 foot radius curve to the right (the radial bearing of which is North 75° 54' 29" West and the chord of which bears South 28° 37' 45" West, 65.35 feet) through a central angle of 29° 04' 29", for an arc distance of 66.05 feet;

THENCE along the arc of a 616.00 foot radius curve to the left, through a central angle of 43° 10' 00", for an arc distance of 464.09 feet;

THENCE South 00° 00' 00" East, 411.11 feet;

THENCE along the arc of a 676.00 foot radius curve to the right, through a central angle of 27° 07' 26", for an arc distance of 320.02 feet;

THENCE South 27° 07' 26" West, 420.93 feet;

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 46° 30' 08", for an arc distance of 519.43 feet;

THENCE South 19° 22' 42" East, 250.97 feet;

THENCE along the arc of a 692.00 foot radius curve to the right, through a central angle of 26° 46' 31", for an arc distance of 323.38 feet;

THENCE South 07° 23' 48" West, 168.25 feet;

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 71° 27' 53", for an arc distance of 798.27 feet;

THENCE South 64° 04' 05" East, 482.55 feet;

THENCE along the arc of a 633.80 foot radius curve to the left, through a central angle of 105° 55' 55", for an arc distance of 1171.81 feet;

THENCE North 09° 20' 15" East, 95.31 feet;

THENCE South 80° 02' 30" East, 28.00 feet to a point that is North 80° 02' 30" West, 37.44 feet from a point that bears 1093.39 feet East and 729.28 feet South of the most Northerly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 09° 20' 15" West, 95.33 feet;

THENCE along the arc of a 661.80 foot radius curve to the right, (the radial bearing of which is North 80° 00' 00" West and the chord of which bears South 62° 57' 58" West, 1056.60 feet) through a central angle of 105° 55' 55", for an arc distance of 1223.58 feet;

THENCE North 64° 04' 05" West, 482.55 feet;

THENCE along the arc of a 668.00 foot radius curve to the right, through a central angle of 71° 27' 53", for an arc distance of 833.19 feet;

THENCE North 07° 23' 48" East, 168.25 feet;

THENCE along the arc of a 664.00 foot radius curve to the left, through a central angle of 26° 46' 31", for an arc distance of 310.30 feet;

THENCE North 19° 22' 42" West, 250.97 feet;

THENCE along the arc of a 668.00 foot radius curve to the right, through a central angle of 46° 30' 08", for an arc distance of 542.16 feet;

THENCE North 27° 07' 26" East, 420.93 feet;

THENCE along the arc of a 648.00 foot radius curve to the left, through a central angle of 27° 07' 26", for an arc distance of 306.76 feet;

THENCE North 00° 00' 00" East, 411.11 feet;

THENCE along the arc of a 644.00 foot radius curve to the right, through a central angle of 27° 55' 35", for an arc distance of 313.89 feet;

THENCE along the arc of a 591.80 foot radius curve to the right, through a central angle of 22° 41' 13", for an arc distance of 234.33 feet to the TRUE POINT OF BEGINNING.


TOGETHER WITH ALL RIGHTS IN AND TO ADJACENT STRIPS, ALLEYS, ROADWAYS, GAPS AND GORES.

**EXHIBIT B - DEMISED PREMISES**





**HAGEDORN**™
SURVEYING + ENGINEERING INC

360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 28, 2009

## DEMISED PREMISES:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 20.00 feet to the TRUE POINT OF BEGINNING;

THENCE North 27° 34' 22" East, parallel with and 40.00 feet Easterly from the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 1159.00 feet;

THENCE North 62° 25' 38" West, 1.00 feet;

THENCE North 27° 34' 22" East, 39.00 feet;

THENCE South 62° 25' 38" East, 1.00 feet;

THENCE continuing along said parallel line (40.00 feet Easterly etc.) 567.78 feet;

THENCE, leaving said parallel line, North 40° 00' 00" East, 101.61 feet;

THENCE along the arc of a 649.00 foot radius curve to the right (the radial bearing of which is South 50° 00' 00" East and the chord of which bears North 78° 46' 00" East, 812.74 feet) through a central angle of 77° 32' 00", for an arc distance of 878.24 feet to the Southwesterly line of Parcel "C", as described in Cowlitz County Auditor's File No. 3096009 at a point that bears South 62° 28' 00" East, 327.17 feet from an angle point on said Southwesterly line;

Exhibit B (Page 2 of 10)

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 2

THENCE South 62° 28′ 00″ East, along said Southwesterly line of Parcel "C", as shown in Volume 21 of Surveys, page 162, Cowlitz County Auditor's Records, for a distance of 232.88 feet;

THENCE, leaving said Southwesterly line, along the arc of a 688.80 foot radius curve to the right, through a central angle of 61° 39′ 52″, for an arc distance of 741.32 feet to the West line of Parcel "D", also described in Cowlitz County Auditor's File No. 3096009, at a point that bears South 27° 34′ 00″ West, 499.40 feet from the Northwest corner thereof;

THENCE South 27° 34′ 00″ West, along the West line of Parcel "D" and the East line of Tract "F", as described in Cowlitz County Auditor's File No. 3096010, for a distance of 2494.68 feet;

THENCE, leaving said East line, along the arc of a 758.80 foot radius curve to the right (the radial bearing of which is North 48° 55′ 20″ West and the chord of which bears South 78° 30′ 18″ West, 922.32 feet) through a central angle of 74° 51′ 15″, for an arc distance of 991.34 feet;

THENCE North 64° 04′ 05″ West, parallel with and 48.79 feet Northeasterly of the centerline of the Consolidated Diking Improvement District #1 right-of-way, as described by decree entered November 16, 1923 in Cowlitz County Superior Court Case #5362 and shown in Volume 21 of Surveys, page 16, Cowlitz County Auditor's Records, for a distance of 482.55 feet to a point that is 1173.32 feet South and 376.49 feet West of the most Northeasterly corner of the "Pacific Fibre Products tract" above described;

THENCE along the arc of a 765.00 foot radius curve to the right, through a central angle of 75° 03′ 30″, for an arc distance of 1002.16 feet;

THENCE North 18° 26′ 53″ East, 122.57 feet;

THENCE along the arc of a 592.00 foot radius curve to the left, (the radial bearing of which is North 82° 36′ 12″ West and the chord of which bears North 05° 59′ 26″ West, 274.14 feet) through a central angle of 26° 46′ 31″, for an arc distance of 276.65 feet;

THENCE North 19° 22′ 42″ West, 250.97 feet;

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 3

THENCE along the arc of a 740.00 foot radius curve to the right, through a central angle of 46° 30′ 08″, for an arc distance of 600.60 feet;

THENCE North 27° 07′ 26″ East, 401.95 feet;

THENCE along the arc of a 738.00 foot radius curve to the left, through a central angle of 21° 55′ 08″, for an arc distance of 282.33 feet;

THENCE North 05° 12′ 18″ East, 492.77 feet;

THENCE along the arc of a 615.80 foot radius curve to the right, through a central angle of 79° 25′ 23″, for an arc distance of 853.62 feet;

THENCE North 84° 37′ 41″ East, 368.36 feet;

THENCE South 05° 22′ 19″ East, 12.00 feet to a point that bears East, 144.37 feet and South, 853.07 feet from a brass cap in concrete at the intersection of Columbia Boulevard and Fibre Way, as shown in Survey 21-162;

THENCE South 05° 22′ 19″ East, 37.00 feet;

THENCE South 84° 37′ 41″ West, 28.12 feet;

THENCE South 78° 16′ 20″ West, 93.82 feet;

THENCE along the arc of a 567.00 foot radius curve to the left, through a central angle of 04° 03′ 07″, for an arc distance of 40.10 feet;

THENCE South 74° 13′ 13″ West, 200.70 feet;

THENCE along the arc of a 589.00 foot radius curve to the left, through a central angle of 74° 13′ 13″, for an arc distance of 762.98 feet;

THENCE South 00° 00′ 00″ West, 24.75 feet;

THENCE along the arc of a 641.00 foot radius curve to the right, through a central angle of 06° 16′ 56″, for an arc distance of 70.29 feet;

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 4

THENCE South 06° 16' 56" West, 184.14 feet;

THENCE South 00° 00' 00" West, 93.14 feet;

THENCE along the arc of a 749.00 foot radius curve to the right, through a central angle of 27° 07' 26", for an arc distance of 354.58 feet;

THENCE South 27° 07' 26" West, 420.93 feet;

THENCE along the arc of a 567.00 foot radius curve to the left, through a central angle of 46° 30' 08", for an arc distance of 460.19 feet;

THENCE South 19° 22' 42" East, 250.97 feet;

THENCE along the arc of a 765.00 foot radius curve to the right, through a central angle of 26° 46' 31", for an arc distance of 357.50 feet;

THENCE South 07° 23' 48" West, 168.25 feet;

THENCE along the arc of a 567.00 foot radius curve to the left, through a central angle of 71° 27' 53", for an arc distance of 707.22 feet;

THENCE South 64° 04' 05" East, 29.91 feet;

THENCE North 27° 00' 00" East, 275.00 feet;

THENCE North 11° 00' 00" East, 138.00 feet;

THENCE North 90° 00' 00" East, 198.00 feet;

THENCE along the arc of a 55.00 foot radius curve to the left, through a central angle of 90° 00' 00", for an arc distance of 86.39 feet;

THENCE North 00° 00' 00" East, 365.00 feet;

THENCE along the arc of a 115.00 foot radius curve to the left, through a central angle of 60° 00' 00", for an arc distance of 120.43 feet;

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 5

THENCE North 60° 00′ 00″ West, 104.37 feet;

THENCE North 27° 34′ 22″ East, 52.81 feet to the TRUE POINT OF BEGINNING.

EXCEPT the following described tract:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;  thence North 00° 00′ 00″ East, 977.19 feet;  thence North 90° 00′ 00″ East, 706.34 feet to the TRUE POINT OF BEGINNING.

THENCE North 27° 42′ 00″ East, 191.00 feet;

THENCE North 19° 20′ 00″ East, 147.00 feet;

THENCE North 28° 30′ 00″ East, 268.19 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 80° 42′ 00″, for an arc distance of 798.33 feet;

THENCE South 62° 28′ 00″ East, 22.87 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 90° 02′ 00″, for an arc distance of 890.66 feet;

THENCE South 27° 34′ 00″ West, 1847.00 feet to a point that is 1093.39 feet East and 729.28 feet South of the Northeast corner of the "Pacific Fibre Products tract" above described;

THENCE North 80° 02′ 30″ West, 65.44 feet;

THENCE along the arc of a 663.35 foot radius curve to the left (the radial bearing of which is North 87° 12′ 55″ West and the chord of which bears North 27° 17′ 42″ West, 664.94 feet) through a central angle of 60° 09′ 32″, for an arc distance of 696.50 feet;

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 6

THENCE North 57° 22' 27" West, 65.05 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 40° 13' 00", for an arc distance of 397.84 feet;

THENCE North 56° 30' 00" East, 331.16 feet;

THENCE South 33° 30' 00" East, 26.00 feet;

THENCE North 56° 30' 00" East, 85.00 feet;

THENCE North 33° 30' 00" West, 23.00 feet;

THENCE North 56° 30' 00" East, 418.00 feet;

THENCE North 88° 30' 00" East, 50.00 feet;

THENCE North 27° 30' 00" East, 64.00 feet;

THENCE North 62° 30' 00" West, 105.00 feet;

THENCE South 27° 30' 00" West, 17.00 feet;

THENCE North 62° 30' 00" West, 454.00 feet to the TRUE POINT OF BEGINNING;

ALSO EXCEPT the following described tract:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;  thence North 00° 00' 00" East, 977.19 feet;  thence North 90° 00' 00" East, 706.34 feet;

THENCE South 24° 27' 42" West, 70.29 feet to the TRUE POINT OF BEGINNING;

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 7

THENCE South 62° 30′ 00″ East, 440.00 feet;

THENCE South 56° 30′ 00″ West, 469.24 feet;

THENCE South 33° 30′ 00″ East, 23.00 feet;

THENCE South 56° 30′ 00″ West, 318.88 feet;

THENCE along the arc of a 566.80 foot radius curve to the right (the radial bearing of which is North 76° 47′ 31″ East and the chord of which bears North 05° 58′ 49″ West, 142.62 feet) through a central angle of 14° 27′ 19″, for an arc distance of 143.00 feet;

THENCE North 25° 20′ 00″ East, 440.00 feet;

THENCE South 64° 40' 00" East, 51.00 feet;

THENCE North 25° 20′ 00″ East, 65.00 feet;

THENCE North 64° 40' 00" West, 37.00 feet;

THENCE North 31° 48' 30" East, 76.54 feet to the TRUE POINT OF BEGINNING;

ALSO EXCEPT the following described tract:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Southwesterly corner of the "Schwans tract", as described in Cowlitz County Auditor's File No. 870213060;

THENCE South 62° 27′ 12″ East, 200.00 feet to the Southeast corner of the "Schwans tract"; thence, continuing South 62° 27′ 12″ East, 140.74 feet; thence South 27° 32′ 48″ West, 99.88 feet to the TRUE POINT OF BEGINNING of the tract to be described;

Exhibit B (Page 8 of 10)

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 8

THENCE along the arc of a 130.17 foot radius curve to the right (the radial bearing of which is North 75° 54' 29" West and the chord of which bears South 28° 37' 45" West, 65.35 feet) through a central angle of 29° 04' 29", for an arc distance of 66.05 feet;

THENCE along the arc of a 616.00 foot radius curve to the left, through a central angle of 43° 10' 00", for an arc distance of 464.09 feet;

