HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| EGT, LLC, a Delaware Limited Liability Company,<br><br>                          Plaintiff,<br><br>    v.<br><br>PORT OF LONGVIEW, a municipal corporation and political subdivision of the State of Washington,<br><br>                         Defendant. | No. 11-cv-05036-RBL<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT<br>[Dkt. #s 27 & 42] |

THIS MATTER is before the Court on Defendant Port of Longview's Motion for Partial Summary Judgment [Dkt. #27] and Plaintiff EGT's Motion for Summary Judgment [Dkt. #42]. EGT and the Port are parties to a long term Lease, under which EGT constructed (and has now begun operating) a grain terminal facility on land owned by the Port. At issue are the parties' competing interpretations of a Lease provision they and their capable lawyers and representatives spent three years negotiating.

The Port seeks a ruling as a matter of law that the executed Lease reflects the parties' agreement to defer to the "Working Agreement" then in place between the Port and the ILWU for the extent to which union labor is required in connection with EGT's operations at the Port. The Port freely concedes that EGT argued throughout the negotiations that the working Agreement did not apply to it as Lessee, and that even if it did, it would be illegal for EGT to

ORDER - 1

agree in advance to use Local 21 union labor in its operations. It claims that the Lease reflects the parties' desire to reach an agreement, while preserving EGT's arguments about the applicability and the legality of the Working Agreement for later resolution.

EGT argues that while that issue was discussed and negotiated at length – and indeed, almost derailed the Lease negotiations altogether – it could not and did not ever agree to be bound by the terms of the Working Agreement. It seeks a ruling as a matter of law that the Lease does not incorporate by reference the Working Agreement, and that it therefore does not obligate EGT to use ILWU labor in its operations, even if the Working Agreement can be read to impose on the Port an obligation to use ILWU labor in grain terminal operations conducted on Port property. EGT claims that the Port bears the burden of establishing clearly and unequivocally that the parties intended to incorporate the subject provision of the Working Agreement into the Lease, and that the language used in the Lease cannot meet this burden.

For the Reasons set forth below, the Port Motion for Partial Summary Judgment is GRANTED and EGT's Motion for Summary Judgment is DENIED.

**FACTS**

Long before[1] EGT and the Port began their negotiations, the Port and the ILWU entered into a "Working Agreement" regarding the use of union longshore labor to handle cargo on Port of Longview property. The working agreement is attached to the Declaration of Ken O'Hollaren at Ex. F [Dkt. #28]. The operative language is contained in Section XI, which purports to require the Port to use longshore labor for cargo handling operations on Port Property:

---

[1] The Working Agreement was first executed in 1999. With revisions, it has been in effect continuously since that time.

ORDER - 2

**SECTION XI.  Jurisdiction and Definition of Work Covered**

    Longshore, warehouse and dock work is defined as handling of cargo on the dock or in warehouses, cars, scows or trucks and shall include such work as the hauling of cargo from ship's gear to last place of rest and vice versa; the piling and stacking and the unpiling and unstacking of cargo on Port property, the boarding and unboarding of cargo; the coopering and recoopering of cargo; the cleaning of cars and barges before and after the loading of cargo; the loading, unloading or tomming of railroad cars, trucks, or any other vehicles or container when used to transport cargo; the loading and unloading of barges or other vessels when done by the employer; the tie-up and let-go of ships; the dumping of logs; the piling of logs or other materials on the dock or from the dock into the water; the sorting and bracing of cargo and other work incidental to the movement of cargo; construction and repair of containers, pallet boards and cargo boards on Port property.  The handling of cargo shall include the operation and maintenance of all machines used in the working of cargo such as lift jitneys, log stackers, tractors, trucks, scoopmobiles, bulldozers and any other machinery used to work cargo.  Cargo shall include all materials of any nature arriving at or departing from The Port of Longview (except as follows:  Material bought for construction or maintenance of the Port of Longview).  Property of the Port of Longview shall include all property presently owned, all future acquisitions of the Port and/or property under the control of the employer by lease or agreement insofar as work performed thereon is assigned to longshoremen under the Pacific Coast  Longshore Contract document and this Working Agreement between the Port of Longview and ILWU Local 231.

It is recognized that this shall not include property leased, rented, assigned or licensed to third parties under the powers granted to port districts by statutes of Washington State Law.

The Port of Longview agrees not to lease property for the sole purpose of performing the work described in the Working Agreement between the Port and ILWU Local 21, Section XI.  Definition of Work Covered, unless the lessee is bound by this Agreement.