THENCE South 00° 00' 00" East, 411.11 feet;

THENCE along the arc of a 676.00 foot radius curve to the right, through a central angle of 27° 07' 26", for an arc distance of 320.02 feet;

THENCE South 27° 07' 26" West, 420.93 feet;

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 46° 30' 08", for an arc distance of 519.43 feet;

THENCE South 19° 22' 42" East, 250.97 feet;

THENCE along the arc of a 692.00 foot radius curve to the right, through a central angle of 26° 46' 31", for an arc distance of 323.38 feet;

THENCE South 07° 23' 48" West, 168.25 feet;

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 71° 27' 53", for an arc distance of 798.27 feet;

THENCE South 64° 04' 05" East, 482.55 feet;

THENCE along the arc of a 633.80 foot radius curve to the left, through a central angle of 105° 55' 55", for an arc distance of 1171.81 feet;

THENCE North 09° 20' 15" East, 95.31 feet;

THENCE South 80° 02' 30" East, 28.00 feet to a point that is North 80° 02' 30" West, 37.44 feet from a point that bears 1093.39 feet East and 729.28 feet

Legal Description for
EGT / Bunge
**DEMISED PREMISES:**
May 28, 2009
Page 9

South of the most Northerly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 09° 20′ 15″ West, 95.33 feet;

THENCE along the arc of a 661.80 foot radius curve to the right, (the radial bearing of which is North 80° 00′ 00″ West and the chord of which bears South 62° 57′ 58″ West, 1056.60 feet) through a central angle of 105° 55′ 55″, for an arc distance of 1223.58 feet;

THENCE North 64° 04′ 05″ West, 482.55 feet;

THENCE along the arc of a 668.00 foot radius curve to the right, through a central angle of 71° 27′ 53″, for an arc distance of 833.19 feet;

THENCE North 07° 23′ 48″ East, 168.25 feet;

THENCE along the arc of a 664.00 foot radius curve to the left, through a central angle of 26° 46′ 31″, for an arc distance of 310.30 feet;

THENCE North 19° 22′ 42″ West, 250.97 feet;

THENCE along the arc of a 668.00 foot radius curve to the right, through a central angle of 46° 30′ 08″, for an arc distance of 542.16 feet;

THENCE North 27° 07′ 26″ East, 420.93 feet;

THENCE along the arc of a 648.00 foot radius curve to the left, through a central angle of 27° 07′ 26″, for an arc distance of 306.76 feet;

THENCE North 00° 00′ 00″ East, 411.11 feet;

THENCE along the arc of a 644.00 foot radius curve to the right, through a central angle of 27° 55′ 35″, for an arc distance of 313.89 feet;

THENCE along the arc of a 591.80 foot radius curve to the right, through a central angle of 22° 41′ 13″, for an arc distance of 234.33 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Demised Premises.cew        07-127-1

Exhibit B (Page 10 of 10)

# EXHIBIT C

## APPURTENANCES

Exhibit C, delineating and depicting some of the Appurtenances established under the Lease for the benefit of Lessee and the Demised Premises, is comprised of the following Exhibits, which are attached hereto and incorporated herein by this reference and made a part hereof (and incorporated into and made a part of the Lease):

Exhibit C-1    Dock Access Easement and Berth Access Easement

Exhibit C-2A   Access Easement

Exhibit C-2B   40-Foot Access Easement

Exhibit C-2C   Access Easement – Interior Roadway

Exhibit C-3    Railroad Easement

Exhibit C-4A   Utility Easement

Exhibit C-4B   Water Easement

Exhibit C-5A   Storm-Water System

Exhibit C-5B   North Storm-Water Easement

Exhibit C-5C   North Storm-Water Pond Easement

Exhibit C-5D   South Storm-Water Pond Easement

Exhibit C-5E   South Storm-Water Easement

Exhibit C-6    Lateral Support Easement

Exhibit C-7A   Temporary Access Easement

Exhibit C-7B   Temporary Construction Easement

**EXHIBIT C-1**



Exhibit C-1 (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 19, 2009

## DOCK ACCESS EASEMENT AND BERTH ACCESS EASEMENT:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim and adjoining tidelands in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northerly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South, 1173.32 feet and West, 376.49 feet to the TRUE POINT OF BEGINNING;

THENCE South 64° 04' 05" East, 482.55 feet;

THENCE along the arc of a 758.80 foot radius curve to the left, through a central angle of 06° 33' 00", for an arc distance of 86.75 feet;

THENCE South 25° 55' 55" West, 203.74 feet to a point on the South line of the Consolidated Diking Improvement District #1 right-of-way, described in Superior Court Cause #5362 (1923), as located and monumented in Book 8 of Surveys, page 144 and shown in Survey 21-16;

THENCE, following said South right-of-way line, South 64° 04' 05" East, 148.74 feet;

THENCE along the arc of a 1295.82 foot radius curve to the left (the radial bearing of which is North 25° 56' 41" East, and the chord of which bears South 67° 01' 05" East, 133.95 feet) through a central angle of 05° 55' 31", for an arc

Exhibit C-1 (Page 2 of 3)

Legal Description for
EGT / Bunge
**DOCK ACCESS EASEMENT AND BERTH ACCESS EASEMENT:**
May 18, 2009
Page 2

distance of 134.01 feet to the East line of the "Port of Longview tract", as described in Cowlitz County Auditor's File No. 3073058;

THENCE South 23° 22' 30" West, 121.76 feet to angle point in said East line;

THENCE South 23° 19' 17" West, 47.07 feet to the Southerly Southeast corner of the "Port of Longview tract";

THENCE, continuing South 23° 19' 17" West, 200.00 feet;

THENCE North 70° 35' 00" West, 1312.01 feet;

THENCE North 19° 25' 00" East, 287.79 feet;

THENCE South 74° 00' 00" East, 200.00 feet;

THENCE North 25° 55' 55" East, 190.00 feet to the South right-of-way line of Consolidated Diking Improvement District #1;

THENCE South 64° 04' 05" East, along said South line, 170.00 feet;

THENCE North 25° 55' 55" East, 205.47 feet;

THENCE along the arc of a 765.00 foot radius curve to the left, (the radial bearing of which is North 33° 30' 38" East and the chord of which bears South 60° 16' 43" East, 101.11 feet) through a central angle of 07° 34' 42", for an arc distance of 101.19 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Dock-Berth Access Easement.cew
07-127-1

Exhibit C-1 (Page 3 of 3)

**EXHIBIT C-2A**



Exhibit C-2A (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

## ACCESS EASEMENT:

A variable width easement for ingress and egress over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 20.00 feet;

THENCE North 27° 34' 22" East, parallel with and 40.00 feet Easterly from the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 2049.87 feet;

THENCE, North 33° 03' 32" East, 284.31 feet;

THENCE North 27° 32' 48" East, 69.84 feet to the Southwest corner of Parcel "C" as conveyed to Longview Fibre Company and described in Cowlitz County Auditor's File No. 3096009;

THENCE North 27° 32' 48" East, 22.00 feet to the Northwest corner of Parcel "C";

THENCE North 27° 32' 48" East, 17.00 feet to the South right-of-way line of Fibre Way, as conveyed to Cowlitz County in 2002;

Exhibit C-2A (Page 2 of 3)

## ACCESS EASEMENT:

Page 2

THENCE North 74° 10' 40" West, along said right-of-way line, 113.00 feet;

THENCE, leaving said South right-of-way line, South 15° 56' 10" East, 63.19 feet to the Southeast corner of a tract conveyed to the Port of Longview in Cowlitz County Auditor's File No. 3085541;

THENCE South 27° 34' 22" West, along the East line of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 2372.87 feet;

THENCE South 62° 25' 38" East, 20.00 feet to the POINT OF BEGINNING.

LD-2009\EGT-E. Mill Road Access.cew
07-127-1

Exhibit C-2A (Page 3 of 3)

## EXHIBIT C-2B



EXHIBIT SKETCH
SHOWING
**40-FOOT
ACCESS EASEMENT**

Exhibit C-2B (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

**40-FOOT ACCESS EASEMENT:**

A 40-foot non-exclusive easement over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, the centerline of which is described as follows:

> BEGINNING at the most Northeasterly corner of the tract conveyed to Pacific Fibre Products, as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;
>
> THENCE North 978.99 feet and West 1441.92 feet to the centerline of International Way at the Southerly terminus of the 80-foot tract conveyed to Cowlitz County in Cowlitz County Auditor's File No. 3099583, said point being the TRUE POINT OF BEGINNING of the easement to be described;
>
> THENCE South 30° 30' 00" West, 355.00 feet;
>
> THENCE South 50° 10' 00" East, 250.00 feet;
>
> THENCE South 64° 40' 00" East, 430.00 feet;
>
> THENCE South 33° 30' 00" West, 260.00 feet;
>
> THENCE South 27° 40' 00" West, 600.00 feet;
>
> THENCE along the arc of a 75.00 foot radius curve to the left, through a central angle of 95° 10' 00", for an arc distance of 124.57 feet;
>
> THENCE South 67° 30' 00" East, 120.00 feet;

Exhibit C-2B (Page 2 of 3)

Legal Description for
EGT / Bunge
**40-FOOT ACCESS EASEMENT:**
May 27, 2009
Page 2

THENCE along the arc of a 400.00 foot radius curve to the right, through a central angle of 19° 30' 00", for an arc distance of 136.14 feet;

THENCE South 48° 00' 00" East, 15.00 feet;

THENCE along the arc of a 60.00 foot radius curve to the right, through a central angle of 48° 00' 00", for an arc distance of 50.27 feet;

THENCE along the arc of a 65.00 foot radius curve to the left, through a central angle of 62° 25' 00", for an arc distance of 70.81 feet;

THENCE South 62° 25' 00" East, 480.00 feet;

THENCE along the arc of a 400.00 foot radius curve to the right, through a central angle of 13° 45' 00", for an arc distance of 95.99 feet;

THENCE South 48° 40' 00" East, 196.82 feet;

THENCE along the arc of a 397.87 foot radius curve to the left, through a central angle of 15° 24' 05", for an arc distance of 106.95 feet to the centerline of the Consolidated Diking Improvement District #1 right-of-way, as shown in Volume 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South 64° 04' 05" East, along said centerline, 175.00 feet to the terminus of said centerline at a point that 1295.81 feet South and 236.15 feet West of the most Northeasterly corner of the "Pacific Fibre Products tract", above described.

LD-2009\EGT–INTL Way to Berth 9.cew
07-127-1

Exhibit C-2B (Page 3 of 3)

**EXHIBIT C-2C**



Exhibit C-2C (Page 1 of 3)



**HAGEDORN**™
SURVEYING + ENGINEERING INC

360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## ACCESS EASEMENT – INTERIOR ROADWAY:

A 28-foot non-exclusive easement for ingress and egress over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, the Northerly and Easterly lines of which are described as follows:

BEGINNING at the most Southwesterly corner of the "Schwans tract", as described in Cowlitz County Auditor's File No. 870213060;

THENCE South 62° 27' 12" East, 200.00 feet to the Southeast corner of the "Schwans tract";

THENCE, continuing South 62° 27' 12" East, 14.14 feet;

THENCE along the arc of a 130.17 foot radius curve to the right (the radial bearing of which is South 27° 32' 48" West and the chord of which bears South 09° 38' 36" East, 207.39 feet) through a central angle of 105° 37' 12", for an arc distance of 239.95 feet;

THENCE along the arc of a 616.00 foot radius curve to the left, through a central angle of 43° 10' 00", for an arc distance of 464.09 feet;

THENCE South 00° 00' 00" East, 411.11 feet;

THENCE along the arc of a 676.00 foot radius curve to the right, through a central angle of 27° 07' 26", for an arc distance of 320.02 feet;

THENCE South 27° 07' 26" West, 420.93 feet;

Exhibit C-2C (Page 2 of 3)

Legal Description for
EGT / Bunge
**ACCESS EASEMENT - INTERIOR ROADWAY:**
May 27, 2009
Page 2

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 46° 30′ 08″, for an arc distance of 519.43 feet;

THENCE South 19° 22′ 42″ East, 250.97 feet;

THENCE along the arc of a 692.00 foot radius curve to the right, through a central angle of 26° 46′ 31″, for an arc distance of 323.38 feet;

THENCE South 07° 23′ 48″ West, 168.25 feet;

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 71° 27′ 53″, for an arc distance of 798.27 feet;

THENCE South 64° 04′ 05″ East, 482.55 feet;

THENCE along the arc of a 633.80 foot radius curve to the left, through a central angle of 105° 55′ 55″, for an arc distance of 1171.81 feet;

THENCE North 09° 20′ 15″ East, 95.31 feet to the terminus of the Northerly and Easterly lines of the 28-foot easement to be described, at a point that is 1093.39 feet East, 729.28 feet South, and North 80° 02′ 30″ West, 65.44 feet from the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

LD-2009\EGT- 28′ Road easement.cew
07-127-1

Exhibit C-2C (Page 3 of 3)

**EXHIBIT C-3**



Exhibit C-3 (Page 1 of 4)



**HAGEDORN**™
SURVEYING + ENGINEERING INC

360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## RAILROAD EASEMENT:

A 20-foot easement and a 35-foot easement over a portion of the Jonathan Burbee Donation Land Claim, the Royal Smith Donation Land Claim and the Harry Huntington Donation Land Claim in Sections 9, 10 and 11, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, the centerline of which is described as follows:

> BEGINNING at a point that is 853.07 feet South and 144.37 feet East of a brass cap in concrete at the intersection of Fibre Way and Columbia Boulevard;  thence describing the center of a 20-foot easement lying 10 feet right and 10 feet left of the following described centerline running North 84° 37' 41" East, 28.55 feet;
>
> THENCE along the arc of a 618.30 foot radius curve to the right, through a central angle of 32° 52' 20", for an arc distance of 354.74 feet;
>
> THENCE describing the center of a 35-foot easement lying 10 feet right and 25 feet left of the following described centerline running South 62° 29' 59" East, 790.28 feet;
>
> THENCE along the arc of a 700.00 foot radius curve to the left, through a central angle of 81° 20' 47", for an arc distance of 993.83 feet;
>
> THENCE North 36° 09' 14" East, 150.44 feet;
>
> THENCE along the arc of a 700.00 foot radius curve to the right, through a central angle of 82° 40' 46", for an arc distance of 1010.12 feet;
>
> THENCE South 61° 10' 00" East, 513.52 feet;
>
> THENCE along the arc of a 2864.79 foot radius curve to the left, through a central angle of 02° 00' 00", for an arc distance of 100.00 feet;

Exhibit C-3 (Page 2 of 4)

Legal Description for
EGT / BUNGE
**RAILROAD EASEMENT:**
May 27, 2009
Page 2

THENCE along the arc of a 924.77 foot radius curve to the left, through a central angle of 28° 30' 00", for an arc distance of 460.00 feet;

THENCE along the arc of a 2864.79 foot radius curve to the left, through a central angle of 02° 00' 00", for an arc distance of 100.00 feet;

THENCE North 86° 20' 00" East, 620.00 feet;

THENCE along the arc of a 3819.72 foot radius curve to the right, through a central angle of 01° 30' 00", for an arc distance of 100.00 feet;

THENCE along the arc of a 1263.27 foot radius curve to the right, through a central angle of 13° 50' 00", for an arc distance of 305.00 feet;

THENCE along the arc of a 3819.72 foot radius curve to the right, through a central angle of 01° 30' 00", for an arc distance of 100.00 feet;

THENCE South 76° 50' 00" East, 550.00 feet;

THENCE along the arc of a 4044.41 foot radius curve to the left, through a central angle of 01° 25' 00", for an arc distance of 100.00 feet;

THENCE along the arc of a 1598.17 foot radius curve to the left, through a central angle of 25° 38' 00", for an arc distance of 715.00 feet;

THENCE along the arc of a 4044.41 foot radius curve to the left, through a central angle of 01° 25' 00", for an arc distance of 100.00 feet;

THENCE North 74° 42' 00" East, 885.00 feet;

THENCE describing the center of a 20-foot easement lying 10 feet right and 10 feet left of the following described centerline running along the arc of a 599.39 foot radius curve to the right, through a central angle of 47° 47' 42", for an arc distance of 500.00 feet;

Exhibit C-3 (Page 3 of 4)

Legal Description for
EGT / BUNGE
**RAILROAD EASEMENT:**
May 27, 2009
Page 3

THENCE South 57° 30' 18" East, 99.53 feet to the terminus of said easement centerline at a point on the main track of the Burlington Northern Santa Fe Railroad, said point being 8155.76 feet East and 1144.63 feet South from the brass cap in concrete at the intersection of Fibre Way and Columbia Boulevard, above described.

LD-2009\EGT–1.5 Mile Rail Ease.cew
07-127-1

Exhibit C-3 (Page 4 of 4)

**EXHIBIT C-4A**



Exhibit C-4A (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

## UTILITY EASEMENT:

A variable width easement for ingress and egress over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 20.00 feet;

THENCE North 27° 34' 22" East, parallel with and 40.00 feet Easterly from the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 2049.87 feet;

THENCE, North 33° 03' 32" East, 284.31 feet;

THENCE North 27° 32' 48" East, 69.84 feet to the Southwest corner of Parcel "C" as conveyed to Longview Fibre Company and described in Cowlitz County Auditor's File No. 3096009;

THENCE North 27° 32' 48" East, 22.00 feet to the Northwest corner of Parcel "C";

THENCE North 27° 32' 48" East, 17.00 feet to the South right-of-way line of Fibre Way, as conveyed to Cowlitz County in 2002;

Exhibit C-4A (Page 2 of 3)

## UTILITY EASEMENT:

Page 2

THENCE North 74° 10' 40" West, along said right-of-way line, 113.00 feet;

THENCE, leaving said South right-of-way line, South 15° 56' 10" East, 63.19 feet to the Southeast corner of a tract conveyed to the Port of Longview in Cowlitz County Auditor's File No. 3085541;

THENCE South 27° 34' 22" West, along the East line of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 2372.87 feet;

THENCE South 62° 25' 38" East, 20.00 feet to the POINT OF BEGINNING.

LD-2009\EGT-E. Mill Road Utility.cew
07-127-1

Exhibit C-4A (Page 3 of 3)

**EXHIBIT C-4B**



EXHIBIT SKETCH SHOWING
**WATER EASEMENT**

N

INTERNATIONAL WAY

1.86 ACRES

RSG FOREST PRODUCTS

EAST MILL ROAD

**WATER EASEMENT**

**WATER EASEMENT**

INTERIOR TRACT 2
4.08 ACRES

RSG FOREST PRODUCTS

ZONED "HEAVY MANUFACTURING" (MH)
(SEE DEVELOPMENT STANDARDS IN
TABLE 18.10.501, COWLITZ COUNTY CODE)

INTERIOR TRACT 3
3.53 ACRES

DATE: 6/01/09    JOB NO.: 07-127-1   DRAWN BY: CC
CALC. BY: CEW    DWG# WATER

Exhibit C-4B (Page 1 of 4)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

**WATER EASEMENT:**

A variable width easement for ingress and egress over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 20.00 feet;

THENCE North 27° 34' 22" East, parallel with and 40.00 feet Easterly from the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 2049.87 feet;

THENCE, North 33° 03' 32" East, 284.31 feet;

THENCE North 27° 32' 48" East, 69.84 feet to the Southwest corner of Parcel "C" as conveyed to Longview Fibre Company and described in Cowlitz County Auditor's File No. 3096009;

THENCE North 27° 32' 48" East, 22.00 feet to the Northwest corner of Parcel "C";

THENCE North 27° 32' 48" East, 17.00 feet to the South right-of-way line of Fibre Way, as conveyed to Cowlitz County in 2002;

Exhibit C-4B (Page 2 of 4)

## WATER EASEMENT:

Page 2

THENCE North 74° 10' 40" West, along said right-of-way line, 113.00 feet;

THENCE, leaving said South right-of-way line, South 15° 56' 10" East, 63.19 feet to the Southeast corner of a tract conveyed to the Port of Longview in Cowlitz County Auditor's File No. 3085541;

THENCE South 27° 34' 22" West, along the East line of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 2372.87 feet;

THENCE South 62° 25' 38" East, 20.00 feet to the POINT OF BEGINNING.

ALSO a 10-foot easement for ingress and egress over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 8.00 feet to the TRUE POINT OF BEGINNING of the easement centerline to be described;

THENCE South 35° 20' 00" West, 145.71 feet;

THENCE North 79° 00' 00" West, 212.85 feet;

THENCE North 60° 17' 41" West, 313.51 feet;

THENCE North 62° 15' 03" West, 55.00 feet;

THENCE North 55° 05' 00" West, 25.00 feet;

THENCE North 17° 45' 00" West, 13.00 feet;

THENCE North 63° 13' 00" West, 486.00 feet;

Exhibit C-4B (Page 3 of 4)

## WATER EASEMENT:

Page 3

     THENCE North 31° 35' 00" East, 122.00 feet;

     THENCE North 32° 25' 00" West, 193.00 feet;

     THENCE North 51° 20' 00" West, 196.00 feet;

     THENCE North 62° 55' 00" West, 283.00 feet;

     THENCE North 27° 23' 45" East, 134.45 feet to the terminus of said easement centerline at a point on the South line of the 80-foot tract conveyed to Cowlitz County (for the International Way Extension) in Cowlitz County Auditor's File No. 3099583, said point being North 62° 27' 12" West, 7.00 feet from the centerline of said 80-foot tract.  (the sidelines of said 10-foot easement to be extended or shortened so as to terminate on the South line of said 80-foot tract and on a line running South 62° 25' 38" East, from the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010.)

LD-2009\EGT-Water Easement.cew
07-127-1

Exhibit C-4B (Page 4 of 4)

**EXHIBIT C-5A**



Exhibit C-5A

**EXHIBIT C-5B**



Exhibit C-5B (Page 1 of 2)



**HAGEDORN**™
SURVEYING + ENGINEERING INC

360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934  fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 21, 2009

## NORTH STORM-WATER EASEMENT:

A 20-foot easement for operation, maintenance and re-construction of a storm-water drainage system over a portion of the Jonathan Burbee Donation Land Claim in Section 9, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, the South line of which is described as follows:

> BEGINNING at the Southeast corner of the "Port of Longview tract", as described in Cowlitz County Auditor's File No. 3085541, said point being South 27° 34' 22" West, 50.00 feet from the Northeast corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117;

> THENCE South 27° 34' 22" West, along the East line of the "Pacific Forest Products tract", 22.00 feet to the Southeast corner of a triangular stormwater easement conveyed to the Port of Longview in Cowlitz County Auditor's File No. 3123468 and the TRUE POINT OF BEGINNING of the South line of the 20.00 foot easement to be described;

> THENCE North 66° 58' 20" West, 90.00 feet to the Western corner of the triangular stormwater easement conveyed to the Port of Longview and being a point on the South line of the "Port of Longview tract", as described in Cowlitz County Auditor's File No. 3085541;

> THENCE  North 75° 00' 00" West, 135.00 feet;  thence North 73° 00' 00" West, 170.00 feet;  thence North 63° 00' 00" West, 200.00 feet;

> THENCE North 52° 00'00" West, 140.00 feet;  thence South 87° 00' 00" West, 30.00 feet;  thence South 35° 00' 00" West, 25 feet, more or less, to the existing pond and terminus of said easement South line.  (The North line of said easement to be extended so as to terminate on the East line of the "Pacific Fibre Products tract".)

Exhibit C-5B (Page 2 of 2)

**EXHIBIT C-5C**



EXHIBIT SKETCH
SHOWING
NORTH
STORM—WATER
POND EASEMENT

FIBRE WAY

33.00'

88.84'

593.63'

PARCEL "A"

PARCEL "C"

AF# 960628117

129.93'

107.00'

94.05'

L=776.23'

LEASE
BOUNDARY

LEASE
BOUNDARY

284.08'

101.61'

EAST MILL ROAD

NORTH
STORM—WATER
POND EASEMENT

LEASE
BOUNDARY

JOB NO.: 07—127—1   DRAWN BY: CC
CALC. BY: CEW      DWG# EGT—N—POND

Exhibit C-5C (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

## NORTH STORM-WATER POND EASEMENT:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 62° 25' 38" East, 20.00 feet;

THENCE North 27° 34' 22" East, parallel with and 40.00 feet Easterly from the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117, for a distance of 1765.78 feet to the TRUE POINT OF BEGINNING;

THENCE, leaving said parallel line, North 40° 00' 00" East, 101.61 feet;

THENCE along the arc of a 649.00 foot radius curve to the right (the radial bearing of which is South 50° 00' 00" East and the chord of which bears North 74° 15' 50" East) through a central angle of 68° 31' 40", for an arc distance of 776.23 feet to a point that is 8.00 feet Southwesterly of the Southwesterly line of Parcel "C", as described in Cowlitz County Auditor's File No. 3096009;

THENCE North 62° 28' 00" West parallel with said Southwesterly line of Parcel "C" and it's Westerly Extension, being the South line of a 10-foot powerline easement, as conveyed to Longview Fiber Company in Cowlitz County Auditor's File No. 3118260, for a distance of 593.63 feet to the East line of the "Pacific Fibre Products tract", as described under Cowlitz County Auditor's File No. 960628117 at a point that is South 27° 34' 22" West, 7.00 feet from the

Exhibit C-5C (Page 2 of 3)

## NORTH STORM-WATER POND EASEMENT:

Page 2

> Southeast corner of the tract conveyed to the Port of Longview in Cowlitz County Auditor's File No. 3085541;
>
> THENCE South 27° 34' 22" West, along the East line of the "Pacific Fibre Products tract", 33.00 feet;
>
> THENCE South 62° 25' 38" East, 88.84 feet;
>
> THENCE South 27° 34' 22" West, 129.93 feet;
>
> THENCE South 42° 32' 00" West, 107.00 feet;
>
> THENCE South 50° 41' 00" West, 54.05 feet to a point that is 40.00 feet East of the East line of the "Pacific Fibre Products tract";
>
> THENCE South 27° 34' 22" West, 284.08 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-N. Stormwater Pond.cew
07-127-1

Exhibit C-5C (Page 3 of 3)

## EXHIBIT C-5D



Exhibit C-5D (Page 1 of 2)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## SOUTH STORM-WATER POND EASEMENT:

An easement over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the tract conveyed to Pacific Fibre Products, as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South 26° 55' 01" West, along the East line of the "Pacific Fibre Products tract", 51.99 feet to the TRUE POINT OF BEGINNING;

THENCE, continuing South 26° 55' 01" West, 132.06 feet;

THENCE, leaving said East line, South 11° 30' 00" East, 158.09 feet;

THENCE South 11° 00' 00" West, 314.60 feet;

THENCE North 90° 00' 00" East, 198.00 feet;

THENCE along the arc of a 55.00 foot radius curve to the left, through a central angle of 90° 00' 00", for an arc distance of 86.39 feet;

THENCE North 00° 00' 00" West, 365.00 feet;