[See O'Hollaren Dec., Dkt. #28, at Ex. F][2].

The Port informed EGT (and Bunge North America, one of EGT's members and the first entity the Port dealt with regarding  the potential lease) of the existence of the Working Agreement and of its belief that it required the use of union longshore labor on Port Property

---

[2]  This language may be less than clear, but neither party asks the Court to interpret or construe this agreement in the Motions before the Court.

ORDER - 3

early on in the negotiations.  The parties' March 16, 2007 draft "Memorandum of Understanding" (MOU) included the following provision, inserted by EGT:

> Discussions with ILWU.  EGT acknowledges that the Port has informed EGT that the Port will not execute a lease relating to the facility until EGT has met and conferred with [the ILWU] regarding the ILWU's claimed jurisdiction with respect to the representation of employees at the facility.

[*See* O'Hollaren Dec., Dkt. #28, at Ex. C]

On March 28, 2007, O'Halloren faxed the Working Agreement to EGT's Scott White, under a cover message reflecting and conveying the Port's understanding that it required the use of longshoremen to do traditional longshore work on Port Property :

> The significant point of agreement between the parties though is that the leasing of property by the port for the sole purpose of performing traditional longshore work requires the consent of the Local, if it is to be performed by a work force other than longshoremen.

[*See* O'Hollaren Dec., Dkt. #28, at Ex. E]

Over the next two years, the parties continued[3] to negotiate the lease terms.  Their negotiations are well-documented in the record.  Between the Moore declaration [Dkt. # 43 and its Exhibits (the Deposition of Ken O'Halloren and its Exhibits)] and the O'Halloren Declarations and Exhibits [Dkt. #s 28 & 49], it appears that the vast bulk of the parties' communications and the drafts they exchanged are before the Court. Without reciting all of these efforts, it is fair to say that the Working Agreement played a prominent role.  The parties negotiated and argued over whether it applied to the leased property, and if so, to what extent. EGT articulated its position that it would be illegal under the NLRA to agree in advance to use Local 21 labor on any part of its facility.  The Port made clear its position that it and the ILWU believed that the Working Agreement did apply to the EGT facility.

---

[3]  The negotiations stalled for a while when the amount of property available for lease and development changed.  It is apparent that while the labor matters issue was a large one, it was not alone responsible for the length of the negotiations.

ORDER - 4

It is worth noting that while the parties argue that the court's inquiry should "begin and end" with the "actual language" of the Lease that was ultimately executed [*See*, for example, EGT's Motion, Dkt. #42 at p 1; *see also* Port's Response, Dkt. # 48, at p. 1], each spends the bulk of its well written and persuasive materials arguing that the history of the negotiations supports its proposed interpretation of the actual language used.  Indeed, EGT's Motion does not even quote the actual language until page 12, and even then its quote is a "red line" version, emphasizing the language that was deleted.

In any event, the parties agreed upon (or at least signed) a final written Lease on June 1, 2009.  The final, executed version of the Lease contains the following "Warranty of Labor" provision, which both parties claim speaks for itself:

> [6.3] Lessor [the Port] warrants that there are no agreements or restrictions affecting the Port, whether Lessor is a party to the same or otherwise, requiring union labor or prevailing wage compliance (a) in connection with the construction of the Lessee Projects or other Improvements on or about the Premises, or (b) except only as expressly set forth on *Exhibit G-2* hereto, in connection with the operation of the Ship Dock and the Barge Dock, the handling of cargo at the Facility and the operation of the Facility.

[*See* Moore Decl., Dkt. #16, at Exhibit A, §6.3].

The Lease includes Exhibit G, which is entitled "DISCLOSURES" and is incorporated into the lease in what both parties would agree is clear language:

> Exhibit G, setting forth disclosures with respect to environmental matters and labor matters, is comprised of the following Exhibits, which are attached hereto and incorporated herein by this reference and made a part hereof (and incorporated into and made a part of the Lease):
>
> Exhibit G-1    Environmental Matters
> Exhibit G-2    Labor Matters

Exhibit G-2, in turn, provides:

> Lessor expressly refers Lessee to the provisions of the Working Agreement between the ILWU Local 21 and the Port, dated 1999-2002, as extended through the date of this Lease, for Longview, Washington.