THENCE along the arc of a 115.00 foot radius curve to the left, through a central angle of 60° 00' 00", for an arc distance of 120.43 feet;

THENCE North 60° 00' 00" West, 123.79 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT–S. Stormwater Pond.cew        07-127-1

Exhibit C-5D (Page 2 of 2)

# EXHIBIT C-5E



Exhibit C-5E (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934  fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## SOUTH STORM-WATER EASEMENT:

A variable width easement over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the tract conveyed to Pacific Fibre Products, as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South 26° 55' 01" West, along the East line of the "Pacific Fibre Products tract", 135.23 feet to the TRUE POINT OF BEGINNING of the easement to be described;

THENCE North 79° 00' 00" West, 227.27 feet;

THENCE North 59° 15' 43" West, along the South line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117 and it's Easterly extension, 214.25 feet;

THENCE, continuing along said South line, North 62° 32' 45" West, 98.77 feet;

THENCE North 62° 15' 03" West, 50.94 feet;

THENCE, leaving the South line of the latter "Pacific Fibre Products tract", North 09° 32' 00" West, 192.12 feet to a point on the West line of said latter " "Pacific Fibre Products tract" that bears North 18° 17' 28" East, 154.97 feet from the Southwest corner thereof;

THENCE, continuing North 09° 32' 00" West, 40.75 feet;

Exhibit C-5E (Page 2 of 3)

Legal Description for
EGT / Bunge
**SOUTH STORM-WATER EASEMENT:**
May 27, 2009
Page 2

THENCE North 21° 00' 00" East, 103.00 feet to the existing log pond;

THENCE South 73° 40' 00" West, along the bank of the existing log pond, 25.15 feet;

THENCE South 21° 00' 00" West, 149.72 feet;

THENCE South 19° 22' 42" East, 184.14 feet;

THENCE along the arc of a 765.00 foot radius curve to the right, through a central angle of 09° 28' 59", for an arc distance of 126.61 feet;

THENCE Northeasterly, along the Northerly line of the former "Pacific Fibre Products tract", along the arc of a 78.58 foot radius curve to the right (the radial bearing of which is South 61° 45' 46" East and the chord of which bears North 74° 29' 16" East, 113.53 feet) through a central angle of 92° 30' 03", for an arc distance of 126.86 feet;

THENCE South 59° 15' 43" East, along said Northerly line and its Easterly extension, 217.16 feet;

THENCE South 79° 00' 00" East, 225.04 feet to the East line of the former "Pacific Fibre Products tract";

THENCE North 26° 55' 01" East, 20.80 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT –S. Stormwater Ease.cew
07-127-1

Exhibit C-5E (Page 3 of 3)

## EXHIBIT C-6



Exhibit C-6 (Page 1 of 3)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 21, 2009

## LATERAL SUPPORT EASEMENT:

An easement for construction and placement of underground lateral support structures over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE North 62° 25' 38" West, 20.00 feet to a point of curvature on the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117;

THENCE North 27° 34' 22" East, along said East line, 1100.00 feet to the TRUE POINT OF BEGINNING of the tract to be described and a point hereinafter called point "A";

THENCE South 62° 30' 00" East, 512.00 feet to a point hereinafter called point "B";

THENCE North 27° 30' 00" East, 150.00 feet to a point hereinafter called point "C";

THENCE North 62° 30' 00" West, 337.00 feet;

THENCE North 27° 30' 00" East, 152.00 feet;

THENCE North 62° 30' 00" West, 174.62 feet to a point on the East line of the latter "Pacific Fibre Products tract", said point hereinafter called point "D";

Exhibit C-6 (Page 2 of 3)

Legal Description for
EGT / Bunge
**LATERAL SUPPORT EASEMENT:**
May 21, 2009
Page 2

THENCE South 27° 34' 22" West, 302.00 feet to the TRUE POINT OF BEGINNING.

EXCEPT the following described tract:

BEGINNING at point "A", above described;  thence South 62° 30' 00" East, 40.00 feet to the TRUE POINT OF BEGINNING;

THENCE, continuing South 62° 30' 00" East, 155.93 feet;

THENCE North 31° 48' 30" East, 22.78 feet;

THENCE South 62° 30' 00" East, 314.36 feet to a point that is North 27° 30' 00" East, 22.72 feet from point "B", above described;

THENCE North 27° 30' 00" East, 70.18 feet;

THENCE North 62° 30' 00" West, 318.09 feet;

THENCE North 27° 42' 00" East, 57.10 feet to a point that is North 62° 30' 00" West, 317.89 feet from point "C", above described;

THENCE North 62° 30' 00" West, 19.11 feet;

THENCE North 27° 30' 00" East, 152.00 feet;

THENCE North 62° 30' 00" West, 134.62 feet to a point that is South 62° 30' 00" East, 40.00 feet from point "D", above described;

THENCE South 27° 34' 22" West, 302.00 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Lateral Support Easement.cew
07-127-1

Exhibit C-6 (Page 3 of 3)

# EXHIBIT C-7A



EXHIBIT SHOWING
"TEMPORARY ACCESS EASEMENT"
(DURING INITIAL CONSTRUCTION,
FOR UP TO 22 MONTHS,
EXTENDED FOR FORCE MAJEURE)

DATE: 5/05/09   JOB NO.: 07-127-1 DRAWN BY: CC
CALC. BY: CEW   DWG# OPTION-1

Exhibit C-7A (Page 1 of 3)



**HAGEDORN**™
SURVEYING + ENGINEERING INC

360.696.4428 office | 866.696.4428 toll free | 360.694.8934 fax | 1924 Broadway, Suite B | Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## TEMPORARY ACCESS EASEMENT:

A variable width easement over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the tract conveyed to Pacific Fibre Products, as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE North 62° 25' 38" West, 20.00 feet to a point on the East line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117;

THENCE, following the Southerly line of the latter "Pacific Fibre Products tract", Southwesterly, along the arc of a 199.56 foot radius curve to the right (the radial bearing of which is North 62° 25' 38" West and the chord of which bears South 74° 09' 19" West, 289.91 feet) through a central angle of 93° 09' 55", for an arc distance of 324.49 feet;

THENCE North 59° 15' 43" West, along the South line of the latter "Pacific Fibre Products tract", 199.93 feet;

THENCE, continuing along said South line, North 62° 32' 45" West, 98.77 feet;

THENCE North 62° 15' 03" West, 73.82 feet;

THENCE, leaving said South line, South 19° 22' 42" East, 5.71 feet;

Exhibit C-7A (Page 2 of 3)

Legal Description for
EGT / Bunge
**<u>TEMPORARY ACCESS EASEMENT:</u>**
May 27, 2009
Page 2

THENCE along the arc of a 765.00 foot radius curve to the right, through a central angle of 09° 28' 59", for an arc distance of 126.61 feet to a point on the Northwesterly line of the former "Pacific Fibre Products tract", as described in Auditor's File No. 961112010;

THENCE Northeasterly, along the Northerly line of the former "Pacific Fibre Products tract", along the arc of a 78.58 foot radius curve to the right (the radial bearing of which is South 61° 45' 46" East and the chord of which bears North 74° 29' 16" East, 113.53 feet) through a central angle of 92° 30' 03", for an arc distance of 126.86 feet;

THENCE South 59° 15' 43" East, along said Northerly line 199.36 feet;

THENCE along the arc of a 219.56 foot radius curve to the left, through a central angle of 93° 09' 55", for an arc distance of 357.01 feet to the most Northeasterly corner of the former "Pacific Fibre Products tract" and the TRUE POINT OF BEGINNING.

LD-2009\EGT –Temp Access.cew
07-127-1

Exhibit C-7A (Page 3 of 3)

## EXHIBIT C-7B



Exhibit C-7B (Page 1 of 4)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## TEMPORARY CONSTRUCTION EASEMENT:

A 20-foot easement over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the tract conveyed to Pacific Fibre Products, as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South 26° 55' 01" West, along the East line of the "Pacific Fibre Products tract", 135.23 feet to the TRUE POINT OF BEGINNING of the easement to be described;

THENCE North 79° 00' 00" West, 227.27 feet;

THENCE North 59° 15' 43" West, along the South line of another "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 960628117 and it's Easterly extension, 214.25 feet;

THENCE, continuing along said South line, North 62° 32' 45" West, 98.77 feet;

THENCE North 62° 15' 03" West, 73.82 feet;

THENCE, leaving the South line of the latter "Pacific Fibre Products tract", North 19° 22' 42" West, 29.40 feet;

THENCE South 62° 15' 03" East, 95.31 feet;

Exhibit C-7B (Page 2 of 4)

Legal Description for
EGT / Bunge
**TEMPORARY CONSTRUCTION EASEMENT:**
May 27, 2009
Page 2

THENCE South 62° 32' 45" East, 99.29 feet;

THENCE South 59° 15' 43" East, 211.35 feet;

THENCE South 79° 00' 00" East, 229.49 feet to the East line of the former "Pacific Fibre Products tract";

THENCE South 26° 55' 01" West, 20.80 feet to the TRUE POINT OF BEGINNING.

Also a 20-foot easement over a portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the tract conveyed to Pacific Fibre Products, as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South 26° 55' 01" West, along the East line of the "Pacific Fibre Products tract", 176.83 feet to the TRUE POINT OF BEGINNING of the easement to be described;

THENCE North 79° 00' 00" West, 222.82 feet;

THENCE North 59° 15' 43" West, 220.64 feet;

THENCE along the arc of a 58.58 foot radius curve to the left, through a central angle of 93° 22' 37", for an arc distance of 95.47 feet;

THENCE South 27° 21' 40" West, 26.33 feet;

THENCE along the arc of a 765.00 foot radius curve to the left (the radial bearing of which is South 82° 39' 11" West and the chord of which bears North 08° 37' 16" West, 34.03 feet) through a central angle of

Exhibit C-7B (Page 3 of 4)

Legal Description for
EGT / Bunge
**TEMPORARY CONSTRUCTION EASEMENT:**
May 27, 2009
Page 3

02° 32' 55", for an arc distance of 34.03 feet to the Northwesterly line of the "Pacific Fibre Products tract";

THENCE following said Northwesterly and Northerly lines of the "Pacific Fibre Products tract", along the arc of a 78.58 foot radius curve to the right, (the radial bearing of which is South 61° 45' 46 East and the chord of which bears North 74° 29' 16" East, 113.53 feet) through a central angle of 92° 30' 03", for an arc distance of 126.86 feet;

THENCE South 59° 15' 43" East, along said Northerly line and its Easterly extension, 217.16 feet;

THENCE South 79° 00' 00" East, 225.04 feet to the East line of the "Pacific Fibre Products tract";

THENCE South 26° 55' 01" West, 20.80 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT –Temp Const Ease.cew
07-127-1

Exhibit C-7B (Page 4 of 4)

# EXHIBIT D

## PERMITTED ENCUMBRANCES

1.      The Demised Premises are subject to the following utility easements and rights-of-way of record (the "Permitted Encumbrances"); Lessor warranting and covenanting that none of such utility easements or rights-of-way have been encroached, violated or breached, and none of such utility easements or rights-of-way will be encroached upon, violated or breached by the installation, development, construction and use of the facilities and improvements comprising the Lessee Projects or the Port Projects under the Lease:

   A.      Easement and Right-of-Way for Dike and Drainage in favor of the Consolidated Diking Improvement District No. 1 by decree entered November 16, 1923, as Superior Court Cause No. 5362.

   B.      Deed containing mineral rights reservation from the State of Washington dated January 18, 1921, and recorded in Auditor's File No. 19952.

   C.      Power Line Right-of-Way Easement in favor of Longview Fibre Company, recorded June 14, 2001, in Auditor's File No. 3117759.

   D.      Utilities Easement in favor of Port, recorded September 12, 2003, in Auditor's File No. 3199505.

   E.      Storm Water Drainage Easement in favor of Port, recorded August 15, 2001, in Auditor's File No. 3123468.

   F.      Quit Claim Deed to Port, recorded December 23, 1998, in Auditor's File No. 3043076.

   G.      Easement and Right-of-Way for Dike and Drainage in favor of Diking Improvement District No. 4 recorded February 21, 1920 in Auditor's File No. 17616.

   H.      Power Line Right-of-Way Easement in favor of Longview Fibre Company, recorded June 20, 2001, in Auditor's File No. 3118260.

   I.      Right-of-Way Easement for Electric Power in favor of the Public Utility District No. 1 of Cowlitz County, Washington, recorded February 3, 2005, in Auditor's File No. 3248296, as amended by First Amendment recorded March 5, 2008 as Auditor's No. 3360866, and as amended by Second Amendment recorded June 3, 2009 as Auditor's No. _3394973_____.

   J.      Deed containing mineral rights reservation from the State of Washington recorded on September 18, 1922 in Auditor's File No. 24995.

2.      Agreement for Deposit, Sale and Use of State-Owned Dredged Material by and between the State of Washington Department of Natural Resources and Port of Longview, recorded

March 4, 2005, in Auditor's File No. 3251040; Lessor warranting and covenanting that (i) such agreement shall not interfere with or delay the installation, development, construction and use of the facilities and improvements comprising the Lessee Projects or the Port Projects under the Lease, and (ii) such agreement and all rights and obligations under such agreement shall expire and be fully discharged, without cost to Lessee, on or before December 31, 2009.

# EXHIBIT E

## ADJACENT PROPERTY/BUFFER AND SET BACK AREAS

Exhibit E, delineating and depicting the Adjacent Property and the Buffer Areas and the Set Back Areas established under the Lease for the benefit of Lessee and the Demised Premises, is comprised of the following Exhibits which are attached hereto and incorporated herein by this reference and made a part hereof (and incorporated into and made a part of the Lease):

Exhibit E-1    Adjacent Property

Exhibit E-2A   Buffer Area No. 1

Exhibit E-2B   Buffer Area No. 2

Exhibit E-2C   Buffer Area No. 3

Exhibit E-2D   Set Back Areas

## EXHIBIT E-1 - ADJACENT PROPERTY





360.696.4428 office | 866.696.4428 toll free | 360.694.8934 fax | 1924 Broadway, Suite B | Vancouver, WA 98663
www.hagedornse.com

May 19, 2009

## ADJACENT PROPERTY (45.42 ACRES):

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;  thence North 00° 00' 00" East, 977.19 feet;  thence North 90° 00' 00" East, 706.34 feet to the TRUE POINT OF BEGINNING;

THENCE North 27° 42' 00" East, 191.00 feet;

THENCE North 19° 20' 00" East, 147.00 feet;

THENCE North 28° 30' 00" East, 268.19 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 80° 42' 00", for an arc distance of 798.33 feet;

THENCE South 62° 28' 00" East, 22.87 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 90° 02' 00", for an arc distance of 890.66 feet;

THENCE South 27° 34' 00" West, 1847.00 feet to a point that is 1093.39 feet East and 729.28 feet South of the Northeast corner of the "Pacific Fibre Products tract" above described;

THENCE North 80° 02' 30" West, 65.44 feet;

Legal Description for
EGT / Bunge
**ADJACENT PROPERTY (45.42 ACRES):**
May 19, 2009
Page 2

THENCE along the arc of a 663.35 foot radius curve to the left (the radial bearing of which is North 87° 12' 55" West and the chord of which bears North 27° 17' 42" West, 664.94 feet) through a central angle of 60° 09' 32", for an arc distance of 696.50 feet;

THENCE North 57° 22' 27" West, 65.05 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, through a central angle of 40° 13 00", for an arc distance of 397.84 feet;

THENCE North 56° 30' 00" East, 331.16 feet;

THENCE South 33° 30' 00" East, 26.00 feet;

THENCE North 56° 30' 00" East, 85.00 feet;

THENCE North 33° 30' 00" West, 23.00 feet;

THENCE North 56° 30' 00" East, 418.00 feet;

THENCE North 88° 30' 00" East, 50.00 feet;

THENCE North 27° 30' 00" East, 64.00 feet;

THENCE North 62° 30' 00" West, 105.00 feet;

THENCE South 27° 30' 00" West, 17.00 feet;

THENCE North 62° 30' 00" West, 454.00 feet to the TRUE POINT OF BEGINNING;

LD-2009\EGT-Adjacent property 45.42 Ac.cew
07-127-1



360.696.4428 office | 866.696.4428 toll free | 360.694.8934 fax | 1924 Broadway, Suite B | Vancouver, WA 98663
www.hagedornse.com

May 19, 2009

## ADJACENT PROPERTY (4.08 ACRES):

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010; thence North 00° 00' 00" East, 977.19 feet; thence North 90° 00' 00" East, 706.34 feet;

THENCE South 24° 27' 42" West, 70.29 feet to the TRUE POINT OF BEGINNING;

THENCE South 62° 30' 00" East, 440.00 feet;

THENCE South 56° 30' 00" West, 469.24 feet;

THENCE South 33° 30' 00" East, 23.00 feet;

THENCE South 56° 30' 00" West, 318.88 feet;

THENCE along the arc of a 566.80 foot radius curve to the right (the radial bearing of which is North 76° 47' 31" East and the chord of which bears North 05° 58' 49" West, 142.62 feet) through a central angle of 14° 27' 19", for an arc distance of 143.00 feet;

THENCE North 25° 20' 00" East, 440.00 feet;

THENCE South 64° 40' 00" East, 51.00 feet;

THENCE North 25° 20' 00" East, 65.00 feet;

Legal Description for
EGT / BUNGE
**ADJACENT PROPERTY (4.08 ACRES):**
May 19, 2009
Page 2

THENCE North 64° 40' 00" West, 37.00 feet;

THENCE North 31° 48' 30" East, 76.54 feet to the TRUE POINT OF BEGINNING;

LD-2009\EGT-Adjacent property 4.08 Ac.cew
07-127-1



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934  fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 19, 2009

## ADJACENT PROPERTY (3.53 ACRES):

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Southwesterly corner of the "Schwans tract", as described in Cowlitz County Auditor's File No. 870213060;

THENCE South 62° 27' 12" East, 200.00 feet to the Southeast corner of the "Schwans tract";  thence, continuing South 62° 27' 12" East, 140.74 feet;  thence South 27° 32' 48" West, 99.88 feet to the TRUE POINT OF BEGINNING of the tract to be described;

THENCE along the arc of a 130.17 foot radius curve to the right (the radial bearing of which is North 75° 54' 29" West and the chord of which bears South
28° 37' 45" West, 65.35 feet) through a central angle of 29° 04' 29", for an arc distance of 66.05 feet;

THENCE along the arc of a 616.00 foot radius curve to the left, through a central angle of 43° 10' 00", for an arc distance of 464.09 feet;

THENCE South 00° 00' 00" East, 411.11 feet;

THENCE along the arc of a 676.00 foot radius curve to the right, through a central angle of 27° 07' 26", for an arc distance of 320.02 feet;

THENCE South 27° 07' 26" West, 420.93 feet;

Legal Description for
EGT / Bunge
**ADJACENT PROPERTY (3.53 ACRES):**
May 19, 2009
Page 2

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 46° 30' 08", for an arc distance of 519.43 feet;

THENCE South 19° 22' 42" East, 250.97 feet;

THENCE along the arc of a 692.00 foot radius curve to the right, through a central angle of 26° 46' 31", for an arc distance of 323.38 feet;

THENCE South 07° 23' 48" West, 168.25 feet;

THENCE along the arc of a 640.00 foot radius curve to the left, through a central angle of 71° 27' 53", for an arc distance of 798.27 feet;

THENCE South 64° 04' 05" East, 482.55 feet;

THENCE along the arc of a 633.80 foot radius curve to the left, through a central angle of 105° 55' 55", for an arc distance of 1171.81 feet;

THENCE North 09° 20' 15" East, 95.31 feet;

THENCE South 80° 02' 30" East, 28.00 feet to a point that is North 80° 02' 30" West, 37.44 feet from a point that bears 1093.39 feet East and 729.28 feet South of the most Northerly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;

THENCE South 09° 20' 15" West, 95.33 feet;

THENCE along the arc of a 661.80 foot radius curve to the right, (the radial bearing of which is North 80° 00' 00" West and the chord of which bears South 62° 57' 58" West, 1056.60 feet) through a central angle of 105° 55' 55", for an arc distance of 1223.58 feet;

THENCE North 64° 04' 05" West, 482.55 feet;

Exhibit E-1 (Page 7 of 10)

Legal Description for
EGT / Bunge
**ADJACENT PROPERTY (3.53 ACRES):**
May 19, 2009
Page 3

THENCE along the arc of a 668.00 foot radius curve to the right, through a central angle of 71° 27' 53", for an arc distance of 833.19 feet;

THENCE North 07° 23' 48" East, 168.25 feet;

THENCE along the arc of a 664.00 foot radius curve to the left, through a central angle of 26° 46' 31", for an arc distance of 310.30 feet;

THENCE North 19° 22' 42" West, 250.97 feet;

THENCE along the arc of a 668.00 foot radius curve to the right, through a central angle of 46° 30' 08", for an arc distance of 542.16 feet;

THENCE North 27° 07' 26" East, 420.93 feet;

THENCE along the arc of a 648.00 foot radius curve to the left, through a central angle of 27° 07' 26", for an arc distance of 306.76 feet;

THENCE North 00° 00' 00" East, 411.11 feet;

THENCE along the arc of a 644.00 foot radius curve to the right, through a central angle of 27° 55' 35", for an arc distance of 313.89 feet;

THENCE along the arc of a 591.80 foot radius curve to the right, through a central angle of 22° 41' 13", for an arc distance of 234.33 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Adjacent Property 3.53 Ac.cew
07-127-1

Exhibit E-1 (Page 8 of 10)



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 19, 2009

## ADJACENT PROPERTY (1.86 ACRES):

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Southwesterly corner of the "Schwans tract", as described in Cowlitz County Auditor's File No. 870213060;

THENCE South 62° 27' 12" East, 200.00 feet to the Southeast corner of the "Schwans tract";  thence, continuing South 62° 27' 12" East, 328.33 feet to the TRUE POINT OF BEGINNING of the tract to be described;

THENCE along the arc of a 589.00 foot radius curve to the left (the radial bearing of which is South 27° 53' 01" East and the chord of which bears South 31° 03' 30" West, 607.74 feet) through a central angle of 62° 06' 59", for an arc distance of 638.56 feet;

THENCE South 00° 00' 00" East, 24.75 feet;

THENCE along the arc of a 641.00 foot radius curve to the right, through a central angle of 06° 16' 57", for an arc distance of 70.29 feet;

THENCE South 06° 16' 56" West, 120.34 feet;

THENCE North 27° 07' 00" East, 651.36 feet;

THENCE along the arc of a 636.59 foot radius curve to the right, through a central angle of 13° 55' 25", for an arc distance of 154.70 feet;

Legal Description for
EGT / BUNGE
**ADJACENT PROPERTY (1.86 ACRES):**
May 19, 2009
Page 2

THENCE North 62° 27' 12" West, 59.56 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Adjacent property 1.86 Ac.cew
07-127-1

# EXHIBIT E-2A





**SURVEYING + ENGINEERING INC**

360.696.4428 office | 866.696.4428 toll free | 360.694.8934 fax | 1924 Broadway, Suite B | Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## BUFFER AREA NO. 1:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;  thence North 00° 00' 00" East, 977.19 feet;  thence North 90° 00' 00" East, 706.34 feet to the TRUE POINT OF BEGINNING;

THENCE North 27° 42' 00" East, 191.00 feet;

THENCE North 19° 20' 00" East, 58.49 feet;

THENCE South 62° 33' 00" East, 28.26 feet;

THENCE South 27° 27' 00" West, 382.00 feet;

THENCE North 62° 33' 00" West, 21.97 feet;

THENCE North 31° 48' 30" East, 63.09 feet;

THENCE North 24° 27' 42" East, 70.29 feet to the TRUE POINT OF BEGINNING;

LD-2009\EGT-Bufffer Area 1.cew
07-127-1

Exhibit E-2A (Page 2 of 2)

## EXHIBIT E-2B





360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

## BUFFER AREA NO. 2:

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northeasterly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010;  thence North 00° 00' 00" East, 977.19 feet;  thence North 90° 00' 00" East, 706.34 feet; thence South 62° 30' 00" East, 20.84 feet to the TRUE POINT OF BEGINNING and a point hereinafter called point "A";

THENCE North 27° 27' 00" East, 30.00 feet;

THENCE South 62° 30' 00" East, 403.19 feet;

THENCE North 27° 30' 00" East, 17.00 feet;

THENCE South 62° 30' 00" East, 165.00 feet;

THENCE South 27° 30' 00" West, 111.67 feet;

THENCE South 88° 30' 00" West, 59.07 feet;

THENCE South 56° 30' 00" West, 379.40 feet;

THENCE South 33° 30' 00" East, 23.00 feet;

THENCE South 56° 30' 00" West, 145.00 feet;

THENCE North 33° 30' 00" West, 26.00 feet;

Exhibit E-2B (Page 2 of 4)

Legal Description for
EGT / BUNGE
May 27, 2009
**BUFFER AREA NO. 2:**
Page 2

THENCE South 56° 30' 00" West, 309.07 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, (the radial bearing of which is North 69° 42' 20" East and the chord of which bears North 18° 43' 34" West, 31.03 feet) through a central angle of 03° 08' 12", for an arc distance of 31.03 feet;

THENCE North 56° 30' 00" East, 331.16 feet;

THENCE South 33° 30' 00" East, 26.00 feet;

THENCE North 56° 30' 00" East, 85.00 feet;

THENCE North 33° 30' 00" West, 23.00 feet;

THENCE North 56° 30' 00" East, 418.00 feet;

THENCE North 88° 30' 00" East, 50.00 feet;

THENCE North 27° 30' 00" East, 64.00 feet;

THENCE North 62° 30' 00" West, 105.00 feet;

THENCE South 27° 30' 00" West, 17.00 feet;

THENCE North 62° 30' 00" West, 433.16 feet to the TRUE POINT OF BEGINNING;

ALSO BEGINNING at point "A", above described;  thence South 27° 27' 00" West, 70.19 feet to the TRUE POINT OF BEGINNING;

THENCE South 62° 30' 00" East, 422.82 feet;

THENCE South 56° 30' 00" West, 469.24 feet;

THENCE South 33° 30' 00" East, 23.00 feet;

Legal Description for
EGT / BUNGE
May 27, 2009
**BUFFER AREA NO. 2:**
Page 3

THENCE South 56° 30' 00" West, 318.00 feet;

THENCE along the arc of a 566.80 foot radius curve to the right, (the radial bearing of which is North 76° 47' 31" East and the chord of which bears North 11° 34' 24" West, 32.34 feet) through a central angle of 03° 16' 10", for an arc distance of 32.34 feet;

THENCE North 56° 30' 00" East, 276.80 feet;

THENCE North 33° 30' 00" West, 23.00 feet;

THENCE North 56° 30' 00" East, 448.31 feet;

THENCE North 62° 30' 00" West, 371.87 feet;

THENCE North 27° 27' 00" East, 30.00 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Buffer Area 2.cew
07-127-1

## EXHIBIT E-2C



EXHIBIT SKETCH
SHOWING
**BUFFER AREA
No. 3**

BUFFER AREA No.3
8.17 ACRES

JOB NO.: 07-127-1   DRAWN BY: CC
DATE:  5/27/09   CALC. BY: CEW   DWG# BUFFER-No-3

Exhibit E-2C (Page 1 of 3)



**HAGEDORN**
SURVEYING + ENGINEERING INC

360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

**BUFFER AREA NO. 3:**

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim and adjoining tidelands in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Northerly corner of the "Pacific Fibre Products tract", as described in Cowlitz County Auditor's File No. 961112010 and shown in Book 21 of Surveys, page 16, Cowlitz County Auditor's Records;

THENCE South, 1173.32 feet and West, 376.49 feet to the TRUE POINT OF BEGINNING;

THENCE South 64° 04' 05" East, 482.55 feet;

THENCE along the arc of a 758.80 foot radius curve to the left, through a central angle of 06° 33' 00", for an arc distance of 86.75 feet;

THENCE South 25° 55' 55" West, 203.74 feet to a point on the South line of the Consolidated Diking Improvement District #1 right-of-way, described in Superior Court Cause # 5362 (1923), as located and monumented in Book 8 of Surveys, page 144 and shown in Survey 21-16;

THENCE, following said South right-of-way line, South 64° 04' 05" East, 148.74 feet;

THENCE along the arc of a 1295.82 foot radius curve to the left (the radial bearing of which is North 25° 56' 41" East, and the chord of which bears South 67° 01' 05" East, 133.95 feet) through a central angle of 05° 55' 31", for an arc

Legal Description for
EGT / Bunge
**BUFFER AREA NO. 3:**
May 27, 2009
Page 2


distance of 134.01 feet to the East line of the "Port of Longview tract", as described in Cowlitz County Auditor's File No. 3073058;

THENCE South 23° 22' 30" West, 121.76 feet to an angle point in said East line;

THENCE South 23° 19' 17" West, 47.07 feet to the Southerly Southeast corner of the "Port of Longview tract";

THENCE North 73° 07' 58" West, along the South line of the "Port of Longview tract", 102.54 feet;

THENCE North 70° 20' 15" West, 163.53 feet;

THENCE North 77° 16' 29" West, 231.68 feet;

THENCE North 65° 34' 02" West, 239.43 feet;

THENCE North 76° 08' 43" West, 146.25 feet;

THENCE North 72° 50' 20" West, 89.40 feet;

THENCE, leaving said South line, North 25° 55' 55" East, 299.20 feet to the South right-of-way line of Consolidated Diking Improvement District #1;

THENCE North 25° 55' 55" East, 205.47 feet;

THENCE along the arc of a 765.00 foot radius curve to the left (the radial bearing of which is North 33° 30' 38" East and the chord of which bears South 60° 16' 43" East, 101.11 feet), through a central angle of 07° 34' 42", for an arc distance of 101.19 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Bufffer Area 3.cew
07-127-1

Exhibit E-2C (Page 3 of 3)

## EXHIBIT E-2D



EXHIBIT SKETCH SHOWING
SET BACK AREAS



360.696.4428 office  |  866.696.4428 toll free  |  360.694.8934 fax  |  1924 Broadway, Suite B  |  Vancouver, WA 98663
www.hagedornse.com

May 27, 2009

<u>SET BACK AREAS:</u>

A portion of the Jonathan Burbee Donation Land Claim and the Royal Smith Donation Land Claim in Sections 9 and 10, Township 7 North, Range 2 West, Willamette Meridian, Cowlitz County, Washington, described as follows:

BEGINNING at the most Southwesterly corner of the "Schwans tract", as described in Cowlitz County Auditor's File No. 870213060;  thence North, 777.56 feet and East, 787.82 feet to a brass cap in concrete at the intersection of Columbia Blvd. and Fibre Way;  thence South 853.07 feet and East 144.37 feet; thence North 05° 22' 19" West, 16.36 feet to the TRUE POINT OF BEGINNING of the tract to be described;

THENCE South 86° 04' 32" West, 351.69 feet;

THENCE along the arc of a 625.00 foot radius curve to the left, through a central angle of 80° 52' 14", for an arc distance of 882.16 feet;

THENCE South 05° 12' 18" West, 496.35 feet;

THENCE along the arc of a 733.00 foot radius curve to the right, through a central angle of 21° 55' 08", for an arc distance of 280.41 feet;

THENCE South 27° 07' 26" West, 464.76 feet;

THENCE along the arc of a 601.00 foot radius curve to the left, through a central angle of 46° 30' 08", for an arc distance of 487.78 feet;

THENCE South 19° 22' 42" East, 326.75 feet;

Exhibit E-2D (Page 2 of 3)

Legal Description for
EGT / Bunge
SET BACK AREAS:
May 27, 2009
Page 2

THENCE along the arc of a 478.00 foot radius curve to the right, through a central angle of 31° 09′ 53″, for an arc distance of 260.00 feet;

THENCE South 82° 45′ 00″ East, 24.62 feet to a point that is 224.39 feet South and 745.21 feet West of the most Northeasterly corner of the "Pacific Fibre Products tract', as described in Cowlitz County Auditor's File No. 961112010;

THENCE along the arc of a 601.00 foot radius curve to the left, (the radial bearing of which is North 82° 36' 12" West and the chord of which bears North 05° 59' 27" West, 278.31 feet) through a central angle of 26° 46' 31", for an arc distance of 280.86 feet;

THENCE North 19° 22′ 42″ West, 250.97 feet;

THENCE along the arc of a 731.00 foot radius curve to the right, through a central angle of 46° 30′ 08″, for an arc distance of 593.29 feet;

THENCE North 27° 07′ 26″ East, 401.95 feet;

THENCE along the arc of a 747.00 foot radius curve to the left, through a central angle of 21° 55′ 08″, for an arc distance of 285.77 feet;

THENCE North 05° 12′ 18″ East, 492.77 feet;

THENCE along the arc of a 606.80 foot radius curve to the right, through a central angle of 79° 25′ 23″, for an arc distance of 841.14 feet;

THENCE North 84° 37' 41" East, 368.36 feet;

THENCE North 05° 22' 19" West, 13.56 feet to the TRUE POINT OF BEGINNING.

LD-2009\EGT-Buffer Area 4.cew
07-127-1

Exhibit E-2D (Page 3 of 3)

# EXHIBIT F - PORT PROPERTY



Exhibit F

# EXHIBIT G

## DISCLOSURES

Exhibit G, setting forth disclosures with respect to environmental matters and labor matters, is comprised of the following Exhibits, which are attached hereto and incorporated herein by this reference and made a part hereof (and incorporated into and made a part of the Lease):

> Exhibit G-1    Environmental Matters
>
> Exhibit G-2    Labor Matters

# EXHIBIT G-1

## ENVIRONMENTAL MATTERS

Lessor has furnished Lessee with copies of (i) that certain Phase I Environmental Site Assessment - Longview Property "East Industrial Park" - Longview Washington, dated September 5, 2006 prepared by Hart Crowser, Inc., (ii) that certain Phase I Environmental Site Assessment Update – Longview Property "East Industrial Park" – Longview Washington, dated January 31, 2008 prepared by Hart Crowser, Inc., and (iii) that certain Phase I Environmental Site Assessment Update - Longview Property and new "West Parcels" - Longview Washington, dated March 26, 2009 prepared by Hart Crowser, Inc.

Lessor warrants and covenants that the conditions described in the matters listed above shall not interfere with the installation, development, construction and use of the facilities and improvements comprising the Lessee Projects or the Port Projects, and shall not result in any costs attributable to remediation, handling or disposition of any such conditions; and without limiting the generality of the foregoing, Lessor further covenants that Lessor shall bear (i) all costs associated with the remediation, handling and disposition of the "Stormwater Ditch with Oily Residue" identified as a Recognized Environmental Condition (or REC) in that certain Phase I Environmental Site Assessment Update – Longview Property and New "West Parcels" – Longview, Washington dated March 26, 2009 and prepared by Hart Crowser, Inc., and (ii) all costs associated with permitting, sampling, handling, storage or disposal of groundwater pumped in the course of completing the Lessee Projects (although only to the extent that such costs are attributable to the presence of any contaminant in the pumped groundwater).

# EXHIBIT G-2

## LABOR MATTERS

Lessor expressly refers Lessee to the provisions of the Working Agreement between the ILWU Local 21 and the Port, dated 1999-2002, as extended through the date of this Lease, for Longview, Washington.

# EXHIBIT H

## FACILITY

The Facility will accommodate the export of grain (including feed grain, dried distillers grain and wheat) and grain byproducts, oilseed and oilseed byproducts, and meal (including soybean meal) and solubles, and similar products and byproducts (collectively, "Products"), which may arrive at the Facility by rail and barge and may be unloaded, stored, cleaned, sampled, weighed and loaded through a system of storage silos ("Storage Silos"), shipping bins ("Shipping Bins") and conveyors onto Panamax-size and other vessels at the Ship Dock.

Products arriving by rail or barge may be unloaded, sampled, weighed and stored (the "Rail Receiving System" or "Barge Receiving System", as the case may be) at the Facility.

Products may be discharged from rail cars into in-line receiving pits or unloaded from barges at the Barge Dock, and then conveyed through a system of conveyors, through sampling and scale systems where the received Products may be sampled and weighed.

Once inbound Products are sampled and weighed, those Products may be conveyed through a system of conveyors for (i) shipping through the Shipping Bins, (ii) cleaning at a Products cleaning system (the "Products Cleaning System") to be located near the Silo System, or (iii) storage in the Storage Silos.

Products may be reclaimed from the Storage Silos through a system of conveyors to the Products Cleaning System or for shipping. Once any Products pass through the Products Cleaning System, those Products may be conveyed to the Storage Silos or for shipping.

Products being conveyed through the Facility for shipping, from the Storage Silos or otherwise, may be conveyed through a system of conveyors, where those Products may be sampled and weighed before being conveyed to the Shipping Bins. When Products in the Shipping Bins conform to the desired grade, the Products may be discharged to conveyors feeding the Ship Dock, where those Products may be loaded onto Panamax size vessels.

The Silo System, Rail Receiving System, Barge Receiving System, Products Cleaning System, and system of conveyors that may convey Products through the Facility shall be designed by Lessee in Lessee's discretion, and may provide for Products to be transported from the Facility offsite via rail cars or semi trucks in addition to vessels loaded at the Ship Dock.

The Facility and any Improvements relating to the Facility, once constructed by Lessee, may be modified at any time and from time to time by Lessee, in Lessee's discretion.

# EXHIBIT I

## LESSEE PROJECTS

Exhibit I, setting forth a description of Lessee Projects, a conceptual plan of the contemplated initial locations of the Lessee Projects on the Land, a description of the methodology and procedures for determining the Footprint of the Improvements within the Land, and a depiction of the initial (assumed) Footprint of the Improvements within the Land contemplated in connection with the Lessee Projects, is comprised of the following Exhibits, which are attached hereto and incorporated herein by this reference and made a part hereof (and incorporated into and made a part of the Lease):

| | |
|---|---|
| Exhibit I-1 | Description of Lessee Projects |
| Exhibit I-2 | Conceptual Plan – Contemplated Initial Locations of Lessee Projects within the Land |
| Exhibit I-3 | Footprint Methodology and Procedures |
| Exhibit I-4 | Initial (Assumed) Footprint |

# EXHIBIT I-1

## DESCRIPTION OF LESSEE PROJECTS

Lessee shall complete the following as Lessee's Projects:

1.  Design and construction of the Facility as described on <u>Exhibit H</u> and including the following:

    (a)  Design and construction of above-water structures (i.e., from the anchor bolts upward) and installation of shiploaders and related improvements on the Ship Dock, exclusive of any Port Projects;

    (b)  Design and construction of above-water structures on the Barge Dock and installation of marine leg adjacent thereto and related improvements, exclusive of any Port Projects;

    (c)  Installation of utilities necessary to the operation of the Facility at the Demised Premises, exclusive of any Port Projects;

    (d)  Design and construction of the state grain inspection offices; and

    (e)  Design and construction of grain terminal facilities, including pits, silos, conveyors, parking lots and offices.

2.  Design and construction of rail tracks to connect the Rail Loop to the existing Industrial Rail Corridor near the junction of the Demised Premises and Fibre Way, including the switch to connect the Rail Loop to the Lessor's Industrial Rail Corridor.

3.  Design and construction of two storm water retention basins serving the Facility and depicted conceptually on <u>Exhibit C-5C</u> and <u>C-5D</u> to the Lease and connections to the Port's stormwater system at the log pond or elsewhere.

4.  Design and construction of multi-loop rail track serving the Facility and depicted conceptually on <u>Exhibit I-2</u> to the Lease.

Lessee's Projects, listed above, are not public works; Lessee's Projects shall be constructed in good and workmanlike manner, but otherwise shall be designed, engineered, constructed and installed at the sole and absolute discretion of Lessee, using such labor and materials as Lessee may select. Lessee covenants that Lessee's Projects shall be performed in a manner that will not interfere with or delay the development or construction of the Port Projects (Lessee acknowledging that Lessor and its contractor shall be working at and around the Ship Dock and the Barge Dock, and Lessee agreeing to coordinate with Lessor to the extent reasonable and practical). Lessee's Projects shall be paid for by Lessee and shall be substantially completed by Lessee in accordance with such construction schedule as Lessee shall reasonably determine necessary in order to substantially complete and open the Facility by the Completion Date, subject to extensions by reason of Force Majeure.

Exhibit I-1 (Page 1 of 2)

Upon completion of construction of Lessee's Projects and upon Lessor's written request, Lessee shall provide Lessor with a set of as-built drawings for the Facility, Lessee shall cause an "as built" survey of the Land and Improvements within the Demised Premises to be prepared by a licensed independent surveyor selected by Lessee, and Lessee shall provide Lessor with a copy of such survey upon completion of the same.

The conceptual layout of Lessee's Projects, listed above as well as other major Improvements contemplated by Lessee within the Demised Premises as part of the Facility initially to be developed by Lessee, are generally depicted on Exhibit I-2 to the Lease; the actual layout, as developed by Lessee, may vary from this conceptual depiction within the contours of the Demised Premises and the Appurtenances and, once developed, may be altered, removed or reconstructed from time to time as permitted under this Lease.

The Footprint of the initial Improvements within the Land, based upon this conceptual depiction of Lessee's Projects as shown on Exhibit I-2 to the Lease, is depicted on Exhibit I-4 to the Lease, and the methodology for determining the Footprint is set forth on Exhibit I-3 to the Lease.

# EXHIBIT I-2

## CONCEPTUAL PLAN --CONTEMPLATED INITIAL LOCATIONS OF LESSEE'S PROJECTS (AND OTHER IMPROVEMENTS) WITHIN THE LAND



Exhibit I-2

# EXHIBIT I-3

## FOOTPRINT METHODOLOGY AND PROCEDURES

The Footprint of the initial Improvements within the Land, based upon the assumptions in the conceptual depiction of Lessee's Projects as shown on Exhibit I-1 to the Lease, is 37.66 acres and is shown on Exhibit I-4 to the Lease.

The methodology for determining the initial Footprint and for measuring any changes to the Footprint for purposes of Section 4.1(c) of the Lease uses a two-dimensional overhead view of the Improvements within the Land consisting of above ground portions of Lessee's installations of buildings, structures, poured foundations, silos, rail tracks, elevators, conveyors and pavement within the boundary of the Land, and then the Footprint is calculated based on the ground directly covered by such Improvements under such overhead view; provided that in no event shall the Footprint include any unpaved (including areas covered by gravel, chat or sand) areas, even if the same may from time to time be used for vehicular or pedestrian access, parking or otherwise, any areas under wires or lines, or any areas under roof overhangs or similar structural overhangs.

From time to time during the term of the Lease, following any addition of Improvements on the Land by Lessee or any removal of Improvements from the Land by Lessee resulting in an aggregate change to the Footprint of the Improvements on the Land of one acre or more since the last adjustment date (or, with respect to the first such adjustment date, by comparison to 37.66 acres), either Lessor or Lessee may notify the other party at least 30 days prior to the end of any Lease Year and may commission a recalculation of the Footprint net of such addition or removal, as the case may be, such recalculation to be at the cost of the commissioning party, and such recalculation to be performed by an independent civil engineering firm selected by the commissioning party, and licensed in the State of Washington and reasonably approved in advance in writing by the other party. The civil engineering firm so commissioned shall then calculate the Footprint and depict the Footprint on a survey, site plan or other graphical depiction certified to Lessor and Lessee, and provided such recalculation and certification shall have been delivered to Lessor and Lessee prior to the last day of such Lease Year and provided further such certified calculation of the Footprint shall show a net and aggregate increase or decrease in the Footprint of the Improvements on the Land of one acre or more since the last adjustment date (or, with respect to the first such adjustment date, by comparison to 37.66 acres) the provisions under subsection (c) of Section 4.1 shall apply, and in such event Lessor and Lessee shall enter into a written confirmation to this Lease, prepared by the requesting party and reasonably satisfactory to Lessor and Lessee, reflecting the applicable adjustment in Rent.

# EXHIBIT I-4
## INITIAL (ASSUMED) FOOTPRINT OF IMPROVEMENTS
### WITHIN THE LAND



SITE PLAN
TOTAL "FOOTPRINT AREA"
37.66 ACRES
(1,640,282 Sq. Ft.)

Exhibit I-4

# EXHIBIT J

## PORT PROJECTS

Lessor shall complete the following projects:

1.　　Relocation, stockpiling and removal of sand on and from the Demised Premises and adjacent property in order to clear areas required for construction, staging, use and operation of the Lessee Projects, and in order to make sufficient stockpiles available to Lessee for the Lessee Projects (including movement/leveling of sand pile on neighboring property owned by Longview Fibre Paper and Packaging, Inc. to the east in order to provide a maintainable slope/grade at the property boundary adjacent to the planned finished elevation of the Demised Premises), all in accordance with and pursuant to the dredge material grading zones plan prepared by Hagedorn, Inc. dated April 8, 2009 (incorporated by this reference).

2.　　Site clearance providing a clean, buildable (although not "compacted") area, including, demolition, removal and disposal of the existing (as of the date of the Lease) dock structures, debris, asphalt and concrete blocks and above-grade remnants of foundations from all areas necessary for development and construction of the Port Projects and the Lessee Projects and cutting to grade (or just below grade) the concrete timber operations structure on the portion of the land formerly owned by RSG Forest Products, Inc. ("RSG") and the concrete bunker/stormwater retaining system or any similar structures in the area of the land-side of the dike on or about the land formerly owned by RSG.

3.　　Design and construction of in-water structures for the Ship Dock, including in particular all improvements, materials, and specifications outlined in the Ship Dock Design Criteria (incorporated by this reference) described in <u>Exhibit K</u> to the Lease, and including generally the following:

　　　(a)　　Foundation of the Ship Dock and platforms sufficient for the shiploaders to be installed on the Ship Dock; and

　　　(b)　　Ship Dock access trestle, walkways, and dolphins, including fender system, bollards, breasting dolphins, mooring dolphins, piling and piling caps (if any) and steel framing system for the trestle and pilings and piling caps for the shiploader conveyor.

4.　　Design and construction of in-water structures for the Barge Dock, including in particular all improvements, materials, and specifications outlined in the Barge Dock Design Criteria (incorporated by this reference) described in <u>Exhibit K</u> to the Lease, and including generally the following:

　　　(a)　　Foundation of the Barge Dock and platforms sufficient for its use as a barge unloading slip;

　　　(b)　　Foundation for the marine leg to be installed adjacent to the Barge Dock; and

(c)   Barge Dock access trestle, mooring/breasting dolphins and walkways, pilings and piling caps for the barge conveyor, framing system for the marine leg, framing system for the trestle and walkways.

5.   Plugging and/or removing the existing (as of the date of the Lease) 5' drain pipe through the dike in the area between the waterline and the Land and grading the area of the drain pipe to the planned finished elevation of the Demised Premises.

6.   Demolition, removal and/or relocation of existing (as of the date of the Lease) rail trackage for all areas necessary for development and construction of the Lessee Projects, including, without limitation, removing the trackage at the north end of the rail loop, relocating the rail line to the west of the log pond, relocating turnout 3 and reconnecting turnout 3 to the rail line to the west, all in accordance with and pursuant to the plans for rail relocation and indicated as "work by others" in the plans for the Facility prepared by Hagedorn, Inc. dated March 12, 2009 (incorporated by this reference).

7.   Design and construction of entrances to the Demised Premises and Facility through Berth 8, installation of an access road within the Appurtenant Easements connecting the portion of International Way under the jurisdiction of Cowlitz County to the Berth 8 roadway to the west of Warehouse 8 through Berth 8 to Berth 9 (or other connecting road to Berth 9 via a mutually acceptable alternative route), and installation of security fencing (with a manned gate) at a mutually acceptable and federally compliant location in route to Berth 9.  The entrances and other road improvements shall be designed and constructed in conformity with standards promulgated by the American Association of State Highway and Transportation Officials, subject to specifications sufficient to handle Lessee's permitted use of the Facility and with asphalt widths of at least 28 feet with 4 feet gravel shoulders and with road bed depths of at least 8 inches of base rock with 5 inches of asphalt.

8.   Design and construction of steel casing under the rail tracks to encase the 8" water loop line to be constructed by Lessee, in a structurally sound and operationally safe manner, in compliance with all federal, state, and local laws and codes and all railroad regulations and safety standards (including, but not limited to, depth, distance, clearance and use requirements), so as not to adversely impact the stability or structural integrity of the rail tracks, and so as not to interfere with the planned location of the rail tracks or track beds or construction and installation (and stability) of such tracks and beds.  In addition, Lessor will reimburse Lessee for 50% of the costs to construct an 8" water loop line in the water easement area depicted in Exhibit C-5B.

9.   Demolition, removal and/or relocation of existing (as of the date of the Lease) electric and any other utility lines, equipment or facilities for all areas necessary for development and construction of the Lessee Projects, including temporarily providing electrical service to a transformer and relocation of an approximate 400' segment of the electric line underground to the area immediately adjacent to the current eastern boundary of East Mill Road and otherwise as may be acceptable to Lessee in a manner so as to ensure the continuing integrity of the power system.  After construction by Lessee of the Lessee Projects, Lessor shall relocate the overhead portion of the electric line to new poles

approximately 12' east of the current eastern boundary of East Mill Road in such location as to not interfere with the completed Lessee Project, and in a manner so as to ensure the continuing integrity of the power system. Notwithstanding the foregoing, however, the cost of the upgraded conductors and relocation of an approximate 400' segment of the electric line underground shall be borne by Lessee.

10.     Remediation, handling and disposition of the "Stormwater Ditch with Oily Residue" identified as a Recognized Environmental Condition (or REC) in that certain Phase I Environmental Site Assessment Update – Longview Property and New "West Parcels" – Longview, Washington dated March 26, 2009 and prepared by Hart Crowser, Inc. in accordance with applicable regulatory requirements.

The Port Projects, listed above, shall be undertaken and constructed by Lessor in a good and workmanlike manner in accordance with the plans and specifications referenced in or prepared pursuant to other provisions of the Lease (or, if not referenced in or prepared pursuant to other provisions of the Lease, in accordance with plans and specifications subject to the advance written approval of Lessee). Lessor covenants that the Port Projects shall be performed in a manner that shall not interfere with or delay the development or construction of the Lessee Projects (Lessor acknowledging that Lessee and its contractors shall be working at and around the Premises and Lessor agreeing to coordinate with Lessee to the extent reasonable and practical). The Port Projects shall be paid for by Lessor without reimbursement by Lessee (except only as expressly provided in Sections 4.3 and 4.4 of the Lease and in Exhibit K to the Lease) and without obligation of Lessee, and shall be completed by Lessor in accordance with the following construction schedule, subject to extensions by reason of Force Majeure excluding, however, Force Majeuere in the nature of any labor or labor-related strikes, lockouts or other industrial disturbances at the Port:

A.     The sand on the Land or within other areas required for construction, staging, use and operation of the Lessee Projects shall be relocated, stockpiled and/or removed by Lessor in conformity with the schedule and completion dates set forth in the dredge material grading zones plan referenced in paragraph 1 of this Exhibit J.

B.     The existing dock structures and concrete blocks and foundations and concrete structures, referenced in paragraph 2 of this Exhibit J, shall be demolished and removed by Lessor by no later than October 31, 2009.

C.     The Dock Completion shall occur no later than July 31, 2010, by which date all work required to be performed by Lessor with respect to the Ship Dock and the Barge Dock shall be completed and such docks shall have been turned over to Lessee; provided further, however, Lessor covenants that substantial completion of all work with respect to the Ship Dock and the Barge Dock shall occur no later than June 30, 2010.

D.     The existing drain pipe referenced in paragraph 5 of this Exhibit J shall be plugged or removed and the grading of the pipe area completed no later than October 31, 2009.

E.     The existing rail trackage and switches referenced in paragraph 6 of this Exhibit J shall be demolished, removed and/or relocated, as applicable, by Lessor by June 30, 2010.

F.     The entrance and other road improvements and the fence referenced in paragraph 7 of this Exhibit J shall be completed by Lessor by December 31, 2010.

G.     The installation of steel casing referenced in paragraph 8 of this Exhibit J shall be completed by Lessor by June 15, 2009.

H.     The temporary service to the transformer and the relocation of an approximate 400' segment of the electric line underground referenced in paragraph 9 of this Exhibit J shall be completed by June 15, 2009, and otherwise the relocation and/or removal of utilities referenced in paragraph 9 of this Exhibit J shall be completed by Lessor by August 1, 2009.

I.     The remediation, handling and disposition of the REC referenced in paragraph 10 of this Exhibit J shall be completed by Lessor by October 1, 2009.

Lessor shall be liable to Lessee for any and all losses and damages suffered or incurred by Lessee as a result of Lessor's default in completing the Port Projects in accordance with the foregoing construction schedule; in addition, in the event of any delay resulting in extension of Lessor's construction schedule otherwise excused by reason of Force Majeure (but excluding Force Majeuere in the nature of any labor or labor-related strikes, lockouts or other industrial disturbances at the Port, as set forth above), Lessor shall reimburse Lessee for any direct losses or damages suffered or incurred by Lessee as a result of any such delay in completion of the Port Projects on or before the scheduled completion dates referenced in paragraphs B, C, D, E, F, G, H and I above, up to a maximum reimbursement amount of $5,000,000 ("Force Majeure Costs"). As used in this paragraph, "direct losses and damages" mean those out of pocket expenditures payable to third parties which are suffered or incurred by Lessee as an immediate result of any delay in completion of the Port Projects on or before the scheduled completion dates referenced above (by way of example, and without limitation, additional monies due to Lessee's contractor for additional costs, overhead, profit and general conditions as a result of such delay) but shall not include losses or damages incurred by Lessee for rental expenses, for loss of use, income, profit, financing, business and reputation, or for loss of management of employee productivity or of the services of such persons. Lessee shall be entitled to a credit against Rent as reimbursement of Force Majeure Costs and such credit shall be applied by Lessee in equal monthly installments over the first 20 years of the Initial Term of this Lease, and in addition such installments shall include an additional credit against Rent for an interest factor on the unreimbursed balance accruing at the interest rate established from time to time by the Internal Revenue Service pursuant to 26 U.S.C. §483 (as the same may be amended).  Lessee shall provide Lessor a separate written statement itemizing such Force Majeure Costs for which Lessee is claiming a credit against Rent (including applicable interest) with reasonable documentation detailing such Force Majeure Costs, and at the time of application of such a credit against Rent, Lessee shall furnish Lessor with Lessee's computation of the applicable interest.

# EXHIBIT K

## DOCK CONSTRUCTION

### Ship Dock

1.    <u>Ship Dock Construction</u>.  Lessor hereby agrees, at its sole cost (except as expressly provided in Section 4.4 of the Lease and in this <u>Exhibit K</u>), to cause the in-water structures for the Ship Dock to be constructed on the terms and conditions as hereinafter set forth.

2.    <u>Design Completion</u>.  The basic design criteria for the in-water structures for the Ship Dock as agreed upon by Lessor and Lessee are set forth in those certain plans prepared by Berger Abam Engineering Inc. ("Consulting Engineer") and dated July 3, 2008 ("Ship Dock Design Criteria").  Lessor shall cause the Consulting Engineer to submit construction drawings for the full and proper construction of the Ship Dock ("Ship Dock Construction Drawings") to Lessee on or before June 26, 2009.  Such Ship Dock Construction Drawings shall cover and conform to, and shall be based upon and consistent with, the Ship Dock Design Criteria, shall comply with all applicable laws, shall be capable of logical measurement and construction and shall contain all such information as may be required for the construction of the in-water structures for the Ship Dock.

Lessee shall either approve or disapprove the Ship Dock Construction Drawings within 5 business days after receipt of same.  If disapproved, Lessor shall make the changes necessary in order to correct the deficiencies noted by Lessee and shall return the Ship Dock Construction Drawings to Lessee, which Lessee shall approve or disapprove within 5 business days after Lessee receives the revised Ship Dock Construction Drawings.  The date that the Ship Dock Construction Drawings are finally approved by Lessee ("Ship Dock Final Plans") shall be the "Ship Dock Final Plan Approval Date."

3.    <u>Selection of Contractor</u>.  No later than August 31, 2009, Lessor shall enter into a construction contract ("Ship Dock Construction Contract") with a contractor ("Ship Dock Contractor") for the construction of the Ship Dock in accordance with the Ship Dock Final Plans, such Ship Dock Construction Contract and Ship Dock Contractor to be selected by Lessor in accordance with applicable laws and codes relating to public projects, although Lessor agrees to consult with Lessee in advance with respect to the substance and content of the bidding and selection process in order to assure the quality of the Ship Dock construction and in order to integrate the Ship Dock construction with the Lessee Projects.  Once the Ship Dock Construction Contract has been accepted by Lessor, there shall be no modifications to the same or change orders or schedule changes under the same without Lessee's prior written approval, which approval shall not be unreasonably withheld so long as the requested modification, change order or schedule change shall not affect the timing, cost or quality of the Ship Dock construction.

4.    <u>Construction Schedule</u>.  Lessor shall cause the Ship Dock Contractor to commence construction of the in-water structures for the Ship Dock on or before October 1, 2009 (unless Barge Dock construction has commenced by October 1, 2009) and to complete

such construction with respect to the Ship Dock in accordance with the Ship Dock Final Plans ("Ship Dock Completion") as required and by the deadlines established in paragraphs B and C on Exhibit J to the Lease. Lessor shall warranty the in-water structures for the Ship Dock for 10 years from the date of Ship Dock Completion, except for latent defects which shall be the sole responsibility of Lessor for the Term of the Lease.

     5.    <u>Lessee's Share</u>.

     (a)    <u>Amount</u>. All costs to construct the in-water structures for the Ship Dock shall be borne solely by Lessor, provided only that Lessee shall reimburse Lessor $1,240,800 (the "Dock Contribution", which Dock Contribution shall be referred to in this Exhibit K as "Lessee's Share") of the costs to construct the in-water structures for the Ship Dock as set forth in the following subsection.

     (b)    <u>Monthly Payments</u>. On or before the last day of each month during the construction of the in-water structures for the Ship Dock, Lessor shall submit to Lessee an invoice detailing the payment sought by Lessor for costs owing by Lessor under the Ship Dock Construction Contract for labor and materials furnished during the immediately preceding month, as well as proof of payment from Lessor to the Ship Dock Contractor of all amounts then owing or payable under the Ship Dock Construction Contract other than the labor and materials specifically covered by such invoice (including, without limitation, evidence of payment over to the Ship Dock Contractor of amounts paid by Lessee to Lessor during the preceding month, as applicable). The amount of Lessee's monthly payment shall be Lessee's pro-rata portion (i.e., Lessee's Share as a percentage of the total contract price of the Ship Dock Construction Contract) of the lesser of (i) the costs actually owing by Lessor to the Ship Dock Contractor pursuant to the terms of the Ship Dock Construction Contract for the immediately preceding month, or (ii) the product of the percentage completion of the in-water structures for the Ship Dock (as certified by the Consulting Engineer in the Ship Dock Contractor's application for payment submitted to Lessor and confirmed by Lessee) multiplied by the total contract price in the Ship Dock Construction Contract, less any prior payments to the Ship Dock Contractor (such lesser amount, the "Ship Dock Monthly Reimbursement Amount"), provided that after the total of Lessee monthly payments to Lessor equal 90% of Lessee's Share, Lessee shall not thereafter be required to make any further payments until 20 days after the date of Ship Dock Completion; subject in any event, however, to a maximum aggregate amount of such payments limited to Lessee's Share. Along with each monthly invoice, Lessor shall submit to Lessee the Ship Dock Contractor's approved application for payment and along with the final invoice Lessor shall submit to Lessee the Ship Dock Contractor's final approved application for payment and, in any event, along with such other supporting documentation as Lessee may reasonably require. Lessee shall make payment of the Ship Dock Monthly Reimbursement Amount to Lessor within 20 days following each properly submitted invoice, and Lessor shall, concurrently with receipt, pay over the same to the Ship Dock Contractor.

     6.    <u>Ownership</u>. Upon completion of the Ship Dock and payment by Lessee of Lessee's Share as set forth on this <u>Exhibit K</u>, the in-water structures comprising the Ship Dock shall be and remain owned by Lessor, and the above-water structures comprising the Ship Dock, as well as any other Improvements from time to time installed thereon by Lessor, shall constitute

part of the Improvements owned by Lessee, and together such improvements and Improvements shall be referred to as the "Ship Dock" in the Lease, unless expressly stated otherwise or unless the context expressly requires a more limited reading; and the Ship Dock shall be located within the Dock/Berth Access Area in location generally depicted on Exhibit I-2 to the Lease.

Barge Dock

     1.     Barge Dock Construction.  Lessor hereby agrees, with the initial cost to be advanced by Lessor (but subject to reimbursement of such cost by Lessee as expressly provided in this Exhibit K), to cause the in-water structures for the Barge Dock to be constructed on the terms and conditions as hereinafter set forth.

     2.     Design Completion.  The basic design criteria for the in-water structures for the Barge Dock as agreed upon by Lessor and Lessee are set forth in those certain plans prepared by Berger Abam Engineering Inc. ("Consulting Engineer") and dated July 3, 2008 ("Barge Dock Design Criteria").  Lessor shall cause the Consulting Engineer to submit construction drawings for the full and proper construction of the Barge Dock ("Barge Dock Construction Drawings") to Lessee on or before the date of the Lease.  Such Barge Dock Construction Drawings shall cover and conform to, and shall be based upon and consistent with, the Barge Dock Design Criteria, shall comply with all applicable laws, shall be capable of logical measurement and shall construction and contain all such information as may be required for the construction of the in-water structures for the Barge Dock.

     Lessee shall either approve or disapprove the Barge Dock Construction Drawings within 5 business days after receipt of same.  If disapproved, Lessor shall make the changes necessary in order to correct the deficiencies noted by Lessee and shall return the Barge Dock Construction Drawings to Lessee, which Lessee shall approve or disapprove within 5 business days after Lessee receives the revised Barge Dock Construction Drawings.  The date that the Barge Dock Construction Drawings are finally approved by Lessee ("Barge Dock Final Plans") shall be the "Barge Dock Final Plan Approval Date."

     3.     Selection of Contractor.  No later than August 31, 2009, Lessor shall enter into a construction contract ("Barge Dock Construction Contract") with a contractor ("Barge Dock Contractor") for the construction of the Barge Dock in accordance with the Barge Dock Final Plans, such Barge Dock Construction Contract and Barge Dock Contractor to be selected by Lessor in accordance with applicable laws and codes relating to public projects, although Lessor agrees to consult with Lessee in advance with respect to the substance and content of the bidding and selection process in order to assure the quality of the Barge Dock construction and in order to integrate the Barge Dock construction with the Lessee Projects.  Once the Barge Dock Construction Contract has been accepted by Lessor, there shall be no modifications to the same or change orders or schedule changes under the same without Lessee's prior written approval, which approval shall not be unreasonably withheld so long as the requested modification, change order or schedule change shall not affect the timing, cost or quality of the Barge Dock construction.

     4.     Construction Schedule.  Lessor shall cause the Barge Dock Contractor to commence construction of the in-water structures for the Barge Dock on or before October 1,

2009 (unless Ship Dock construction has commenced by October 1, 2009) and to complete such construction with respect to the Barge Dock in accordance with the Barge Dock Final Plans ("Barge Dock Completion") as required and by the deadlines established in paragraphs B and C on Exhibit J to the Lease.  Lessor shall warranty the in-water structures for the Barge Dock for 10 years from the date of Barge Dock Completion, except for latent defects which shall be the sole responsibility of Lessor for the Term of the Lease.

     5.    <u>Lessee's Share</u>.

     (a)    <u>Amount</u>.  All costs to construct the in-water structure for the Barge Dock shall be advanced by Lessor, subject to Lessee's obligation to reimburse Lessor the actually and necessarily incurred costs to construct the in-water structures for the Barge Dock as set forth in subsection (b) of this Section 5 and subject to credit against such obligations as set forth in subsection (c) of this Section 5.

     (b)    <u>Monthly Payments</u>.  On or before the last day of each month during the construction of the in-water structures for the Barge Dock, Lessor shall submit to Lessee an invoice detailing the payment sought by Lessor for costs owing by Lessor under the Barge Dock Construction Contract for labor and materials furnished during the immediately preceding month, as well as proof of payment from Lessor to the Barge Dock Contractor of all amounts then owing or payable under the Barge Dock Construction Contract other than the labor and materials specifically covered by such invoice (including, without limitation, evidence of payment over to the Barge Dock Contractor of amounts paid by Lessee to Lessor during the preceding month, as applicable).  The amount of such monthly payment shall be the amounts actually owing by Lessor to the Barge Dock Contractor pursuant to the terms of the Barge Dock Construction Contract for the immediately preceding month (the "Barge Dock Monthly Reimbursement Amount").  Along with each invoice, Lessor shall submit to Lessee the Barge Dock Contractor's approved application for payment and such other supporting documentation as Lessee may reasonably require.  Lessee shall make payment of the Barge Dock Monthly Reimbursement Amount to Lessor within 20 days following each properly submitted invoice, and Lessor shall, concurrently with receipt, pay over the same to the Barge Dock Contractor.

     (c)    <u>Advance</u>.  Prior to the date hereof, Lessee has advanced Lessor the sum of $459,852 in respect of payment of costs for the Barge Dock, and such sum shall be applied by Lessor as a credit against all obligations of Lessee for the Barge Dock Monthly Reimbursement Amounts until such $459,852 credit shall have been fully applied for Lessee's benefit.

     6.    <u>Ownership</u>.  Upon completion of the Barge Dock and payment by Lessee for the costs of the same as set forth in this <u>Exhibit K</u>, the in-water structures and the above-water structures comprising the Barge Dock, as well as any other Improvements from time to time installed thereon by Lessee, shall constitute part of the Improvements owned by Lessee, and together such Improvements shall be referred to as the "Barge Dock" in the Lease, unless expressly stated otherwise or unless the context expressly requires a more limited reading; and the Barge Dock shall be located within the Dock/Berth Access Area initially in the location generally depicted on <u>Exhibit I-2</u> to the Lease.

ADDENDUM

FORM OF ACKNOWLEDGMENT OF COMMENCEMENT
DATE, COMPLETION DATE AND INITIAL TERM

Re:    Lease between Port of Longview ("Lessor") and EGT Development, LLC ("Lessee"), for premises at the Port of Longview, County of Cowlitz, State of Washington (the "Premises") dated June 1, 2009 (the "Lease")

Lessor and Lessee acknowledge and confirm as follows::

1.    The Commencement Date under Section 3.1 of the Lease is _____, 2009.

2.    The Completion Date under Section 7.1 of the Lease is _____, 20___.

3.    The Initial Term under Section 3.1 of the Lease commenced on _____, 20___, and ends on _____, 20___.

In Witness Whereof, Lessor and Lessee caused this Acknowledgment to be executed this _____ day of _____, 20___.

LESSOR

PORT OF LONGVIEW

By:_____
    Name:_____
    Title:_____

LESSEE

EGT DEVELOPMENT, LLC

By:_____
    Name:_____
    Title:_____

3053672