ORDER - 5

After the Lease was executed, EGT sought to reach agreement with the ILWU Local 21 about performing work at its facility. Those negotiations failed, for reasons that are not particularly relevant to this dispute. This lawsuit and these Motions followed.

**DISCUSSION**

**A. Summary Judgment Standard.**

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**B. Contract Interpretation Under Washington Law.**

Washington law on the interpretation of a contract is well-settled and familiar, though it varies to some extent from the law in other states, in that it employs the "context rule" of *Berg v. Hudesman*, 115 Wn.2d 657 (1990). Nevertheless, and despite EGT's suggestions to the contrary, the Court's primary purpose is to ascertain and give effect to the parties' intent. The following propositions are taken from a case cited repeatedly in the briefing, *W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc*., 103 Wn. App. 488, 7 P.3d 861 at 865-866 (Div. 2 2008).

A court's purpose in interpreting a contract is to ascertain the parties' intent. Washington courts use the "context rule" of interpretation. Under this rule, extrinsic evidence may be admissible to give meaning to the contract language. Extrinsic evidence illuminates what was written, not what was intended to be written. Thus, we determine intent "not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." Extrinsic evidence may be used whether or not the contract language is ambiguous. But such evidence may not be used (1) to establish a party's unilateral or subjective intent as to the meaning of a contract word or term; (2) to show an intention independent of the instrument; or (3) to vary, contradict, or modify the written word. When extrinsic evidence is used to interpret a contract, summary judgment is appropriate only if one reasonable inference can be drawn from the extrinsic evidence. (Internal citations omitted).

### C. The Court cannot determine as a matter of law that the Lease imposes no obligations on EGT regarding the Working Agreement.

EGT's Motion argues that the Court's inquiry should begin and end with the actual language of the Lease, though it focuses on what is not there rather than what is. It emphasizes its position that the Lease does not contain any language expressly incorporating the Working Agreement by reference, or otherwise indicating that EGT agreed to be bound by the Working Agreement. It claims that the burden is on the Port to show clearly and unequivocally that the parties intended to incorporate the Working Agreement, and that the Port cannot meet that burden as a matter of law.

As an initial matter, it is not the Port's position that EGT has already agreed to be bound by the Working Agreement. It argues instead that, in light of the parties' impasse on the topic, they agreed to preserve EGT's argument about the applicability of the Working Agreement to the facility it was constructing (a separate contract interpretation issue), and its argument that so agreeing would be illegal under the NLRA. To this extent, the parties' respective Motions do not

ORDER - 7

really address the same issue.  Nevertheless, EGT does seek a ruling as a matter of law that it has no obligations whatsoever under the Working Agreement.

EGT argues primarily that the Port has the burden of showing clearly and unequivocally that it agreed to incorporate by reference the term of the Working Agreement requiring ILWU jurisdiction over longshore work on the lease property.  It relies largely on *Seventh Day Adventists*, *supra*.

There, the court explained that the incorporation must be clear and unequivocal.  It did not hold, as EGT seems to suggest, that the burden of proof is clear and convincing:

> Incorporation by reference allows the parties to incorporate contractual terms by reference to a separate agreement to which they are not parties. But incorporation by reference is ineffective to accomplish its intended purpose where the provisions to which reference is made do not have a reasonably clear and ascertainable meaning. Incorporation by reference must be clear and unequivocal.  It must be clear that the parties to the agreement had *knowledge of* and *assented to* the incorporated terms.

*Seventh Day Adventists*, 7 P.3d at 865 (emphasis added; internal citations omitted).  *See also Northrup Grumman Information Tech, Inc. v. U.S.*, 535 F.3d 1339, 1345 (Fed. Cir. 2008)("[T]he incorporating contract must use language that is *express* and *clear,* so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract.")

Despite EGT's reliance on it, the facts and holding in *Seventh Day Adventists* are not especially helpful to EGT.  There, the Church hired a subcontractor to install a furnace.  In the "trade contract," the subcontractor agreed "to perform the Work in accordance with the Project Contract Documents."  The project's mechanical specifications were also provided, which provided that "Related Documents" included the Division I of the Specifications Sections.  Division I, in turn, expressly incorporated AIA Form A201, which includes a waiver of subrogation rights among the owner, architect, contractor and subcontractors.

ORDER - 8

When a fire destroyed the Church building, the Church's insurer sued the subcontractor, seeking subrogation for the loss it had paid. The subcontractor asserted the waiver of subrogation provision of Form A201. The issue was whether the parties had intended to incorporate that provision into the trade contract. Despite the absence of "express incorporation by reference" language at each step of the references, the court held that Form A201 was clearly and unequivocally incorporated into the trade contract. It did so despite the fact the Form was not provided or attached to the contract, and even though it was not clear that the parties had discussed the waiver of subrogation provision at all.

Other cases similarly establish that contracting parties can incorporate external documents by reference without using that precise language. *See Santos v. Sinclair*, 884 P.2d 941, 943 (Wn. App. Div. 2 1994)(reference to legal description sufficient to incorporate easement therein into title insurance policy); *Turner v. Wexler*, 14 Wn. App. 143, 148 (1975)("Where a writing refers to a separate agreement, an agreement or so much of it as referred to should be considered as part of the writing."). *Compare Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817 (Fed. Cir. 2010), which unremarkably held that the parties did not intend to incorporate by reference the entire Endangered Species Act by the following reference to it in their timber sales contract:

> Location of areas needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act of 1973 and R-3 Sensitive Plant and Animal Species List are shown on Sale Area Map and identified on the ground.

*Id*. at 826.

Here, the parties were acutely aware of the Working Agreement, and of the Port's (and the ILWU's) belief that it established union longshore jurisdiction over the property to be leased – both on the docks and on the land side of the facility. The Working Agreement is clearly identified and referenced in Exhibit G-2, which in turn is incorporated into Exhibit G, which in

turn is incorporated by reference into the lease by Section 29.1, and is referenced in Section 6.3. [*See* Moore Decl., Dkt. #16, at Exhibit A].

EGT's argument that the parties did not intend to incorporate the Working Agreement for any purpose (or that they did so only for the limited, unilateral purpose of the Port's warranty of labor) is not supportable against this legal backdrop, and makes no sense in the factual context of the Lease's purpose, the negotiations leading up to it, and the words used in the final version.

To read the Lease as EGT advocates, the Court would have to conclude that, at the last minute, the Port "threw in the towel" on its position that the Working Agreement required it to pass on to its Lessee the obligation to use Local 21 labor; that it decided to breach one agreement in order to reach another. There is no evidence supporting the conclusion that the Port did so. EGT's claim that the Court can or should read only the words on the page – and ignore the "nonsense" about what the Port intended or believed with respect to the Labor Matters provision – is not supportable. To the extent EGT's Motion for Summary Judgment [Dkt. # 42] seeks a ruling as a matter of law that the Working Agreement imposes no obligations on it whatsoever, it is DENIED.

It is also clear, however, that EGT did not abandon (and did not intend to abandon) its position that the Working Agreement does not by its terms apply to some or all of the leased property, and its claim that it would be illegal for it to agree to use ILWU labor prior to hiring any employees. Thus, to the extent EGT seeks a ruling that it did not waive or abandon those arguments, it is correct. The purpose for which the parties agreed to refer, and defer, to the Working Agreement is discussed in connection with the Port's Motion, below.

**D. The Parties agreed to defer to the Working Agreement to resolve questions as to its applicability and legality.**

The Port's Motion for Partial Summary Judgment is not the opposite of EGT's; it does not seek a ruling as a matter of law that EGT *is* obligated by the Lease and the Working Agreement to employ union longshore labor at its facility. Instead, the Port seeks a ruling as a matter of law that the final Lease reflects the parties' mutual intent that, faced with an impasse

on their positions on the Working Agreement's applicability and legality, they agreed to defer to that Agreement to resolve those issues, if and to the extent it became necessary to do so.

The court's task is to determine the parties' intent "not only from the actual language of the agreement, but also from 'viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *See Berg, supra*.

As is discussed above, the parties' purpose in referencing the Lease is ascertainable, both from the language and from the context: The parties agreed to defer to the Working Agreement to determine outstanding issues as to its applicability to the EGT facility, and the legality of any interpretation that would require it to do so. As the Port argues, this is the only reasonable reading of the Lease, in the context of its subject matter and the history of its negotiations. For this reason, the Port's Motion for Partial Summary Judgment [Dkt. # 27] is GRANTED.

* * *

It is the Court's tentative conclusion that the "legality" issue should be referred to a labor arbitrator for resolution, and that the Working Agreement's applicability is a question of law for this Court. If and to the extent the parties wish to weigh in on this proposal, or on how it should be logistically accomplished, they should file short (ten pages) Briefs on these issues by October 17.

**IT IS SO ORDERED.**

Dated this 7th day of October, 2011.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE